Hilary Rosenthal (CA Bar No. 332384)
hrosenthal@sanfordheisler.com
Cara Van Dorn (CA Bar No. 321669)
cvandorn@sanfordheisler.com
SANFORD HEISLER SHARP MCKNIGHT, LLP
7911 Herschel Avenue, Suite 300
La Jolla, CA 92037
Telephone: (619) 821-3337
Facsimile: (619) 577-4250

*Attorneys for Plaintiffs*

*[Additional counsel listed on next page]*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

TWENTY CADETS: KENDALL ANDERSON, CHRISTOPHER CHODKOWSKI, DE'ANDRE CLARK, ANDREW FOGEL, LUDGY GERMAIN, DISNEY-SEAN GRANNELL, JUAN HERNANDEZ, JAMAAL JOHNSON, KRYSTALL JONES, ADAM KHAN, ASHLEY KUMAR, FAITH LITTLE, HONNAH LUSBY, SAMIRA MCGOWAN, KETSIA MIANDA, THIAGO ORTEGA, IVANA PAGE, ANDREW PEARSON, TRISTON SANDERSON, and MATHIAS THELUS, individually,

Plaintiffs,

v.

AMERICAN AIRLINES, INC., AMERICAN AIRLINES GROUP, INC., and COAST FLIGHT TRAINING AND MANAGEMENT, INC.,

Defendants.

Case No.: 3:25-cv-03609-BAS

**FIRST AMENDED COMPLAINT**

DEMAND FOR JURY TRIAL

*[continued from previous page]*

Saba Bireda (DC Bar No. 888229591, admitted *pro hac vice*)
sbireda@sanfordheisler.com
Christine Dunn (DC Bar No. 468401, admitted *pro hac vice*)
cdunn@sanfordheisler.com
SANFORD HEISLER SHARP MCKNIGHT, LLP
700 Pennsylvania Ave. SE, Suite 300
Washington, DC 20003
Telephone: (202) 499-5209
Facsimile: (202) 499-5199

Carolin Guentert (NY Bar No. 5354519, admitted *pro hac vice*)
cguentert@sanfordheisler.com
SANFORD HEISLER SHARP MCKNIGHT, LLP
17 State Street, Suite 3700
New York, NY 10004
Telephone: (646) 768-7058
Facsimile: (202) 499-5199

Michael Lockman (TN Bar No. 039797, admitted *pro hac vice*)
mlockman@sanfordheisler.com
SANFORD HEISLER SHARP MCKNIGHT, LLP
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 442-6886
Facsimile: (615) 434-7020

Plaintiffs Kendall Anderson, Christopher Chodkowski, De'Andre Clark, Andrew Fogel, Ludgy Germain, Disney-Sean Grannell, Juan Hernandez, Jamaal Johnson, Krystall Jones, Adam Khan, Ashley Kumar, Faith Little, Honnah Lusby, Samira McGowan, Ketsia Mianda, Thiago Ortega, Ivana Page, Andrew Pearson, Triston Sanderson, and Mathias Thelus ("Plaintiffs" or "Cadets") are non-white individuals induced to enroll in a flight school through false promises of prime opportunities that were not actually available and never came. Additionally, Defendants unlawfully targeted and discriminated against Plaintiffs on the basis of race. Plaintiffs therefore bring this action for damages, injunctive relief, and declaratory relief against Defendants American

Airlines, Inc., American Airlines Group, Inc. (collectively, "American") and Coast Flight Training ("Coast") (American and Coast collectively referred to as "Defendants") pursuant to the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*; the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq*.; the Texas Deceptive Trade Practices Act ("DTPA"), Tex. Bus. & Com. Code § 17.01 *et seq.*; the California Unruh Civil Rights Act ("Unruh Civil Rights Act"), Cal. Civ. Code § 51 *et seq.*; the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*; Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981; and Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d. Plaintiffs also bring claims of fraud and breach of contract and the implied covenant of good faith and fair dealing under California and Texas common law. Plaintiffs allege as follows:

## I. INTRODUCTION

1. In 2018, American Airlines—the world's largest airline—announced a new initiative that it claimed would "change the airline industry and provide aspiring pilots with a life changing opportunity."[1] American launched the American Airlines Cadet Academy ("AACA" or "Cadet Academy"), purportedly a "first-of-its-kind" flight training program designed to provide aspiring pilots with the training, financing, and mentoring needed to become commercial airline pilots. *Id.*

2. American promised potential cadets the opportunity to interview and receive a conditional job offer with the airline's regional carriers upon completion of the AACA. The AACA website advertised "Income potential in 12 months" and a "Curated career

[1] *American Airlines Announces New Program to Recruit Next Generation of Pilots with Launch of Cadet Academy*, AMERICAN AIRLINES NEWSROOM (Apr. 24, 2018), https://news.aa.com/news/news-details/2018/American-Airlines-Announces-New-Program-to-Recruit-Next-Generation-of-Pilots-With-Launch-of-Cadet-Academy/.

track to American" with "No prior training required."[2] American suggested that those who completed the AACA would be on the road to making "$135 – $235K+" as a flight captain.[3] The fact that the pilot training—which usually takes years—was expedited made the AACA especially attractive to prospective cadets.

3. American partnered with several flight schools, including Coast, to provide flight training to AACA cadets. Coast offered training at locations in San Diego, California, San Marcos, Texas, and Dallas, Texas.

4. The Plaintiffs, non-white former AACA cadets, applied for and enrolled at the AACA to pursue the life-changing opportunity that American promised. However, they found that, instead of offering a pathway to a prestigious career as a pilot, the AACA barely resembled the comprehensive, state-of-the-art, 12-month program advertised on American's and Coast's slick websites and brochures.

5. To attract potential cadets like the Plaintiffs, Defendants unleashed a fraudulent, deceptive, and discriminatory campaign that deliberately targeted people of color—who are historically and presently disproportionately underrepresented in the aviation field.

6. Defendants made false and misleading statements to Plaintiffs and the public about the AACA, including but not limited to, misrepresentations about the rate of program completion, the length of time required to complete the AACA, the cost of the AACA (allegedly capped at $110,000, and later $120,000, for all costs associated with the program), the frequency of flight training opportunities, the availability of American pilot mentors to guide cadets through the program, and the sufficiency of training resources at the AACA at Coast.

---

[2] Internet Archive Wayback Machine, AMERICAN AIRLINES CADET ACADEMY, https://web.archive.org/web/20230313082034/https://aacadetacademy.com/ (captured Mar. 13, 2023).

[3] Internet Archive Wayback Machine, *Pilot Journey*, AMERICAN AIRLINES CADET ACADEMY, https://web.archive.org/web/20230131170526/https://aacadetacademy.com/pilot-journey/ (captured Jan. 31, 2023).

7. In reliance on these representations, each Plaintiff took out a large loan—either from the American Airlines Federal Credit Union ("AAFCU") or another private lender—ranging from $52,000 to $126,000 to fund their training at the AACA at Coast. Plaintiffs left steady employment and other opportunities to train at the AACA. All Plaintiffs relocated to be closer to an AACA location, incurring significant moving expenses.

8. The reality at the AACA bore little resemblance to Defendants' representations and what Plaintiffs thought that they had signed up for. In reality, completing the program required a significantly longer commitment than the 12 months promised by Defendants at a significantly greater cost than the amount advertised. Each Plaintiff spent substantially more time and money on the program than promised by Defendants or would have had to do so in order to complete it. This was in part because the program did not have the advertised resources, facilities, and staff. During the program, each Plaintiff was able to train and fly much less than the advertised five to six days per week. Contrary to Defendants' promises, only five of the twenty Plaintiffs received a mentor within the first three months of starting the program, and nine never received a mentor at all. Plaintiffs' training was hampered by high turnover and inconsistency among instructors and too few functional aircraft for all cadets to train consistently.

9. Defendants did not conduct their predatory and fraudulent scheme on an equal opportunity basis. Instead, Defendants engaged in racial discrimination by intentionally targeting and preying on non-white students seeking to break into a white-dominated industry.

10. American engaged in "reverse redlining" by directing its advertising and marketing activities to non-whites. American explicitly touted the diversification of the pilot corps as the goal of the AACA. Its website and print materials prominently featured non-white pilots and aspiring pilots to lure minority candidates.

11. Defendants' discriminatory targeting of non-white students was successful. Plaintiffs estimate that about 50% of the AACA cadets in their cohorts (people who started at the same time) were people of color. The disparity between non-white representation in the aviation field and the overrepresentation of non-whites at the AACA indicates that Defendants purposefully and intentionally marketed the AACA to people of color.

12. Defendants' efforts to develop and train a new diverse generation of pilots would be commendable if the AACA were what it claimed to be—a high-quality, accelerated, cost-saving program in which people with little or no aviation experience could become licensed commercial pilots in one year. Instead, Defendants targeted people of color for participation in a substandard program that Defendants knew they had almost no chance of completing.

13. To add insult to injury, Defendants not only conned Plaintiffs into enrolling in the AACA but then also subjected them to blatant race discrimination and a hostile environment. Defendants committed and perpetuated a pattern and practice of systemic race discrimination at the AACA including disparate treatment regarding, *inter alia*: (1) scheduling; (2) instructor assignment; (3) grading/evaluation; (4) mentorship; (5) placement and treatment in the remedial program; and (6) forced withdrawals and terminations from the Cadet Academy. Defendants also fostered a pervasively racist, hostile environment at the AACA.

14. After deliberately drawing in cadet classes with high numbers of people of color, Coast allowed its majority white instructors and staff to operate a program that was overtly biased and hostile towards non-white students. Coast instructors made racially derogatory statements about non-white students. For example, an instructor called a Black Plaintiff "ghetto," another instructor called one Black Plaintiff's brown skin "dirty" and her fingernails "ghetto," and another instructor told a Black Plaintiff that he had a "tiny brain" and excoriated him in front of his peers by telling him to "shut the fuck up." Defendants knew about this racially hostile conduct and did nothing to address it.

15. The systemic racism, bias, and hostile environment delayed Plaintiffs' training even further, and made it impossible for them to succeed in the AACA—so much so that, upon information and belief, non-white cadets at the AACA were over three times more likely to be removed or forced to resign from the AACA than white cadets. Defendants terminated sixteen Plaintiffs from the AACA for pretextual reasons and forced four Plaintiffs to resign in the face of continued, unrelenting discrimination.

16. Plaintiffs enrolled in the AACA at Coast to pursue their dreams of becoming fully licensed commercial pilots for the world's largest airline. Instead of being a vehicle to diversify the pilot profession, the AACA proved to be a nightmare where Plaintiffs, like other non-white cadets, experienced overt race discrimination and constant unfulfilled promises.

## II. THE PARTIES

### A. PLAINTIFFS

17. Plaintiff Kendall Anderson is a resident of Dallas, Texas. Prior to attending the AACA, Plaintiff Anderson lived in San Diego, California. In reliance on Defendants' misrepresentations, she attended the AACA at Coast in San Diego, where she lived until April 2024. Defendants removed Plaintiff Anderson from the AACA in March 2023.

18. Plaintiff Christopher Chodkowski is a resident of Battlefield, Missouri. Prior to attending the AACA, Plaintiff Chodkowski lived in Battlefield, Missouri. In reliance on Defendants' misrepresentations, he moved to San Marcos, Texas to attend the AACA at Coast, where he lived from September 2022 to December 2023. Defendants removed Plaintiff Chodkowski from the AACA in February 2024.

19. Plaintiff De'Andre Clark is a resident of Dallas, Texas. Prior to attending the AACA, Plaintiff Clark lived in Hayward, California. In reliance on Defendants' misrepresentations, he moved to Dallas, Texas to attend the AACA at Coast, where he has lived since September 2022. Plaintiff Clark was forced to resign from the AACA in August 2023.

20. Plaintiff Andrew Fogel is a resident of San Diego, California. Prior to attending the AACA, Plaintiff Fogel was a California resident living in Israel. In reliance on Defendants' misrepresentations, he moved to San Diego, California to attend the AACA at Coast, where he has lived since December 2021. Plaintiff Fogel was forced to resign from the AACA in October 2023.

21. Plaintiff Ludgy Germain is a resident of Port St. Lucie, Florida. Prior to attending the AACA, Plaintiff Germain lived in Port St. Lucie, Florida. In reliance on Defendants' misrepresentations, he moved to San Marcos, Texas to attend the AACA at Coast, where he lived from September 2022 to December 2023. Defendants removed Plaintiff Germain from the AACA in January 2024.

22. Plaintiff Disney-Sean Grannell is a resident of Olive Branch, Mississippi. Prior to attending the AACA, Plaintiff Grannell lived in Philadelphia, Pennsylvania. In reliance on Defendants' misrepresentations, he moved to Dallas, Texas to attend the AACA at Coast, where he lived from July 2022 to June 2023. Defendants removed Plaintiff Grannell from the AACA in June 2023.

23. Plaintiff Juan Hernandez is a resident of Moreno Valley, California. Prior to attending the AACA, Plaintiff Hernandez lived in Moreno Valley, California. In reliance on Defendants' misrepresentations, he moved to San Diego, California to attend the AACA at Coast, where he lived from February 2023 to July 2024. Defendants removed Plaintiff Hernandez from the AACA in November 2023.

24. Plaintiff Jamaal Johnson is a resident of Dallas, Texas. Prior to attending the AACA, Plaintiff Johnson lived in Chicago, Illinois. In reliance on Defendants' misrepresentations, he moved to Dallas, Texas to attend the AACA at Coast, where he has lived since September 2022. Plaintiff Johnson was forced to resign from the AACA in July 2023.

25. Plaintiff Krystall Jones is a resident of Detroit, Michigan. Prior to attending the AACA, Plaintiff Jones lived in Columbia, South Carolina. In reliance on Defendants' misrepresentations, she moved to San Marcos, Texas to attend the AACA at Coast, where

she lived from September 2022 to June 2023. Defendants removed Plaintiff Jones from the AACA in June 2023.

26. Plaintiff Adam Khan is a resident of California, currently living in New York City, New York. Prior to attending the AACA, Plaintiff Khan lived in New York City, New York. In reliance on Defendants' misrepresentations, he moved to San Diego, California to attend the AACA at Coast, where he lived from June to October 2023. Defendants removed Plaintiff Khan from the AACA in September 2023.

27. Plaintiff Ashley Kumar is a resident of Dallas, Texas. Prior to attending the AACA, Plaintiff Kumar lived in Marion, Ohio. In reliance on Defendants' misrepresentations, she moved to San Diego, California to attend the AACA at Coast, where she lived from June 2021 to July 2023. Defendants removed Plaintiff Kumar from the AACA in May 2023.

28. Plaintiff Faith Little is a resident of New York City, New York. Prior to attending the AACA, Plaintiff Little lived in Chicago, Illinois. In reliance on Defendants' misrepresentations, she moved to San Diego, California to attend the AACA at Coast, where she lived from September 2021 to November 2023. Plaintiff Little was forced to resign from the AACA in February 2023.

29. Plaintiff Honnah Lusby is a resident of San Marcos, Texas. Prior to attending the AACA, Plaintiff Lusby lived in Davidsonville, Maryland. In reliance on Defendants' misrepresentations, she moved to San Marcos, Texas to attend the AACA at Coast, where she has lived since October 2022. Defendants removed Plaintiff Lusby from the AACA in July 2023.

30. Plaintiff Samira McGowan is a resident of San Diego, California. Prior to deciding to attend the AACA, Plaintiff McGowan lived in Dallas, Texas. In reliance on Defendants' misrepresentations, she moved to San Diego, California to attend the AACA at Coast, where she has lived since August 2022. Defendants removed Plaintiff McGowan from the AACA in October 2023.

31. Plaintiff Ketsia Mianda is a resident of Houston, Texas. Prior to attending the AACA, Plaintiff Mianda lived in Charlotte, North Carolina. In reliance on Defendants' misrepresentations, she moved to San Marcos, Texas to attend the AACA at Coast, where she lived from January 2023 to January 2024. Defendants removed Plaintiff Mianda from the AACA in July 2023.

32. Plaintiff Thiago Ortega is a resident of Philadelphia, Pennsylvania. Prior to attending the AACA, Plaintiff Ortega lived in Philadelphia, Pennsylvania. In reliance on Defendants' misrepresentations, he moved to San Marcos, Texas to attend the AACA at Coast, where he lived from January to June 2023. Defendants removed Plaintiff Ortega from the AACA in August 2023.

33. Plaintiff Ivana Page is a resident of California, currently living in Pennsylvania. Prior to attending the AACA, Plaintiff Page lived in Viera, Florida. In reliance on Defendants' misrepresentations, she moved to San Diego, California to attend the AACA at Coast, where she lived from approximately January 2022 to November 2022. Defendants removed Plaintiff Page from the AACA in May 2022.

34. Plaintiff Andrew Pearson is a resident of San Diego, California. Prior to attending the AACA, Plaintiff Pearson lived in Westminster, California. In reliance on Defendants' misrepresentations, he moved to San Diego, California to attend the AACA at Coast, where he has lived since January 2024. Defendants removed Plaintiff Pearson from the AACA in May 2025.

35. Plaintiff Triston Sanderson is a resident of San Diego, California. Prior to attending the AACA, Plaintiff Sanderson lived in Dallas, Texas. In reliance on Defendants' misrepresentations, he moved to San Diego, California to attend the AACA at Coast, where he has lived since April 2022. Defendants removed Plaintiff Sanderson from the AACA in December 2023.

36. Plaintiff Mathias Thelus is a resident of Portland, Oregon. Prior to attending the AACA, Plaintiff Thelus lived in Portland, Oregon. In reliance on Defendants' misrepresentations, he moved to San Diego, California to attend the AACA at Coast,

where he has lived from October 2021 to September 2023. Defendants removed Plaintiff Thelus from the AACA in January 2023.

## B. DEFENDANTS

37. Defendant Coast Flight Training and Management, Inc. is a corporation incorporated in the State of California, with its corporate headquarters in San Diego, California. Coast conducts business throughout California, including within the Southern District of California.

38. Defendant American Airlines, Inc. is a Delaware corporation with its corporate headquarters in Fort Worth, Texas. It maintains numerous offices in and conducts business throughout California, including within the Southern District of California.

39. Defendant American Airlines Group, Inc. is a Delaware corporation with its corporate headquarters in Fort Worth, Texas. It conducts business throughout California, including within the Southern District of California.

40. American Airlines, Inc. is a wholly owned subsidiary of American Airlines Group, Inc. American Airlines, Inc. and American Airlines Group, Inc. jointly operate and do business as American Airlines or American. American Airlines, Inc. and American Airlines Group, Inc. jointly administered the AACA, including according to American Airlines Group, Inc.'s own representations.

41. Starting in 2019, American partnered with Coast to create the AACA at Coast, a flight training program for prospective pilots.

42. American interviewed and selected the prospective cadets, and then allowed the cadets to choose Coast (among other flight schools American had selected to be part of the AACA), from one of its locations in California and Texas, to obtain the training needed to earn their commercial pilot ratings.

43. Employees and independent contractors of each Defendant are agents of that Defendant. In acting or failing to act as alleged in this Complaint, Defendants acted

through their employees and/or agents and are liable for the acts and omissions of their employees and/or agents.

44. In acting or failing to act as alleged in this Complaint, Defendant Coast was acting within the course and scope of its authority as an agent of American with American's permission, authorization, consent, and ratification of Coast's actions and/or omissions.

## III. JURISDICTION AND VENUE

45. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

46. This Court has personal jurisdiction over Coast because it is incorporated in California, maintains its principal place of business in San Diego, California, and the wrongful conduct alleged in this Complaint occurred at and/or arose from Coast's facilities in San Diego, California.

47. This Court has personal jurisdiction over American (a) because it regularly conducts business within the Southern District of California, (b) because it purposefully availed itself of the privileges of conducting business in California and directly targeted California in connection with the AACA and the claims asserted by Plaintiffs herein including, through its partnership with Coast (a California-based company), by advertising and providing flight training to AACA cadets, including Plaintiffs, in San Diego, California, and (c) because the wrongful conduct alleged in this Complaint occurred at and/or arose from Coast's facilities in San Diego, California.

48. American and Coast promoted and offered flight training in San Diego, California to residents of all states, including to all Plaintiffs.

49. Defendants contracted with residents of California, including Plaintiffs Anderson, Clark, Fogel, Hernandez, Khan, and Pearson, and induced residents of other states, including Plaintiffs Kumar, McGowan, Page, Sanderson, and Thelus, to move to San Diego, California to attend the AACA at Coast, and contracted with them in California.

50. This Court has jurisdiction over Plaintiffs' state law claims via pendent jurisdiction, as these claims arose out of Defendants' contacts with California and share a common nucleus of operative facts with the claims arising under federal law.

51. Venue is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(2), and (d) in that a substantial part of the events or omissions giving rise to the claims occurred in this district and the corporate Defendants are subject to personal jurisdiction in this district. Particularly, the unlawful activities or omissions occurred in San Diego, California. American's unlawful acts and omissions (including any ratification of or acquiescence to Coast's acts and omissions) occurred in San Diego, California. Further, American contracted and maintained a business partnership with the perpetrators of the unlawful acts and omissions within this judicial district. Moreover, Coast maintains an office situated in and conducts substantial business within this judicial district. American maintains an office situated in and conducts substantial business within this judicial district. Finally, several plaintiffs reside within this judicial district.

## IV. FACTUAL BACKGROUND

### A. American Airlines Created the AACA with the Purported Aim to Diversify the Pilot Profession

52. In 2018, American Airlines announced a new program created to "attract a diverse group of professional aviators to American for years to come": the American Airlines Cadet Academy.[4] American advertised that the AACA offered a clear path to obtain all the necessary licenses and ratings "need[ed] to fly for the world's largest airline [American]."[5]

---

[4] *American Airlines Announces New Program to Recruit Next Generation of Pilots with Launch of Cadet Academy*, *supra* note 1.

[5] *Id.* These licenses and ratings include the Private Pilot License ("PPL"), Instrument Flight Rating ("Instrument" or "IFR"), Commercial Single-Engine Land ("Commercial" or "CSEL"), Commercial Multi-Engine Land ("Multi-Engine" or "(C)MEL"), Certified Flight Instructor ("CFI"), and Certified Flight Instrument Instructor ("CFII") (collectively, "licenses" or "ratings").

53. American needed the AACA and it needed Plaintiffs to populate the AACA. American claimed *inter alia* that it needed a "pipeline" of future pilots. In reports to investors, American urged that "[w]e must develop a strong pipeline of pilot candidates, and doing so requires a long-term outlook and commitment [and] [t]he American Airlines Cadet Academy is one of the initiatives that will help us achieve this goal."

54. American communicated in official company publications that its expectation was that Plaintiffs would serve as professional "representative[s]" of American and would "represent th[e] brand."

55. American advertised that the AACA "will provide an opportunity for future pilots to become first officers at one of American's three wholly owned regional carriers and eventually fly larger aircraft at American."[6]

56. Piloting is a sought-after and prestigious career given the level of selectivity airlines exercise in choosing pilots, high pay, and job stability and satisfaction.

57. It is well established that Black and non-white individuals are grossly under-represented as pilots in the airline industry. From 2009 to 2018, 91.4 to 94.1% of aircraft pilots and flight engineers were white and only 1.6 to 3.4% were Black, one compilation of government data noted.[7] In 2024, according to the U.S. Bureau of Labor Statistics, aircraft pilots and flight engineers were 88.3% white, 4.4% Black, 2.7% Asian, and 8.3% Hispanic or Latino.[8]

58. American consistently stated that its purpose in creating the AACA was to make flight training accessible and efficient to those who had historically been excluded from such opportunities, including people of color, in order to expand racial and ethnic

---

[6] *American Airlines Announces New Program to Recruit Next Generation of Pilots with Launch of Cadet Academy*, *supra* note 1.

[7] Lindsay Stevenson, Haydee M. Cuevas, & Katie S. Kirkpatric, *Racial Diversity in Aviation*, EMBRY RIDDLE AERONAUTICAL U., 12-2020, p. 11, Table 1 and Table 2, https://commons.erau.edu/cgi/viewcontent.cgi?article=1165&context=student-works.

[8] U.S. Dep't of Labor, Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey*, https://www.bls.gov/cps/cpsaat11.htm (last updated Jan. 29, 2025).

diversity in the profession. American reached out to and made recruitment efforts toward people of color, and to people with no aviation experience or existing path to the cockpit—which tend to disproportionately be persons of color.

59. From the outset, American promoted the AACA by holding out the promise of a lucrative and fulfilling career to prospective cadets.

## B. American Partnered With Coast to Operationalize the AACA and They Promoted Lenders to Cadets as Student Loan Options

60. Starting in January 2019, American and Coast partnered together to offer the AACA at Coast's flight schools located in San Diego, California, Dallas, Texas, and San Marcos, Texas. Coast's website features the below:




*Airline Career Training Program*, Coast Flight Training, https://iflycoast.com/airline-career-training-program/ (last visited Dec. 2, 2025).

61. American recruited, interviewed, and selected cadets for admission to the AACA, while Coast provided flight training to the cadets that American selected for the program.

62. On the American side, the AACA was operated by both American Airlines, Inc., and by American Airlines Group, Inc. American Airlines Group, Inc., represented in public sustainability reports that the AACA was "our" (*i.e.*, American Airlines Group, Inc.'s) "Cadet Academy" and that the AACA "helps us" (*i.e.*, American Airlines Group, Inc.) "achieve our recruitment goals."

63. American advertised and promoted the AACA on its website and in promotional materials.

64. Coast advertised and promoted the AACA on its website and in promotional materials, such as the below:




//

//

*American Airlines Cadet Academy with Coast Flight Training*, COAST FLIGHT TRAINING, https://iflycoast.com/aa-cadet-training-at-coast-flight-training/ (last visited Dec. 2, 2025).

65. Coast also held out American Airlines Group, Inc. as its "partner" on Coast's website.

66. Defendants designated specific loan providers as "partnered lenders" from which AACA applicants could apply for a loan to cover the cost of the program.

67. On their websites and in emails to and conversations with Plaintiffs, American and Coast specifically identified, offered, and recommended their partnered lenders. Defendants advertised specific terms, conditions, and benefits of loans with their recommended partner lenders.

68. Such lenders included, but are not limited to, Discover, Sallie Mae, and the AAFCU.

69. Both American and Coast sent Plaintiffs emails with information and links to the lenders' application websites.

70. All Plaintiffs took out loans from these partnered lenders.

71. Each Plaintiff chose a lender that Defendants had identified as a student loan option, informed Coast of their choice, and applied for the loan.

72. After choosing a lender, each Plaintiff signed a funding disclosure with Coast.

73. Coast certified the loan before a Plaintiff was permitted to use the loan.

74. Coast coordinated with Plaintiffs, via email and in verbal conversations, about the amount, timing, and logistics of loan distribution.

75. As set out in Coast's funding disclosure, the loan amount to be used for a Plaintiff's training funds is disbursed directly from the lender to Coast.

76. Coast held these funds in its own "prepaid" accounts and Cadets were able to request disbursements from Coast's online Student Portal.

77. Coast direct-deposited disbursements of the loan for "student paid items," such as housing, food, equipment, supplies, and exam costs, into Plaintiffs' bank accounts.

78. Coast selected the lenders cadets could choose from, set the schedule and terms for the distribution of loan funds, held the funds in its own accounts, distributed loan funds to cadets, and paid itself from the prepaid accounts for cadets' training costs. Plaintiffs coordinated with Coast if and when they needed to make changes to their loan disbursement schedule or amount, and Coast made decisions on such changes.

## C. DEFENDANTS SYSTEMATICALLY AND INTENTIONALLY MISREPRESENTED MATERIAL CHARACTERISTICS OF THE AACA TO PLAINTIFFS AND THE PUBLIC

79. American and Coast misrepresented key aspects of the AACA to induce individuals to take out massive loans and uproot their lives to enroll in a program that American and Coast promised would lead to lucrative careers as airline pilots.

80. American and Coast included misleading statements on their websites, in online articles and press releases, in conversations between their representatives and potential cadets, and in emails and promotional materials distributed to individuals applying and admitted to the AACA.

81. American and Coast misrepresented, through these statements, conversations, and materials, to Plaintiffs and members of the public at large that, through the AACA at Coast, **cadets could and would achieve all the ratings required to become a commercial pilot—within twelve (12) months and at a specified cost that was all-inclusive and would be covered by a single loan.**

82. In reality, only a fraction of those who start the AACA at Coast complete the program.

83. The vast majority of cadets who do complete the program take significantly longer than the 12 months promised and spend far more than the quoted cost to do so.

84. American and Coast misrepresented to Plaintiffs and members of the public at large that **all cadets in the AACA at Coast would be flying five days per week.**

85. These representations made Plaintiffs believe that they would become certified pilots within one year, and these representations were material to their decision to enroll in the AACA.

86. In reality, most Plaintiffs received training and practiced flying far fewer days per week than Defendants represented they would.

87. American and Coast misrepresented to Plaintiffs and members of the public at large that all AACA cadets would be assigned **an American Airlines pilot as a mentor** to guide and assist them through the program.

88. Many Plaintiffs did not receive mentors, and most of those who did receive a mentor were assigned one only after many months in the program and after repeated complaints to Defendants of not receiving one.

89. Defendants knowingly misrepresented that Coast had sufficient state-of-the-art aircraft, trained and experienced instructors and staff, and systems, policies, and infrastructure in place to ensure that all cadets could get through the program on time and on budget.

90. All three Coast locations suffered from insufficient aircraft, inadequate instructors, and policies and practices that caused devastating delays in Cadets' training.

91. American and Coast knew that the statements described above were not true or had little to no basis for making these claims, but they made these claims to sell the AACA to prospective cadets.

92. American and Coast induced Plaintiffs to attend the AACA at Coast *inter alia* by making promises about the likelihood of completing the AACA at Coast, the time it would take to complete it, the cost it would take to complete it, the frequency with which Plaintiffs would train, that Plaintiffs would receive a pilot mentor, and that Coast would have sufficient training resources.

93. Relying on the accuracy of these statements and believing that they would earn all ratings necessary to pursue careers as airline pilots within one year and for the specific cost quoted, the Plaintiffs took out significant loans, quit their jobs or turned

down scholarship opportunities, and incurred great expense moving to attend the AACA at Coast.

94. In Plaintiffs' understanding, Defendants' systematic use of misrepresentations to market the AACA, as described here, began in approximately 2018 and continued in substantially the same form through at least 2024. In many cases, this conduct has continued through the present.

95. As detailed in Section IV.F, Plaintiffs first encountered Defendants' advertising about the AACA between 2019 and 2022, and they applied for and were admitted to the program between 2020 and 2024.

96. By the time Plaintiffs interviewed for and enrolled in the AACA, both American and Coast knew or should have known that (1) most cadets did not complete the AACA; (2) it took cadets longer than the promised 12 months to complete the AACA, if at all; (3) attending and completing the AACA cost cadets much more than the advertised price; (4) cadets were not able to train as frequently as promised; (5) cadets were not assigned mentors; and (6) Coast did not have sufficient resources to ensure cadets could train and complete the AACA within the promised timeline and cost.

97. Thus, both American and Coast knew or should have known about these deficiencies by the time Plaintiffs applied to the AACA, yet they concealed this knowledge from Plaintiffs.

98. If Plaintiffs had known the truth about these misrepresentations, as enumerated in further detail below, they would not have chosen to attend the AACA at Coast.

**i. Defendants Misrepresented Plaintiffs' Likelihood of Completing the AACA at Coast and Earning All Ratings Needed to Start a Career as an Airline Pilot**

99. In its press release announcing the launch of the AACA on April 24, 2018, American stated the AACA was "a first-of-its-kind program designed to help future aviators receive the training, financing and mentoring opportunities they need to fly for

the world's largest airline" and "will provide an opportunity for future pilots to become first officers at one of American's three wholly owned regional carriers and eventually fly larger aircraft at American."[9]

100. In an article published on its website a year later on April 30, 2019, American touted the success of the AACA's first year of operation and spotlighted the first cadet to graduate and be hired by one of American's fully owned regional carriers:

> [H]e's set for life. . . [H]e never has to interview again. He'll instruct, build hours, become an Envoy First Officer, be promoted to Captain and, in as little as six years, flow through to American, where he can live out his dream for the next 40 years or so. And the best part? He'll soon have a lot of company.[10]

101. In the same article, American emphasized the selectivity of the program and implied that everyone who had started the program had either completed the program and were employed as flight instructors or were "working on their final qualifications before they, too, will interview with either Envoy, Piedmont Airlines, or PSA Airlines to officially begin their careers." *Id.*

102. On its AACA website, American also advertised that cadets would be on their way to careers at American if they completed the program. For example, its website stated, "Most importantly, upon program completion, American's three wholly owned regional carriers (Envoy, Piedmont, and PSA) will offer you a guaranteed interview. If

---

[9] *American Airlines Announces New Program to Recruit Next Generation of Pilots with Launch of Cadet Academy*, *supra* note 1.

[10] *Focused on the Future: American Airlines Celebrates Cadet Academy's First Year*, AMERICAN AIRLINES NEWSROOM (Apr. 30, 2019), https://news.aa.com/news/news-details/2019/Focused-on-the-future-American-Airlines-celebrates-Cadet-Academys-first-year/.

hired by one of these regional airlines, you are well on your way to working at American Airlines."[11]

103. As indicated on the AACA website, Envoy Air Inc., Piedmont Airlines, Inc., and PSA Airlines are all wholly-owned subsidiaries of American Airlines Group, Inc.

104. From approximately December 2022 until March 2025, American's landing page for the AACA stated: "**No prior training required**," "**Income potential in 12 months**," "**Curated career track to American**," as depicted below:




[11] Internet Archive Wayback Machine, About the Academy, AMERICAN AIRLINES CADET ACADEMY, https://web.archive.org/web/20221006030111/https://aacadetacademy.com/about-the-academy/ (captured Oct. 6, 2022).

AMERICAN AIRLINES CADET ACADEMY, *supra* note 2.[12]

105. From approximately April 2018 until June 2022, American's website stated, "It takes ambition to become a professional pilot. If you have the passion, Cadet Academy provides everything else."[13]

106. From approximately April 2018 until October 2023, the "Cadet Academy FAQs" page on American's website stated:

> Although a job is not guaranteed, due to the significant demand for pilots and instructors over the next several decades, American Airlines expects the vast majority of participants to become employed as flight instructors, and eventually, first officers.[14]

107. From approximately May 2019 to the present, Coast has made representations on its website implying cadets' high likelihood of completing the program and touting its strong pilot placement rates.

108. Representations appearing on Coast's website include:

a. "The training [in the AACA] is designed to get a student, with no flight experience, through all of their commercial ratings. They complete the program as a Certified Flight Instructor and are eligible for employment as a flight instructor at schools all across the nation."[15]

---

[12] In or around March 2025, American removed "No prior training required" and replaced it with "Discovery flight required," but the page continues to state, "Income potential in 12 months" and "Curated Career track to American." *See* AMERICAN AIRLINES CADET ACADEMY, https://academy.aa.com/landing/academy/html/home-page.html (last visited Dec. 2, 2025).

[13] *See, e.g.,* Internet Archive Wayback Machine, *Cadet Academy Index*, AMERICAN AIRLINES CADET ACADEMY, https://web.archive.org/web/20220313021937/https://aacadetacademy.com/CadetAcademy/Index (captured Mar. 13, 2022).

[14] *See, e.g.,* Internet Archive Wayback Machine, *Cadet Academy FAQs*, AMERICAN AIRLINES CADET ACADEMY, https://web.archive.org/web/20231024034355/https://aacadetacademy.com/faq/ (captured Oct. 24, 2023).

[15] *American Airlines Selects Coast Flight San Marcos to Help Train Future Pilots*, COAST FLIGHT TRAINING, https://iflycoast.com/blog/american-airlines-selects-coast-flight-san-marcos-to-help-train-future-pilots/ (last visited Oct. 9, 2025).

b. "Coast Flight Training has created an all encompassing, accelerated program that provides a clear pathway to becoming an airline pilot. […] This high-quality, accelerated flight training is the best way to achieve your dream of becoming an airline pilot."[16]

c. "Students **will receive** their Private Pilot License, Instrument Rating, Commercial Single-Engine License, Commercial Multi-Engine License, Certified Flight Instructor License, and Certified Flight Instrument Instructor License."[17]

d. "Coast students get the distinction of being awarded the largest number of conditional commercial pilot job offers in the nation" and "AIRLINE PILOT BENEFITS BEGIN IMMEDIATELY AFTER TRAINING IN AS LITTLE AS 12-18 MONTHS!"[18]

e. "INTERVIEW WITH THE AIRLINES AND SECURE EMPLOYMENT BEFORE COMPLETING YOUR FLIGHT TRAINING! […] BE THE SOLUTION TO THE PILOT SHORTAGE. Lock in Career Earnings of +$7,000,000."[19]

109. Coast provided its Brochure to potential cadets, including many Plaintiffs received, the first page of which states: "COAST FLIGHT TRAINING OFFERS A COMPREHENSIVE, ACCELERATED PROGRAM THAT PROVIDES A CLEAR PATHWAY TO BECOMING A PROFESSIONAL PILOT" and lists the six "FLIGHT

---

[16] *Airline Career Training Program*, COAST FLIGHT TRAINING, https://iflycoast.com/ airline -career-training-program/ (last visited Dec. 2, 2025).

[17] *American Airlines' Academy,* COAST FLIGHT TRAINING, https://iflycoast.com/blog/ american-airlines-academy/ (last visited Oct. 9, 2025) (emphasis added).

[18] Internet Archive Wayback Machine, *Airline Career Training Program*, COAST FLIGHT TRAINING, https://web.archive.org/web/20190211172628/https://iflycoast.com/ airline-career-training-program/ (captured Feb. 11, 2019).

[19] *Id.*; *see also Airline Career Training Program*, *supra* note 16.

RATING[S] ACHIEVED," as depicted below:




110. Plaintiffs read (including, but not limited to, on Defendants' websites and brochures) and heard (including, but not limited to, in interviews and conversations with Defendants) these representations.

111. Plaintiffs relied on Defendants' representations that Plaintiffs would have a high likelihood of completing the AACA at Coast in making their decision to attend the AACA at Coast.

112. For each Plaintiff, the promise that they had a high likelihood of completing the AACA was a material factor in choosing to attend the AACA at Coast.

113. However, Defendants' representations were false.

114. In reality, only a small fraction of those cadets who start the AACA at Coast complete the program and earn all their ratings to become a pilot.

115. Upon information and belief, only about 36% of cadets who started the AACA with Plaintiffs completed it.

116. According to a 2023 sustainability report published by American Airlines Group, Inc., since the AACA's launch in 2018, only about 11.5% of cadets that entered the AACA ended up flying for the regional carriers.

117. None of the Plaintiffs completed the AACA.

118. Defendants made these representations despite knowing that the vast majority of cadets in the AACA at Coast did not complete the program.

119. Defendants knew their representations about completion of the AACA were false, but they continued to make the same representations to convince prospective cadets, such as Plaintiffs, to attend the AACA at Coast.

120. If Plaintiffs had known the truth that the majority of cadets do not complete the AACA, and that it is more likely than not that they would not complete the program and be on track to pursue a career as an airline pilot, they would not have chosen to attend the AACA at Coast.

**ii. Defendants Misrepresented the Time it Would Take to Complete the AACA at Coast**

121. From approximately December 2022 to the present, American has prominently advertised on its landing page for the Cadet Academy "Income Potential in

12 Months."[20]

122. Potential cadets had to click on a different part of the website, the "FAQ" page, scroll down to the "Application" section, and select the "How long will training take?" question to find out that training could take "up to 18 months."[21]

123. American representatives told many Plaintiffs in either their AACA admission interviews or in subsequent discussions that the AACA is a 12-month program.

124. From approximately September 2020 to the present, Coast has repeatedly and prominently stated on its website that the AACA at Coast is a 12-month training program, with no qualifications or disclaimers, as depicted in the images below:




Internet Archive Wayback Machine, *American Airlines Cadet Academy with Coast Flight Training*, COAST FLIGHT TRAINING, https://web.archive.org/web/20200925004431/ https://iflycoast.com/aa-cadet-training-at-coast-flight-training/ (captured Sep. 25, 2020).

//

//

//

[20] AMERICAN AIRLINES CADET ACADEMY, *supra* note 12.

[21] *Cadet Academy FAQs*, *supra* note 14.




Internet Archive Wayback Machine, *American Airlines Cadet Academy*, COAST FLIGHT TRAINING, https://web.archive.org/web/20220206035224/https://iflycoast.com/american -airlines- cadet-academy/ (captured Feb. 6, 2022).

125. Starting in or around November 2020, Coast's "Airline Career Training Program" webpage began advertising a "12 Month Training Program," including alongside AACA branding as depicted below:



*Airline Career Training Program*, COAST FLIGHT TRAINING, https://iflycoast.com/ airline-career-training-program/ (last visited Dec. 2, 2025).[22]

126. From approximately October 2020 to the present, Coast made similar misrepresentations across many pages on its website, including:

a. "The full program is an estimated 12 months to graduate but can be completed faster."[23]

b. "This immersive program offers full time flight training that is expected to be completed in 12 months."[24]

c. "The Coast Academy is a full time, 12 month, immersive flight training experience."[25]

127. The documents Coast provided directly to cadets admitted to the AACA further emphasized that the program would be completed in 12 months. For example, Coast provided many of the Plaintiffs with a Price Sheet and Hours Catalogue, several

[22] From approximately 2018 to October 2020, this page advertised an even faster timeline, promoting Coast's Airline Direct program as "Quickest to Industry" and "9 Months to Employment." *See, e.g., Airline Career Training Program*, *supra* note 18. From approximately October to November 2020, this webpage advertised that Coast provided a "10-12 Month Training Program." *See, e.g.,* Internet Archive Wayback Machine, *Airline Career Training Program*, COAST FLIGHT TRAINING, https://web.archive.org/web/20201001181237/ https://iflycoast.com/ airline-career-training-program/ (captured Oct. 1, 2020).

[23] *American Airlines' Academy*, *supra* note 17 (first posted Dec. 1, 2021).

[24] *Airline Career Training Program*, *supra* note 16 (this language first appeared in October 2020).

[25] Internet Archive Wayback Machine, *Frequently Asked Questions*, COAST FLIGHT TRAINING, https://web.archive.org/web/20201001213805/https://iflycoast.com/ frequently-asked-questions/ (captured Oct. 1, 2020).

versions of which state in no uncertain terms, "Full Program – 12 Months,"[26] and the Brochure states, "12 Month Training Program."[27]

128. The Coast Academy Program Guide, a version of which Coast provided to many Plaintiffs, does not disclose that the program could (and likely will) take significantly longer to complete due to a host of factors outside of the student's control, and instead states, "The program is designed to complete all CORE and CORE Plus (CORE+) Courses in approximately 12 months."

129. Some Plaintiffs also received emails from Coast representatives stating:

> This program allows you to obtain all of the ratings you need to become an airline pilot and is designed to finish in 10-12 months. In that time, you will complete your PPL, IFR, CSEL, MEL, CFI & CFII.

*See, e.g.*, *infra* ¶¶ 660, 689, 868.

130. Plaintiffs read (including, but not limited to, on Defendants' websites and brochures) and heard (including, but not limited to, in interviews and conversations with Defendants) these representations.

131. Plaintiffs relied on Defendants' representations that Plaintiffs would complete the AACA in 12 months in making their decisions to attend the AACA at Coast.

132. For each Plaintiff, the 12-month timeline and the promise that they would achieve all ratings within one year were material factors in choosing to attend the AACA at Coast.

133. However, Defendants' representations were false.

134. In reality, of those few cadets who finished the AACA, the vast majority took far longer than the 12 months promised.

---

[26] Internet Archive Wayback Machine, *Coast Academy Hours Catalog and Coast Academy Price Sheet*, COAST FLIGHT TRAINING, https://web.archive.org/web/20240513052928/https://iflycoast.com/wp-content/uploads/2022/02/Coast-Academy-Full-Program.pdf (captured May 13, 2024).

[27] Coast Brochure, *supra* ¶ 109.

135. Collectively, Plaintiffs recall only ***four*** cadets in any of their cohorts (which comprised a total of approximately 91 people) who finished within the 12-month timeline—a shocking 4.4% of those who entered the program at the same time as the Plaintiffs.

136. None of the Plaintiffs were able to complete the program, and none in 12 months. Twelve Plaintiffs earned one or more ratings at the AACA, but for each of those Plaintiffs, the ratings they achieved took far longer than Coast's advertised timeline.

137. Ten of the Plaintiffs were in the program for longer than one year. Among those, only one received four ratings, and the other nine received only two or three ratings.

138. Plaintiffs reviewed Defendants' representations and spoke with Defendants' representatives, and at no point did Defendants state that the 12-month timeline represented a minimum or a very optimistic goal as to how long the program would take, or that the timeline could be severely delayed due to a host of variables outside of the student's control—including the availability of planes, instructors, and other resources.

139. Defendants made these representations despite knowing and/or having reason to know that the vast majority of cadets in the AACA at Coast would not complete the program within 12 months.

140. Defendants knew their representations about length of time to complete the AACA were false, but they continued to make the same representations to convince prospective cadets, such as Plaintiffs, to attend the AACA at Coast.

141. If Plaintiffs had known the truth that it typically takes significantly longer than 12 months to complete the program (if cadets are able to do so at all), they would not have chosen to attend the AACA at Coast.

**iii. Defendants Misrepresented the Cost of the AACA at Coast**

142. On their websites and in promotional materials, American and Coast consistently represented that the cost of completing the AACA would be a single price, all of which would be covered by a single loan.

143. In its first press release about the AACA published on April 24, 2018, on its website, American stated, "Our financing program can be used to pay for all aspects of the training program from start to finish."[28]

144. From approximately August 2018 until January 2022, American's "Cadet Academy Cost" page stated:

> You are responsible for one price. All costs associated with becoming a professional pilot are covered in that one price. The majority of flight schools charge students by the flight hour, meaning students all pay different amounts, based on their learning speed. Cadet Academy is different in that it offers a set course cost for the completion of each step, allowing you to work at your own pace. This fixed cost method provides you with the highest quality training and eliminates surprise costs.[29]

//

//

//

//

//

//

//

//

//

//

---

[28] *American Airlines Announces New Program to Recruit Next Generation of Pilots with Launch of Cadet Academy*, *supra* note 1.

[29] *See, e.g.,* Internet Archive Wayback Machine, *Cadet Academy Cost*, American Airlines Cadet Academy, https://web.archive.org/web/20220131212820/http://www.aacadetacademy.com/Cadet Academy/program_costs/1 (captured Jan. 31, 2022).

145. A screenshot of the webpage as it appeared in August 2018 is depicted below:




Internet Archive Wayback Machine, *Cadet Academy Cost*, AMERICAN AIRLINES CADET ACADEMY, https://web.archive.org/web/20180823151249/http://www.aacadetacademy.com/CadetAcademy/program_costs/1 (captured Aug. 23, 2018).

146. On the same page, American listed its "Partner schools" and their respective prices below the "Turn key approach" section. In or around February 2019, American added "Coast Flight" as one of its partner schools and listed the cost as $87,285.[30]

//

//

[30] Internet Archive Wayback Machine, *Cadet Academy Cost*, AMERICAN AIRLINES CADET ACADEMY, https://web.archive.org/web/20190225092118/http://www.aacadetacademy.com/CadetAcademy/program_costs/1 (captured Feb. 25, 2019).

147. Immediately below the listed prices, American stated:

> The price of the program includes all training, materials, and uniforms. The cost of housing, meals, and transportation can be added, if necessary, up to a $100,000 aggregate borrowing limit. Cadet Academy is designed to avoid any unforeseen expenses.

*Id.* This section of the website, as it appeared in February 2019, is depicted below:




*Id.*

148. Although the partner schools and their respective prices changed over time, these sections of American's "Cadet Academy Costs" page appeared in substantially the same form until approximately May 2022.

149. American's "Cadet Academy Costs" page also contained information about the loans cadets could use to pay for the AACA, which American described *inter alia* as

"designed to cover all expenses, including housing and stipend costs."[31]

150. Coast sent a version of a "Welcome Email" to all Plaintiffs that stated, "The max application amount for the loan is $110,000 which can cover all training and some or all of your cost of living."[32]

151. To at least some Plaintiffs, Coast sent an email and/or brochure that stated, "This program [the Cadet Academy] unlocks the opportunity to apply for a loan that covers all training and living costs."

152. Coast also sent each Plaintiff a Price Sheet with the Welcome Email that provided specific prices for each rating, the "Flight Training Total," the cost of textbooks, supplies, and Federal Aviation Administration ("FAA") certifications, and the "Total Program Total." Nowhere does the Price Sheet state that this is an estimated cost, nor does it make *any* indication that the price could vary from this amount.

153. One version of the Price Sheet that Coast sent to cadets, including at least nine Plaintiffs, from approximately 2021 to 2023, is depicted below:

//

//

//

//

//

//

---

[31] *American Airlines Cadet Academy Introduces New Student Loan Options with American Airlines Federal Credit Union*, AMERICAN AIRLINES NEWSROOM (Apr. 26, 2022), https://news.aa.com/news/news-details/2022/American-Airlines-Cadet-Academy-Introduces-New-Student-Loan-Options-With-American-Airlines-Federal-Credit-Union-STEM-04/.

[32] From 2020 to approximately March 2022, the email said $110,000. From approximately June to September 2022, the Welcome Email said:

> The max application amount for the Discover loan is $110,000.00 and for the American Airlines Credit Union loan is $120,000.00. These loans can cover all training expenses and some or all of your cost of living.

Starting in approximately March 2023, the Welcome Email stated only $120,000.

CoastFlight TRAINING

## Coast Academy Price Sheet

### Full Program - 12 Months

| Courses of Instruction | | Per Course |
|---|---|---|
| Private Pilot License (PPL) | | $19,320.00 |
| Instrument Rating (IFR) | | $24,840.00 |
| Commercial Single Engine License (CSEL) | | $22,300.00 |
| Certified Flight Instructor (CFI) | | $7,350.00 |
| Certified Flight Instructor Instrument (CFII) | | $4,100.00 |
| Commercial Multi Engine License (CMEL) | | $9,680.00 |
| | **Flight Training Total** | **$87,590.00** |
| | **Textbooks & Supplies** | **$1,408.00** |
| | **FAA Certifications** | **$8,925.00** |
| | **Total Program Total** | **$97,923.00** |

Additional items that can be self provided or added to the loan amount

| | Recommendation | Price |
|---|---|---|
| Headset | David Clark H10-13 S | $341.00 |
| Tablet (Cellular Data Not Required) | iPad-Mini (128 GB+) | $595.00 |
| Cost of Living | | Variable |

*If added to the loan, Coast will direct deposit the funds to the student so that selected items can be independently purchased or paid for.

*Coast Academy Hours Catalog and Coast Academy Price Sheet, supra* note 26.

154. According to this Price Sheet, from approximately 2021 to 2023, Coast advertised that its full program cost $97,923, with the PPL costing $19,320, the IFR costing $24,840, the CSEL costing $22,300, the CFI costing $7,350, the CFII costing $4,100, the CMEL costing $9,680, textbooks and supplies costing $1,408, and FAA certifications costing $8,925. *Id.* According to this Price Sheet, cadets would also have to purchase a headset for $341 and a tablet for $595, and cover the cost of living, which is variable. *Id.*

155. Coast provided some cadets, including some Plaintiffs, with other versions of the Price Sheet that listed different costs for obtaining some ratings, but the "Total Program Total" was either $97,923, $97,712, or $103,495 on all versions of the Price

Sheet Coast sent Plaintiffs.[33]

156. Plaintiffs read (including, but not limited to, on Defendants' websites and brochures) and heard (including, but not limited to, in interviews and conversations with Defendants) these representations.

157. Plaintiffs relied on Defendants' representations that they would obtain all the ratings that they needed to become commercial pilots for a single price that was all-inclusive (and could be covered by a single loan) in making their decision to attend the AACA at Coast.

158. For each Plaintiff, each of these representations was a material factor in choosing to attend the AACA at Coast.

159. However, Defendants' representations were false.

160. In reality, Plaintiffs spent far more than the costs Defendants advertised to complete training and ratings in the AACA and received far less for their money.

161. The nine Plaintiffs who received no ratings at all spent between $26,000 and $67,000 (an average of approximately $50,000) on training at Coast and associated expenses. For the Plaintiffs who did earn certain ratings, they spent approximately $45,000 more than the prices Coast advertised on average. The two Plaintiffs who received only one rating (PPL) spent about $35,000 and $58,000, respectively, which is far more than the $19,320 quoted in Coast's Price Sheet for that rating. The Plaintiffs who received two, three, or four ratings spent an average of $45,000 more than Coast's quoted prices for the ratings they received.

[33] Some other versions also listed other costs, including a Foreflight Subscription for $99, five uniform shirts for $200, and the Spin Endorsement for $450. Some versions of Coast's Price Sheet also listed "OPTIONAL LIVING EXPENSES," which advertised that, for a double occupancy room, housing cost $850 per month in San Diego, $550 per month in San Marcos, and $600 per month in Dallas, and a meal stipend cost $400 per month.

A few Plaintiffs, including Plaintiffs Anderson, Little, and Thelus, also received Price Sheets for the "Instrument Start" program—a shorter version of the program for cadets who had already obtained their PPL. The Instrument Start Price Sheet listed the Total Program Total at $77,968.

162. To Plaintiffs' knowledge and understanding, the vast majority of cadets in the AACA at Coast pay far more than the quoted prices to complete each pilot rating and the program as a whole. Defendants did not disclose to Plaintiffs that the schedule and cost of the AACA could vary substantially based on a variety of factors outside Plaintiffs' control and that the loan would almost certainly be insufficient to cover the cost of training and housing—particularly because the program typically lasted longer than the advertised 12 months.

163. At no point, neither in their promotional materials nor through their representatives, did Defendants state that the $97,923 (or $97,712 or $103,495) price tag was an estimated cost, nor make any indication that the price could vary wildly from this amount.

164. Defendants knew that their representations about the cost of the program were false but they continued to make the same representations to convince prospective cadets, such as Plaintiffs, to attend the AACA at Coast.

165. If Plaintiffs had known the truth that it typically costs cadets significantly more money than the advertised cost to participate in and complete the AACA, they would not have chosen to attend the AACA at Coast.

#### iv. Defendants Misrepresented the Frequency of Flight Training for Cadets in the AACA at Coast

166. In their communications with the Plaintiffs and on their websites, Defendants ubiquitously advertised the AACA as being an "immersive," "accelerated," and "full time" flight training program.[34]

167. From May 21, 2020 to present, American has advertised, "This program is designed to be full-time accelerated flight training program."[35]

---

[34] *See, e.g.*, *Airline Career Training Program*, *supra* note 16; *American Airlines Cadet Academy with Coast Flight Training*, COAST FLIGHT TRAINING, https://iflycoast.com/ aa-cadet-training-at-coast-flight-training/ (last visited Oct. 9, 2025).

[35] *Enrollment Information*, AACA BLOG SPOT (May 21, 2020) https://aaca929002555. wordpress.com/ 2020/05/21/enrollment-and-the-process/ (last visited Dec. 2, 2025).

168. From at least December 2021 to present, Coast has stated on its website, "The training [in the AACA] is full-time, 5 to 6 days per week with scheduled events between 2 to 6 hours per day."[36]

169. From approximately October 2020 until December 2024, Coast's "FAQ" page stated, "The Coast Academy is a full time, 12-month, immersive flight training experience."[37]

170. On a page titled "Coast Academy[:] Expedited Professional Pilot Training," Coast states its "all encompassing, accelerated" and "immersive program offers full time training that is expected to be complete in 12 months."[38]

171. Coast's Brochure, which Coast either emailed directly to Plaintiffs after they were admitted to the AACA or made available to Plaintiffs at their discovery flight (a voluntary, introductory flight for prospective cadets), advertises, "COAST FLIGHT TRAINING OFFERS A COMPREHENSIVE, ACCELERATED PROGRAM THAT PROVIDES A CLEAR PATHWAY TO BECOMING A PROFESSIONAL PILOT."[39]

172. As explained in section IV.F, *infra*, many Plaintiffs received emails from Coast stating unequivocally, "You will be flying 5-6 days a week." *See, e.g., infra* ¶¶ 582, 660, 689, 814, 868.

173. Plaintiffs read (including, but not limited to, on Defendants' websites and brochures) and heard (including, but not limited to, in interviews and conversations with Defendants) these representations.

174. Plaintiffs relied on Defendants' representations about the frequency of their training in making their decision to attend the AACA at Coast.

---

[36] *American Airlines' Academy*, *supra* note 17.

[37] *Frequently Asked Questions*, *supra* note 25.

[38] *Airline Career Training Program*, *supra* note 16.

[39] Coast Brochure, *supra* ¶ 109.

175. For each Plaintiff, Defendants' promises about accelerated timeline and high frequency of training were material factors in choosing to attend the AACA at Coast.

176. However, Defendants' representations were false.

177. In reality, during their time in the AACA at Coast, Plaintiffs collectively received flight training (including ground training, flying, and using flight simulators), on average, much less than the advertised five to six days a week.

178. Plaintiffs' training was inconsistent. Many Plaintiffs went days and sometimes weeks without flying.

179. Such infrequent training made learning and perfecting a complicated new skill nearly impossible.

180. The gaps in scheduling, consistency, and frequency of training were out of Plaintiffs' control. Although weather played a part in some delays, many delays were caused by Defendants' lack of equipment, lack of resources, poor planning or inattention to issues, and/or favoritism and bias.

181. Defendants knew their representations about frequency of training were false but they continued to make the same representations to convince prospective cadets, such as Plaintiffs, to attend the AACA at Coast.

182. If Plaintiffs had known the truth that they would be training so infrequently, they would never have chosen to take on an enormous amount of debt to attend the AACA at Coast.

**v. Defendants Misrepresented that Plaintiffs Would Receive Pilot Mentors**

183. In an article published on its website on April 30, 2019, American touted individual pilot mentorship as an extremely valuable characteristic of the program: "[p]airing pilots with the cadets is a key component of the program so cadets can get first-hand guidance and coaching along their journey."[40]

---

[40] *Focused on the Future: American Airlines Celebrates Cadet Academy's First Year*, *supra* note 10.

184. American explained that "[m]entorship pairing is a very detailed process; there are personality tests and assessments completed by a third-party vendor to make sure mentors have the best mix of qualities and commitment for mentees." *Id.*

185. From approximately October 2022 to October 2023, American advertised on its website that all cadets would be "paired with an American Airlines pilot mentor to walk with [them] through the program."[41]

186. From approximately October 2022 to present, American's website has promised cadets would receive "[i]ndividualized support from an American pilot mentor that continues along [their] path to American." *Id.* [42]

187. In a blog post published on June 12, 2020 by an agent of American—Cadet Development Specialist for the AACA, Maria Didonna—and shared with individuals admitted to the AACA, including several of the Plaintiffs, American specified that "[a]bout a month prior to starting flight training, each cadet is paired with a mentor."[43]

188. During several Plaintiff admission interviews, American representatives emphasized the significant advantage the mentorship program would provide to Plaintiffs if they attended the AACA.

189. From at least May 2021 to present, Coast has also prominently advertised that cadets would receive an "American Airline's Pilot Mentor" on the landing page of its website for the AACA:




[41] *About the Academy*, *supra* note 11.

[42] *See also About the Academy*, AMERICAN AIRLINES CADET ACADEMY, https://academy.aa.com/landing/academy/html/about-the-academy.html (last visited Dec. 2, 2025).

[43] *Overview of the Cadet Academy of Mentors*, AACA BLOG SPOT (June 12, 2020) https://aaca929002555.wordpress.com/2020/06/12/what-is-the-cadet-academy/ (last visited Dec. 4, 2025).

Internet Archive Wayback Machine, *American Airlines Cadet Academy*, COAST FLIGHT TRAINING, https://web.archive.org/web/20220523023931/https://iflycoast.com/american-airlines-cadet-academy/ (captured May 23, 2022).

190. Plaintiffs read (including, but not limited to, on Defendants' websites and brochures) and heard (including, but not limited to, in interviews and conversations with Defendants) these representations.

191. Plaintiffs relied on Defendants' representations that Plaintiffs would receive a pilot mentor to assist them throughout the program in making their decision to attend the AACA at Coast.

192. For each Plaintiff, Defendants' promises that they would receive mentors was a material factor in choosing to attend the AACA at Coast.

193. However, Defendants' representations were false.

194. In reality, most Plaintiffs either never received a mentor or received a mentor many months after they joined the program, despite repeatedly asking Defendants for one.

195. Nine Plaintiffs never received a mentor at all. Six Plaintiffs received a mentor late in their training—at least seven months after they started the program, and many of them much later than that. Only five Plaintiffs received a mentor within the first three months of their training (one of whom was terminated within days of receiving a mentor). Of the Plaintiffs who received mentors at all, the average amount of time it took for them to be assigned a mentor was *eight months*.

196. Many Plaintiffs who did receive mentors found them to be disappointingly unhelpful.

197. Instead of carefully "pairing" cadets with a mentor and providing "[i]ndividualized support" as promised, American typically assigned one pilot mentor to a group of four to seven cadets. Several Plaintiffs merely received a single group email or text from their assigned mentor and afterwards never heard from them again.

198. Defendants knew their representations about mentorship were false but they continued to make the same representations to convince prospective cadets, such as Plaintiffs, to attend the AACA at Coast.

199. In 2022 and 2023, cadets, including Plaintiffs, complained to American and Coast about their failure to provide the promised mentors, and during that time, several representatives of American acknowledged in emails that many cadets still did not have mentors.

200. For example, on September 9, 2022, American representative Jessica Ast emailed cadets acknowledging that American was working on "making sure everyone has a mentor that guides them through to be successful in the instructional phase."

201. On March 13, 2023—years after Defendants started advertising mentors as a critical aspect of the AACA—Ms. Didonna acknowledged in an email to cadets that American had yet to "begin the official rollout of our mentor program" at Coast's San Diego location.

202. On May 2, 2023, American representative Christopher Shope emailed cadets acknowledging a complaint that "cadets in the San Diego location have not heard from their mentors yet" and stating that Ms. Ast and Ms. Didonna were "working on the mentor situation right now."

203. On May 9, 2023, Ms. Didonna emailed the cadets in Dallas (some of whom had been in the program since October 2022) stating she and Ms. Ast had finally emailed pilots about serving as mentors for each cadet.

204. If Plaintiffs had known the truth that only a fraction of cadets receive a mentor, most cadets do not receive a mentor until many months into training, each mentor is assigned a group of cadets, and most cadets barely hear from their mentor at all, they would not have chosen to join the AACA at Coast.

//

//

//

**vi. Defendants Deceptively Advertised the Flight Training Resources Available at Coast**

205. Since 2018, American claimed it had "carefully selected flight schools"[44] to become their "trusted partner schools" for the AACA.[45]

206. Plaintiffs trusted that if American had selected Coast to be a "trusted partner [school]" for the program bearing American's name and logo, Coast must have sufficient resources to enable all cadets to succeed in the program.

207. Coast made a host of misleading statements designed to convince prospective cadets that with Coast's aircraft, facilities, simulators, instructors, scheduling systems, employees, curriculum, and expertise, they would have no problem getting through the program in the advertised 12-month training period.

208. Both on its website and on its Brochure, Coast states, "Coast Academy utilizes dedicated instructors, proactive schedulers, and modern aircraft to ensure that satisfactory academic standards are achievable" and "[a]ll of our locations offer a large fleet of state of the art aircraft with G1000 avionics."[46]

209. In reality, Coast did not have sufficient resources for cadets to train regularly.

210. For example, Coast prominently boasts about its aircraft across its website, including "NEW 2019 PIPER ARCHER FLEET"[47] and "NEW PIPER ARCHER TX TRAINING FLEET Model Year 2019 – G1000 Avionics."[48]

---

[44] Internet Archive Wayback Machine, *Cadet Academy Index*, AMERICAN AIRLINES CADET ACADEMY, https://web.archive.org/web/20180719045517/http://www.aacadetacademy.com/CadetAcademy/index/1 (captured July 19, 2018).

[45] *Pilot Journey*, *supra* note 3.

[46] *Airline Career Training Program*, *supra* note 16.

[47] Internet Archive Wayback Machine, *American Airlines Cadet Academy*, COAST FLIGHT TRAINING, https://web.archive.org/web/20210804162310/https://iflycoast.com/american-airlines-cadet-academy/ (captured Aug. 4, 2021).

[48] *American Airlines Cadet Academy with Coast Flight Training*, COAST FLIGHT TRAINING, https://iflycoast.com/aa-cadet-training-at-coast-flight-training/ (last visited Dec. 4, 2025).

211. Several Plaintiffs received emails from Coast stating, "We fly brand new, 2019 Piper Archers with G1000 avionics that are exclusive to our American Airlines Cadet Program."

212. Contrary to Coast's statements about its aircraft fleet, there often were not enough operational aircraft for the students to fly because planes were constantly grounded for maintenance.

213. Plaintiffs experienced malfunctioning and disengaging communications systems while in flight, leakages on aircraft, and loose components on aircraft.

214. Several flight instructors quit Coast due to concerns about the safety of the aircraft.

215. Plaintiff Sanderson was told by a Designated Pilot Examiner ("DPE"), an examiner appointed by the FAA, that most of the planes Coast used for training needed full engine overhauls and were in such bad repair that they were not safe to use for instruction.

216. Several times during Plaintiffs' training, including at least in summer 2023 and again in summer 2024, Coast made major changes to the availability of certain aircraft for Plaintiffs to train on, which further delayed Plaintiffs' training.

217. In June 2023, Coast cut by half its fleet of 14 Piper Archers at its San Diego location. Suddenly, there was a severe shortage of Piper Archers, a shortage of instructors who knew how to fly the other aircraft available (Cessnas), and a shortage of maintenance crew who knew how to maintain the aging Cessnas.

218. In 2024, Coast switched its Cessnas from its San Diego location to its Texas location and brought in the Archers. This change derailed some cadets' trainings, including but not limited to Plaintiffs Pearson and Fogel, because the different planes involve different equipment and systems.

219. Relatedly, some of these planes were downed often.

//

//

220. Plaintiff Fogel was unable to train for or take his multi-engine rating for several months because Coast did not have an appropriate multi-engine plane available for him to fly.

221. Plaintiff Pearson openly and directly complained to Coast staff about the sudden switch from Cessnas to Archers, causing a shortage of Cessnas, and that it derailed his training schedule.

222. American and Coast were both aware of Coast's aircraft shortages and the negative impact these shortages had on cadets' ability to complete the program.

223. In a letter to cadets at Coast San Diego on June 8, 2023, Coast states, "Currently, we know that about 45% of our aircraft fleet for our Academy Students are downed due to maintenance, which is unfortunate for all of us. . . . We recognize right now it may feel as though we are not here for you, planning correctly on your timeline, or getting you scheduled accordingly[.]"

224. In an email on June 17, 2023 to cadets in Dallas, a representative of American acknowledged issues with twin engine aircraft availability and the "long queue of students waiting to complete the program."

225. Plaintiffs read (including, but not limited to, on Defendants' websites and brochures) and heard (including, but not limited to, in interviews and conversations with Defendants) these representations.

226. Plaintiffs relied on Defendants' representations that Plaintiffs would have access to sufficient training resources in making their decision to attend the AACA at Coast.

227. For each Plaintiff, Defendants' promises about the quantity and quality of flight training resources were material factors in choosing to attend the AACA at Coast.

228. However, Defendants' representations were false.

229. Defendants knew their representations about quality and quantity of aircraft at the AACA were false but they continued to make the same representations to convince prospective cadets, such as Plaintiffs, to attend the AACA at Coast.

230. If Plaintiffs had known the truth that Coast did not have sufficient aircraft and other resources needed for students to train the five to six days per week as Defendants promised to complete the AACA in 12 months, they would not have chosen to attend the AACA at Coast.

### D. DEFENDANTS UNLAWFULLY DISCRIMINATED AGAINST PLAINTIFFS ON THE BASIS OF RACE

231. American Airlines promoted the Cadet Academy as a flight training program with a mission to "diversify the pilot profession"[49]—historically an overwhelmingly white-dominated field.[50]

232. In annual sustainability reports produced by American Airlines Group, Inc., American consistently touts the AACA as a prime example of its efforts to recruit people of color and from "groups that have historically faced barriers to entering our industry to pursue the stable and rewarding careers [the pilot industry] provides."

233. Although American claimed altruistic motivations for seeking diverse candidates, its practices reveal that it embarked on a predatory and discriminatory campaign of targeting non-white cadets, including Plaintiffs, for a flight training program American knew or should have known they were unlikely to complete.

234. Further, once Defendants successfully recruited these non-white cadets, including Plaintiffs, Defendants subjected them to an environment rife with racial bias and hostility that severely impacted their ability to succeed in an already deficient program.

235. Thus, Defendants unlawfully discriminated against Plaintiffs on the basis of race in two ways: by "reverse redlining" (in violation of ECOA and Title VI), and by subjecting Plaintiffs to disparate treatment once they were enrolled in the AACA (in violation of Section 1981, Title VI, and the Unruh Civil Rights Act).

---

[49] *American Airlines Cadet Academy Introduces New Student Loan Options with American Airlines Federal Credit Union*, *supra* note 31.

[50] *See supra* ¶ 57; *supra* notes 7 and 8.

236. Further, when Plaintiffs complained about the discriminatory treatment, Defendants failed to take any action to abate it and instead punished Plaintiffs for complaining.

### i. American Utilized Reverse Redlining Tactics to Target Racial Minorities for a Predatory Scheme

237. American targeted racial minorities with deceptive and misleading advertising to entice non-white cadets, including Plaintiffs, to take out massive loans to enroll in the AACA—a predatory program with little likelihood of a successful outcome.

238. Through focused and systematic advertising, American convinced Plaintiffs that the AACA was designed to help people of color, like them, achieve their goal of becoming airline pilots and commencing a stable, lucrative career.

239. This practice Defendants engaged in—targeting certain racial groups to sell predatory products or services, or treating them less favorably through facially-neutral practices that nevertheless have a disproportionate and unjustified impact on the basis of race—is known as "reverse redlining."

240. American's advertisements, promotions, representations, reports, and actions consistently show that American targeted the program toward non-white applicants.

241. In a 2019 article celebrating the program's first year, American touted the "diverse pool of prospective pilots [that] continues to join the American Airlines Cadet Academy" and spotlighted two cadets: one Black and one of Hispanic descent.[51]

242. American also described its continued "effort to recruit and retain the next generation of aviators" at "Moton Field (06A) in Tuskegee, Alabama, where more than 100 children from the area were offered the chance to take discovery flights," noting "[m]any of those who participated were from families who didn't have the means to expose them to aviation and could not afford the cost of discovery flights." *Id.*

[51] *Focused on the Future: American Airlines Celebrates Cadet Academy's First Year*, *supra* note 10.

243. Based on the photos American published in the article, all of the participants were Black. In fact, every one of the five pictures published in the article prominently featured Black and other non-white individuals:













*Id.*

244. In 2022, American reiterated that the AACA was part of "[their] work to grow and diversify the pilot profession," and the loans available through third parties "were designed to help eliminate the financial barriers prospective pilots face, while supporting the incremental growth of the pilot population and creating greater diversity amongst the future and current pilot ranks."

245. In April 2022, American posted an article on its website celebrating the first two AACA cadets to be hired by American—both of whom were Black. American stated, "Through its Cadet Academy, American [is] creating greater diversity among the current and future pilot ranks," and "[w]ith nearly 600 cadets in the program today — and many graduates already working in the flight deck — American continues to grow the program, significantly impacting the diverse makeup of flight crews industrywide."[52]

[52] *Paving the Path: First Two American Airlines Cadet Academy Graduates Hired at American Airlines*, AMERICAN AIRLINES NEWSROOM (Aug. 12, 2022), https://news.aa.com/news/news-details/2022/Paving-the-path-First-two-American-Airlines-Cadet-Academy-graduates-hired-at-American-Airlines-ID-BK-08/.

246. American also published videos on its website and YouTube channel in which these two Black cadets lavished praise on American and the AACA.[53]

247. American prominently features Black and other non-white cadets and pilots on its AACA website and in promotional materials advertising the AACA to attract non-white individuals to the program—for example, on its AACA page, as shown below:




*About the Academy*, *supra* note 42.

248. On American's "Pilot Journey" page, three out of the four individuals pictured are Black, as shown below:

//

//

//

//

//

[53] *Id.*; *Honoring a Legacy of Firsts,* AMERICAN AIRLINES NEWSROOM (May 12, 2022), https://news.aa.com/news/news-details/2022/Honoring-a-Legacy-of-Firsts-ID-BK-05/default.aspx; AMERICAN AIRLINES, *Paving the Path: First Two American Airlines Cadet Academy Graduates Hired at American Airlines*, (YouTube, Aug 19, 2022), https://youtu.be/dU3e2elrVbE?si=q7K7ZxE3CrsyEi3h.

# Career Flight Path

The flight path is simple no matter where you start – with or without your certificate, little or a lot of experience.



## Learn to fly

The first step in beginning a career as a pilot is to complete initial flight training. With the Cadet Academy, you will join other cadets to train at one of our trusted partner schools. Your initial flight training will include the following certificates and ratings:

- **private pilot**
- **instrument rating**
- **commercial pilot**
- **multi-engine rating**
- **certified flight instructor**
- **certified flight instructor - instrument**

**$35K** **Paid to fly**



## Build time

You will then build the necessary flight hours in order to be hired by a regional airline. Most cadets build hours by becoming a certified flight instructor, where you can get paid to teach others how to fly.

**$50K** **Transition to Airlines**



## Fly for American Airlines

Most new hires to American come directly from our regional partners. But it's not the $90K average salary their first year that makes American the destination for new hires. It's the chance to pilot the largest aircraft to the most destinations globally, while being supported by the largest airline in the world.

**$135 – $235K+** ▸ **Become a captain**

## The View from the Left Seat




## Fly for a Regional Airline

Once you reach 1,500 total flight hours you will be eligible to join one of American Airlines Group wholly-owned regional airlines: Envoy, Piedmont, and PSA. These regionals have a contractual flow agreement with American Airlines guaranteeing you a first officer position with American Airlines.

**$70-90K** ▸ **Gain Experience**

*Pilot Journey*, AMERICAN AIRLINES CADET ACADEMY, https://academy.aa.com/landing/academy/html/pilot-journey.html (last visited Dec. 4, 2025).

249. American's "Pilot Stories" page spotlights 10 individuals—at least half of whom are Black and/or non-white, as shown below:






*Pilot Stories*, AMERICAN AIRLINES CADET ACADEMY, https://academy.aa.com/landing/academy/html/pilot-stories.html (last visited Dec. 4, 2025).

250. In 2022, American flew a group of young aviation enthusiasts from Chicago to Wisconsin for the EAA AirVenture (an annual aviation industry gathering) to learn about aviation and try out flight simulators, and nearly every person featured in American's videos of this event was Black.[54]

251. American had booths and representatives promoting and recruiting for the AACA at events targeted toward certain minority groups, such as the Women in Aviation, Organization of Black Aerospace Professionals ("OBAP"), Society of Hispanic Professional Engineers, Professional Asian Pilots Association, and National Society of Black Engineers conferences. Several Plaintiffs learned about the AACA at these events, and Plaintiff Mianda interviewed for the AACA at an OBAP event.

//

//

//

[54] AMERICAN AIRLINES, *Inspiring Future Aviators | EAA AirVenture Oshkosh Air Show 2022*, (YouTube, Aug. 26, 2022), https://youtu.be/AKQIL7FmKw?si=zt5IktIIAF fzkpqy; AMERICAN AIRLINES, *Young Aviation Enthusiasts Visit the Annual EAA AirVenture in Oshkosh, WI*, (YouTube, Aug. 16, 2022), https://youtu.be/6wZhXQaAkPM?feature =shared.

252. At the annual OBAP conference in 2022, American announced it was donating $1.5 million to OBAP.[55] Christina Flores, Head of Global Talent Acquisition for American, stated:

> At American, diversity, equity, and inclusion is at the very core of our company and embedded in what we do. At this critical time in our industry, we believe it is important to have all work groups represent the customers that we serve. We are also focused on supporting the pilot population growth and increasing diversity amongst both future and current pilot ranks. And our partnership with OBAP is critical to that mission and to the future of our organization. We must be intentional in our efforts to recruit and train pilots, and show those needing a path forward the direction. **That is why we launched the American Airlines Cadet Academy in 2018**.[56]

253. Also in 2022, American sponsored the Girls United Summit and three representatives of American "stopped by the GU Summit 2022 to express the need for more Black women in aviation" and promote the AACA.[57]

254. American's YouTube channel features a playlist called "Empowering Black Talent in Aviation" containing 12 videos all promoting American's efforts toward racial diversity, including several about the AACA.[58]

---

[55] *American Airlines Continues Its Efforts to Diversify the Flight Deck With a $1.5 Million Donation to the Organization of Black Aerospace Professionals*, AMERICAN AIRLINES NEWSROOM (Aug. 15, 2022), https://news.aa.com/news/news-details/2022/ American-Airlines-Continues-its-Efforts-to-Diversify-the-Flight-Deck-With-Donation-to-the-Organization-of-Black-Aerospace-Professionals-ID-BK-08/default.aspx.

[56] *OBAP Conference and American Airlines Donation - Sound Bites*, AMERICAN AIRLINES NEWSROOM, https://news.aa.com/multimedia/videos/default.aspx (choose "Culture" from the menu on the lefthand side; then select the Play or Download symbol on the video titled "OBAP Conference and American Airlines Donation - Sound Bites") (last visited Dec. 4, 2025) (emphasis added).

[57] Kenyatta Victoria, *American Airlines Elevates Black Women In Aviation During GU Summit 2022* (May 1, 2024), ESSENCE GU: GU SUMMIT AA AVIATION PANEL https://girlsunited.essence.com/ feedback/news/gu-summit-aa-aviation-panel/.

[58] AMERICAN AIRLINES, *Empowering Black Talent in Aviation*, (YouTube, Aug. 2022 to Feb. 2023) https://www.youtube.com/playlist?list=PL43OjlkXFdqZnGnYa9 DOD4qvefwBovuUi (last visited Dec. 4, 2025).

255. In addition to intentionally targeting non-white prospective cadets, American targets the AACA to certain groups of nontraditional applicants aspiring to be pilots.

256. For example, American targets applicants who have no experience piloting, no existing relationship to pilots, and no existing pipeline to becoming a pilot; low-income applicants or applicants who do not have the disposable income necessary to afford flight training; older applicants; and applicants who had prior careers in other industries. Because applicants from these groups are disproportionately non-white, the facially neutral policy of targeting these groups of nontraditional cadet-applicants has an impermissible disparate impact on non-white cadets.

257. American specifically advertises to and targets racial minorities and persons for whom pilot training was not readily accessible.

258. American's efforts to target the AACA to racial minorities have worked. Plaintiffs estimate that of the 91 AACA cadets in their cohorts, 43 are white and 48 (including Plaintiffs) are non-white. Based on these estimates, about 53% of AACA cadets are people of color.

259. American tracks cadets' demographics and progress through the program.

260. Upon information and belief, the proportion of AACA cadets who are non-white is at least three times more than the proportion of non-white pilots in the profession in the U.S.[59]

261. Each Plaintiff saw and was encouraged by American's representations that non-white people were supported and able to become successful cadets. But for American's purported commitment to diversity, Plaintiffs would not have enrolled at the AACA at Coast.

//

//

[59] *See supra* ¶ 57; *supra* notes 7 and 8.

262. Whether through intentional targeting or facially neutral policies that have the effect of disproportionately attracting non-white cadets, Defendants enticed Plaintiffs—all of whom are non-white—to enroll in the AACA.

263. These targeted efforts to enroll Plaintiffs in the AACA also ensnared the Plaintiffs in credit transactions that they would not otherwise have entered into.

264. None of the Plaintiffs had sufficient funds to pay for the AACA at Coast.

265. In order to pay for the AACA, all of the Plaintiffs took out a loan.

266. All of the Plaintiffs entered into these credit transactions based on the false and fraudulent premise that the AACA could be completed within 12 months and at a maximum cost of $103,495.

267. In reality, the average student needed more than 12 months—and much more than $103,495—to complete the AACA. Defendants knew this but continued to recruit cadets based on these fraudulent premises and target non-white applicants to the program.

268. As a result of the misrepresentations that caused Plaintiffs to take out the predatory loans, Plaintiffs accrued substantial debt, which led to lasting detrimental effects such as massive drops in their credit scores.

269. Defendants' actions demonstrate a pattern and practice of discrimination under ECOA and Title VI: their targeting resulted in disproportionately high rates of non-white people terminated or forced to resign from the AACA, saddled with significant high-interest debt that they are unable to pay back. These acts constitute reverse redlining and racial discrimination under ECOA and Title VI.[60]

**ii. Defendants Subjected Plaintiffs to Disparate Treatment on the Basis of Race**

270. While Plaintiffs were enrolled in the AACA, Defendants subjected them to disparate treatment on the basis of race.

[60] *Carroll v. Walden Univ., LLC*, 650 F. Supp. 3d 342, 362 (D. Md. 2022).

271. Based substantially on Plaintiffs' race, Defendants denied Plaintiffs full and equal services that would enable them to progress and succeed at the AACA.

272. Defendants also subjected Plaintiffs to a hostile educational environment.

273. Defendants treated non-white cadets less favorably than white cadets in the AACA. As a result, white cadets, on average, progressed significantly faster and ultimately finished the AACA at far higher rates than non-white cadets.

274. Plaintiffs disproportionately faced scheduling delays that white cadets did not; experienced frequent turnover or reassignment in their instructors and often received inadequate instruction in comparison to their white counterparts; were graded, without factual basis, more harshly than their white peers; were disproportionally placed in the remedial program, often due to discriminatory scheduling practices and unfair assessments; and ultimately were disproportionately dismissed or forced to resign from the AACA.

275. Plaintiffs also experienced open hostility from Coast instructors and staff and, in some instances, were subjected to racialized comments and stereotypes.

276. Defendants discriminated against the Plaintiffs in the following ways:

277. ***Scheduling***. Defendants discriminated against Plaintiffs—all of whom are non-white cadets—in how they operated flight and training scheduling.

278. Defendants failed to schedule Plaintiffs for events (direct training sessions), scheduled events during times that the flights were likely to be canceled, and/or frequently canceled Plaintiffs' flights.

279. Plaintiffs witnessed Defendants schedule white cadets for training events more frequently and at more advantageous times, allowing them to train more often and progress faster.

280. For example, Plaintiff Chodkowski was scheduled so much less frequently than his white cohort-mate, H.S., that H.S. finished the AACA in approximately 11 months, despite starting at the same time as Plaintiff Chodkowski and with less prior flying experience.

281. In April 2023, while Plaintiff Mianda was working on obtaining her PPL, she went through a 24-day streak of being grounded because of weather conditions, but she found out that white cadets were being scheduled during this time when there were pockets of favorable weather conditions.

282. In October 2022, Plaintiff Clark went 18 days without flying. In November 2022, he went 25 days without flying. In December 2022, he only flew three times. During many months of his time in the AACA, Plaintiff Clark was unable to fly on more than 20 days. Plaintiff Clark was not responsible for any of the idle periods; rather, they were imposed by Defendants. Many of his white counterparts flew far more often than he did during those months.

283. The FAA requires flight trainees to pass a "checkride" to obtain each of the ratings required to become a commercial pilot. For this reason, checkrides are a vital part of pilot training.

284. Defendants forced Plaintiffs to wait unreasonably long periods of time to complete their checkrides, which stalled their training because they were not permitted to progress on to the next stages of training while waiting.

285. There were often long queues to take checkrides, partially due to the scarcity of DPEs who conduct the checkrides. Yet white cadets received priority in the queue and in the timing of the checkride.

286. These delays forced Plaintiffs to spend extra money and hours refreshing their skills before the checkride test.

287. Several Plaintiffs were not allowed to progress in the AACA *at all* while they waited for a checkride, which caused even further delays.

288. For example, Plaintiff Grannell had to wait months for his PPL checkride, and Coast would not allow him to advance in his training during that waiting period. Meanwhile, white cadets, such as J.C. and K.L., had shorter waiting periods or were allowed to advance their training during waiting periods.

289. White San Marcos cadets I.S., K.C., A.Z., and S.W. were allowed to advance to Instrument training while waiting for their PPL checkrides, but Plaintiff Lusby was required to complete her PPL checkride before advancing.

290. Several Plaintiffs' checkrides were also scheduled with very little notice. This gave some Plaintiffs insufficient time to prepare for these vital exams. Defendants gave white cadets sufficient notice for their checkrides.

291. For example, Coast scheduled Plaintiff Anderson's Commercial and CFI checkrides with only a few days' notice. She had insufficient time to do the necessary warm-up flights to prepare, which caused her to fail the checkrides and delayed her progress.

292. In or around October 2023, Coast gave Plaintiff McGowan fewer than 36 hours' notice of her first checkride. This was inadequate time to complete the FAA paperwork for the first time and study for the test. As a result, she failed the oral examination.

293. ***Instructor Assignment and Poor Instruction.*** Many Plaintiffs' training timelines were delayed because the Defendants frequently switched their instructors.

294. Because different instructors applied different standards and methods of teaching, Plaintiffs who had multiple instructors per course were often forced to repeat training.

295. While nearly every Plaintiff's training was negatively impacted by inconsistent instruction, many Plaintiffs experienced extremely high turnover in instructors.

296. Plaintiff Khan flew with five different instructors in one month while he was in the remedial program.

297. Plaintiff Clark had three different primary instructors in his first three months of the AACA, and seven primary instructors in total during his 10 months in the AACA.

298. In Plaintiffs' understanding and experience, white cadets had more consistency and less turnover in instructors than Plaintiffs did.

299. Of the instructors that Plaintiffs were assigned, many instructors refused to teach Plaintiffs and/or actively demonstrated a lack of interest in their training. This also delayed their training.

300. For example, Plaintiff Kumar's instructor Levi McKenzie stated that he did not like flying with her, and his disdain for training with her culminated in him often arriving late for her training sessions or canceling her training last minute. Mr. McKenzie did not treat white students in the same way.

301. As another example, Plaintiff Jones's instructor Alexa Aspan refused to allow her to be scheduled for training for four days even though the "mistake" Plaintiff Jones had made was due to an instruction from the control tower. Meanwhile, Ms. Aspan comforted white cadets who crashed or almost crashed planes.

302. In Plaintiffs' experience and observations, instructors treated white cadets with more attention, respect, and professionalism and generally prioritized teaching them.

303. ***Grading.*** Instructors at the AACA graded Plaintiffs more harshly than white cadets, holding them to an unreasonably high standard (e.g., expecting them to know more advanced material), failing them for small errors, and/or refusing to allow them to progress without a valid reason.

304. For example, instructor Luke Bazaldua forced Plaintiff Grannell to repeat training lessons he had already successfully completed, such as grounds lessons, but would not explain the material or what Plaintiff Grannell should do to improve. Plaintiff Grannell observed that white cadets—particularly his cohort mates, J.C. and K.L.—were not treated this way.

305. San Diego instructor Nayef Howar gave Plaintiff Sanderson "unsatisfactory" grades on more than 20 events for small mistakes that should not have warranted a failing grade. Instructors did not treat white cadets in a similar manner.

306. Instructor Annika Rivera tested Plaintiff Lusby on harder and more detailed material than her white peers, did not permit her to utilize study materials during her

exams, and denied Plaintiff Lusby second chances to repeat exams or lessons, unlike white cadets, such as A.A.

307. ***Mentors.*** Although American was responsible for providing mentors to cadets, few cadets in the AACA received mentors as promised.

308. In Plaintiffs' experience and observations, white cadets received mentors at a higher rate and earlier in their training than non-white cadets.

309. Nine Plaintiffs never received mentors as promised.

310. For example, Plaintiff Fogel never received a mentor at all despite being in the AACA for 21 months. Plaintiff Little never received a mentor at all despite being in the AACA for 17 months.

311. Of the eleven Plaintiffs who did receive mentors, at least six only received those mentors at least seven months into their training. Because mentors were supposed to be assigned at the beginning of training, this created delays in Plaintiffs' progress in the program.

312. ***Placement in Remedial Program and Removal from AACA.*** Defendants discriminatorily placed Plaintiffs Clark, Fogel, Grannell, Hernandez, Jones, Johnson, Khan, Kumar, Lusby, McGowan, Mianda, Ortega, Pearson, Sanderson, and Thelus in the remedial program. Additionally, Defendants discriminatorily removed all Plaintiffs from the AACA, including by forcing some Plaintiffs to resign.

313. Defendants had the power to place cadets in a remedial program during their training. The remedial program is described in the Coast Academy Program Guide, a version of which each Plaintiff received, as a five-tiered process to assist a cadet with issues in their progression and remedy these issues. Cadets may be placed in the remedial program for inability "to maintain the Coast Academy Training Expectations (course progression, availability, professionalism, etc.)."

314. Coast's Program Guide states that Coast will "make an asserted effort to work directly with the cadet to attempt to resolve the issue" for cadets in the remedial

program, and that cadets placed in the remedial program or who require extra instruction "will still have a pathway to success."

315. In reality, the remedial program was a pathway to force cadets, particularly non-white cadets, out of the AACA after they had already paid tuition and incurred debt.

316. Fifteen out of twenty Plaintiffs were placed in the remedial program. The reasons for this placement into the remedial program were uniformly discriminatory.

317. Defendants placed Plaintiffs in the remedial program for reasons such as lack of progress, high hours, and poor performance. But these purported performance issues usually stemmed from circumstances outside of the Plaintiffs' control (such as weather cancelations) or Coast's own failure to deliver proper training (such as biased scheduling, repeatedly switching instructors, or forcing Plaintiffs to work with an instructor who treated them poorly, *see supra* ¶¶ 277-312).

318. Coast failed to provide the "asserted effort" that it promised to resolve any training issues that might arise. The remedial program was a dead end; it was not a "pathway to success" as Coast promised.

319. In Plaintiffs' experience and observations, Defendants did not place white cadets with similar or worse performance issues than Plaintiffs in the remedial program at the same rates, indicating that Coast selectively chose to railroad non-white cadets into this dead-end pathway.

320. For example, Plaintiff Clark was put in the remedial program, purportedly for lack of progress and high hours, yet Coast admitted that these issues were not his fault. In contrast, several white students, such as A.Y., were at roughly the same stage as Plaintiff Clark, repeatedly failed stage checks, were not proficient at key skills, and/or had exceeded the allotted hours, but Defendants did not place them in the remedial program.

321. Defendants placed Plaintiff Khan in the remedial program in July 2023 for having "unsatisfactory" training events due to small, inconsequential mistakes he made in training. Defendants claimed the remedial program was "an asserted effort" to give

Plaintiff Khan a "pathway to success." But instead of receiving support, Plaintiff Khan found he had no continuity with instructors. While he was in the remedial program, Plaintiff Khan flew with five different instructors in one month, each of whom had different standards and different teaching styles. Rather than allowing for a pathway to success, the haphazard and ineffective remedial program caused Plaintiff Khan to fall *further* behind.

322. Defendants placed Plaintiff Johnson in the remedial program in May 2023, purportedly for unsatisfactory and incomplete events and high hours, even though Coast was responsible for these issues. In contrast, white cadets with performance issues such as J.H. were not placed in the remedial program.

323. Nearly all of the other cadets with Plaintiffs in the remedial program were non-white.

324. When Plaintiffs tried to complain to American and Coast about the unjust decisions and the underlying drags on their training, they were ignored or retaliated against.

325. For example, just a few days after he raised concerns about unfairness in the AACA to staff, Plaintiff Khan was terminated from the AACA.

326. Defendants terminated sixteen Plaintiffs from the AACA for pretextual reasons. Plaintiffs were terminated for accruing too many hours, receiving unsatisfactory events, or failing too many checkrides, even though these purported performance issues were attributable to Coast's failure to provide a proper training program, as described *supra* ¶¶ 277-312.

327. Defendants terminated some Plaintiffs, such as Plaintiffs Thelus, Ortega, and Jones, for supposed "unsafe" practices, but never identified what those practices were.

328. For example, Plaintiff Lusby's white peers, S.L., I.S., and B.D., had approximately the same hours as Plaintiff Lusby and failed as many exams and checkrides. But unlike Plaintiff Lusby, none of them were placed in the remedial program or removed from the AACA.

329. Defendants unfairly forced Plaintiffs Fogel, Clark, Little, and Johnson to resign from the AACA. Through discrimination, unnecessary delays, extra expenses, and failure to respond to complaints, Defendants made these Plaintiffs' training so difficult that it was clear they would not receive a fair shot at succeeding and continuing in the program would have been futile.

330. In Plaintiffs' observations and experiences, white cadets were removed at a far lower rate than non-white cadets and were able to finish the program at a much higher rate.

331. Plaintiffs recollect that their collective cohorts contained 91 people: 43 white cadets and 48 non-white cadets. Among those, Plaintiffs estimate that 24 white cadets finished the program (a pass rate of 56%), while just nine non-white cadets finished (a pass rate of 19%).

332. ***Defendants created a hostile environment.*** Plaintiffs not only faced significant obstacles in their training because of Defendants' disparate treatment but were also forced to endure a hostile environment because they were non-white.

333. The racial demographics of the instructors and staff at Coast mirrored that of the aviation profession, in that the majority of them are white. Unlike the aviation field, a large portion of the AACA cadets were non-white.

334. Defendants allowed instructors and staff to act with blatant antagonism towards non-white cadets and to make racially biased, stereotypical, and insensitive remarks that made the training environment intolerable.

335. Plaintiffs also endured mistreatment by instructors, including shouting, disrespectful language, condescension, and disinterest in Plaintiffs' training, whereas instructors were friendly, supportive, and helpful to white students.

336. For example, Coast instructor Andrew Law commented that Plaintiff Fogel must have grown up "in the hood" "struggling" because of his race and said words to the effect of, "watch out, you'll be working for me someday."

337. This disparity in instruction was so bad for Plaintiff Fogel that a white cadet in his cohort, N.C., noted that Plaintiff Fogel's instructor refused to help him learn the required material for a checkride, an instructor publicly yelled at him, and an instructor vaped during a flight. These instructors did not treat N.C. in this manner.

338. As another example, Dallas instructor Jeffrey Gill was openly hostile toward Plaintiff Johnson, telling him to "shut the fuck up" when Plaintiff Johnson asked a question in a group setting about how to park the planes. This instructor did not speak to white cadets in this manner. Mr. Gill then told Plaintiff Johnson that "he should be able to take that type of treatment since [he is] from Chicago." Plaintiff Johnson is from California, but Mr. Gill assumed that Plaintiff Johnson is from a rough neighborhood in a city with a large Black population because of his race.

339. On another occasion, Mr. Gill told Plaintiff Johnson that he had a "tiny brain."

340. When Plaintiff Jones complained about her lack of flying time and the difficulty she was experiencing getting placed on the flying schedule, San Marcos Site Director Tamra Reid called her "hostile" and "aggressive," a stereotypical characterization of Black women.

341. Coast instructor Zachary Wild criticized Plaintiff Page's crochet-style hair braids by claiming they were "taking up too much space."

342. A Coast instructor called a Black cadet's skin "dirty" and her fingernails "ghetto."

343. A Coast instructor called Plaintiff Pearson, who is Black, "ghetto," and likened him to a broken-down plane.

344. Coast accused Plaintiff Page of being "hostile" and Plaintiff Thelus of having an "argumentative attitude" in disciplinary documents—both offensive racial stereotypes.

345. In Plaintiffs' experience and observations, white cadets were not subjected to such racialized comments about their appearance and behavior.

346. Many instructors were also overly critical of and displayed a cold demeanor towards Plaintiffs, even though they were affable and conversational with white cadets.

347. Defendants knew or should have known that Plaintiffs were experiencing race discrimination in the AACA.

348. Plaintiffs notified American and Coast agents and officials of instances of discrimination and unfair practices at Coast. Plaintiffs also complained to American and Coast officials about the hostile environment at Coast. Plaintiffs made these complaints in multiple forms and on multiple occasions.

349. Plaintiffs also alerted instructors, flight leads, site directors, mentors, current American pilots, Coast President Heath Jameson, and other officials about these issues via private communications, in campus-wide town halls, and in other forums.

350. Defendants did not take any remedial action in response to Plaintiffs' concerns.

351. Upon information and belief, American and Coast were tracking demographic data of AACA program completion. This data should have alerted them that non-white cadets were disproportionately placed in the remedial program, that non-white cadets were disproportionately dismissed from the program, and that non-white cadets disproportionately failed to finish the program as compared to white cadets.

352. Defendants did not take any action to remedy the issues causing these discriminatory failure rates.

353. Plaintiffs were harmed by this disparate treatment. Every Plaintiff was terminated or forced to resign from the AACA for discriminatory reasons.

354. Defendants caused each Plaintiff emotional distress from the racist and biased treatment each faced at the AACA.

355. Each Plaintiff was financially harmed by their unfair and discriminatory premature ouster from the AACA.

356. Defendants' discriminatory conduct was a substantial factor in causing Plaintiffs' harm.

### iii. American's Role and Knowledge of Discrimination at the AACA at Coast

357. American and its representatives were aware of the racial bias occurring at the AACA at Coast and knew or should have known about this unlawful discrimination.

358. From as early as 2022 through May 2025, Plaintiffs complained to American about the issues that they were facing in the program, some of which American acknowledged in writing.

359. American's representatives, including Maria Didonna, Cadet Development Specialist for the AACA, Christopher Shope, Senior Manager of Aviation Programs and Pilot Career Strategy at American Airlines, Jessica Ast, Senior Manager of Aviation Programs at AACA Operations, and/or Hannah Butterfield, Pilot Career Development Analyst at American Airlines, visited (or were supposed to visit) each of Coast's locations at least monthly. They interacted with each Plaintiff either in-person, via email, or through the online, monthly progress reports Plaintiffs submitted to American. American hosted site visits, meetings, and on-site events with AACA cadets at each Coast location. For example, Ms. Ast wrote in an April 14, 2025 email sent to AACA cadets, including to Coast San Diego AACA cadets:

> When AAG (American Airlines group) is in town to conduct a class/standards meeting/or other type of event outside of regular site visits, the cadets that are blocked off their schedule to attend are required to attend. These AAG events: Cadet Academy, Safety, Credit Union, Regional visits, or other, are now considered mandatory in attendance for cadets blocked. Not all cadets will be blocked for all events. We will take role and review with the school who did not show up. Eligible excuses include but are not limited to Checkrides, EOC, stage checks, illness, and the remainder will be reviewed on a case-by-case basis. If we find that someone did not show because they did not want to, then it will be reported to the school as a no-show event and handled according to the no-show policy for the school.

360. Moreover, American's representatives were in frequent communication with Coast's representatives.

361. Coast management, including site directors and flight leads at each Coast location, provided reports, both written and oral, to representatives of American, such as Ms. Didonna, Ms. Ast, and/or Mr. Shope, regarding the progress of cadets in the AACA and issues that arose in their training.

362. Further, Coast provided information about AACA cadets to American through meetings, calls, and emails. Coast management had at least several calls a month with American in which they reviewed the students' progress and any complaints.

363. Upon information and belief, Coast created and shared documentation with American, including "Letter[s] of Caution," "Remedial Training Plan[s]," and "Flight Training Discontinuance" letters, purportedly to document problems cadets were experiencing during training and the steps being taken to address those issues.

364. In many cases, the documentation Coast created regarding Plaintiffs' training contained inaccurate and derogatory statements about Plaintiffs' piloting skills, behavior at Coast, and ability to complete their ratings.

365. Through frequent communication with Plaintiffs and with Coast, American knew or should have known about the issues, complaints, and discrimination that Plaintiffs encountered at the AACA.

366. Ms. Didonna, Mr. Shope, Ms. Ast, and Ms. Butterfield sent frequent emails to cadets providing updates about the program, acknowledging complaints they had received, and describing steps being taken to improve the program.

367. For example, in May 2023, Ms. Ast wrote to all cadets admitting that American was aware that some cadets were "pushing timelines" or were past the timelines they anticipated and stated that Coast was working on a "plan of action" for these students.

368. In June 2023, Mr. Shope wrote to all cadets acknowledging the complaints and frustrations that Plaintiffs and others had been lodging and acknowledged the need to remedy issues at the AACA. He specifically referenced the shortage of twin engine aircraft in Dallas and "the long queue of students waiting to finish the program."

369. For example, in or around August 2023, after hearing multiple complaints from San Diego cadets, Ms. Didonna wrote an email to Coast stating:

> I wanted to bring to your attention some ongoing scheduling issues that are affecting our cadets in San Diego. We have been discussing this for over a month now and have seen very little movement. Several have shared evidence of being left off of the schedule, particularly during key training moments such as the EOC, for extended periods of time. Unfortunately, these issues have persisted despite our previous discussions and efforts to rectify the situation. . . our scheduling team in San Diego has been described as unprofessional, shows favoritism, among other complaints. These issues have led to some of our cadets being stuck in PPL after six months of training, which is an unacceptable and concerning situation, and over 23 cadets that are estimated to complete training after the curriculum timeline of 13.5 months. . . I understand that there are factors outside of our control, such as weather and maintenance, but I believe this issue is also caused by a lack of planning on the scheduling team's part. This does not mean that we place those 23 cadets on remedial training plans due to "not meeting timeline", unless it truly does fall within the remedial guidelines. As a result, I would appreciate it if the Coast leadership team in San Diego could take a more proactive approach towards [getting each cadet back on track].

370. On August 28, 2023, after a townhall in which multiple cadets complained about the AACA and Coast, Ms. Ast acknowledged the concerns, and wrote in an email to cadets:

> Thanks for your patience and for allowing us time to collaborate and work through details with Coast since our townhall. . . Since our townhall, we have had several meetings between AACA and Coast, and Coast has worked with their team(s) internally to bring self-awareness, areas of improvement, and hopefully what you will see as a cultural shift over the next few months . . . From communication, scheduling efficiencies, and support towards your success, there are multiple efforts being put into place for you.

371. On June 10, 2024, Ms. Ast emailed cadets acknowledging a complaint that Coast is "having trouble with scheduling students across the board."

372. In San Diego, Plaintiffs complained about unfair treatment during on-site visits from American representatives such as Ms. Butterfield, Mr. Shope, and Ms. Didonna, in emails and calls with Ms. Didonna, Mr. Shope, and Ms. Ast, in their monthly progress reports to American, during townhalls held by American, and in one-on-one conversations with representatives.

373. In Dallas, Plaintiffs complained to American in calls with Ms. Didonna, at townhalls, in monthly progress reports, and during site visits, which American acknowledged in writing.

374. In San Marcos, Plaintiffs complained to American in calls and emails to Ms. Didonna and through monthly progress reports to American.

375. Some Plaintiffs, such as Plaintiffs McGowan and Sanderson, made requests to Ms. Didonna to switch to a different flight school within the AACA given the hostile environment they faced at Coast, but their requests were denied.

376. In March 2023, Ms. Didonna emailed several Plaintiffs to suggest they speak with Captain LeRoy Young, a veteran Black pilot at American and AACA mentor based in California. Captain Young acknowledged to Plaintiffs Sanderson, Fogel, and McGowan that cadets of color experienced discriminatory treatment in the AACA, and although he said he would talk to American and see if there was anything he could do to help, his primary advice for Plaintiffs was to keep their heads down and do their best to overcome the adversity.

377. American also was or should have been aware of the disparity in success rates between white and non-white cadets because it was tracking the demographics of the cadets and their progress through the program.

## E. DEFENDANTS' UNLAWFUL CONDUCT DERAILED PLAINTIFFS' LIVES

378. Defendants' fraudulent, deceptive, and discriminatory practices with respect to the AACA caused each Plaintiff substantial economic, reputational, and emotional harm and seriously derailed their lives.

379. To pay for the program, all Plaintiffs incurred significant debt in the form of large student loans and owe between $26,000 and $130,000, with an average of approximately $90,000. Many Plaintiffs' loans carry high interest rates—some as high as 14%.

380. Each Plaintiff left or turned down a lucrative job or declined a college acceptance offer in order to attend the AACA.

381. All Plaintiffs suffered costs related to relocation, additional costs from training taking months longer than expected and/or housing costs being higher than expected, and/or unexpected fees and misrepresented costs of additional exams or trainings for the program.

382. Nearly every Plaintiff took out additional loans or incurred significant credit card debt to cover living expenses during the AACA, especially when their training stretched beyond one year.

383. In addition to the wages Plaintiffs lost during their participation in the AACA, after leaving the program, many Plaintiffs had difficulty finding new jobs or were forced to accept lower paying jobs out of desperation.

384. For example, after Defendants removed Plaintiff Hernandez from the AACA, he still needed to make ends meet to afford his leased apartment. Despite it not being lucrative or even enough to pay all of his bills, Plaintiff Hernandez accepted a job at SeaWorld paying approximately $13.00 per hour. Plaintiff Hernandez's job prior to attending the AACA paid approximately more than twice that amount, but he could not return to it immediately on such short notice.

385. Most Plaintiffs have faced extreme difficulty in making their loan payments on time. Several are behind on their payments, and at least one has entered default.

386. The financial hardship created by Defendants has caused most Plaintiffs to miss payments on their loans, rent, and/or credit cards, and their credit scores have declined as a result.

387. Many Plaintiffs have had to pay for additional flight training to obtain the pilot ratings they should have received through the AACA, while others cannot afford to continue their flight training and are left scrambling to start their lives over.

388. All Plaintiffs experienced harm to their career path and their reputation in the insular aviation industry.

389. If Defendants had delivered the program they promised and not discriminated against Plaintiffs, Plaintiffs would have obtained the ratings they needed to proceed down the path to lucrative careers as airline pilots—first earning $35,000 to $50,000 per year as flight instructors and flying for regional airlines, transitioning to a major airline like American where the starting salary averages $90,000, and finally becoming captains earning $135,000 to $235,000+ per year.[61]

390. Defendants' unlawful conduct delayed some Plaintiffs' progress down this career path by several years, causing significant loss of income. This delay is especially harmful because there is an age limit to being an airline pilot.

391. For other Plaintiffs, Defendants' unlawful conduct placed the dream of a career as an airline pilot permanently out of reach.

392. Defendants' deception and discrimination also caused Plaintiffs significant emotional distress. All Plaintiffs experienced stress, frustration, humiliation, worry, indignity, and loss of self-esteem while they were in the AACA and following their removal. These effects are ongoing and likely to continue indefinitely.

393. As a result of their treatment in the AACA, many Plaintiffs experienced more severe emotional distress, including depression, anxiety, fatigue, digestive problems, weight loss, loss of sleep, panic attacks, and/or aggravation of other ailments.

394. Several Plaintiffs have sought medical treatment in order to cope with their mental anguish.

[61] *Pilot Journey, supra* note 3.

395. Plaintiffs' emotional distress has continued to impact them long after their departures from the program.

396. Many Plaintiffs' personal relationships have suffered, including marital difficulties and fractured familial ties.

## F. DEFENDANTS ENGAGED IN UNLAWFUL CONDUCT WITH RESPECT TO EACH PLAINTIFF

397. Each Plaintiff relied on the misrepresentations described *supra*, section IV.C in applying for and attending the AACA.

398. Defendants also made specific misrepresentations about the quality, duration, features, and cost of the AACA to each Plaintiff directly in order to induce them to join the program.

399. Each Plaintiff relied on these general and direct representations in selecting the AACA.

400. Despite Defendants' misrepresentations about the AACA, it was extremely difficult for any student to finish the program within 12 months and at the advertised cost. However, non-white students faced the additional challenge of being treated unfairly because of their race, detailed below, which exacerbated their inability to complete the program in the timeframe and at the price that Defendants promised.

401. Defendants made misrepresentations to each Plaintiff, and discriminated against each Plaintiff, in the following ways in addition to the common misrepresentations and discrimination as described above:

### i. Kendall Anderson

402. Plaintiff Kendall Anderson, who is Black, applied to the AACA and reviewed American's AACA website in 2020 and 2021. At the time, she was living in San Diego, California and working at a hotel.

403. In Plaintiff Anderson's June 2021 AACA admission interview, American's Pilot Recruiting & Development employee, Claire Webb, represented that the listed program price included all costs associated with the program and that cadets who focus

on training get their ratings in 12 months.

404. In a July 2021 phone call with Plaintiff Anderson, Ms. Didonna represented that all costs associated with the AACA would be covered by a loan, that most cadets finished within 12 months, and that if Plaintiff Anderson was good enough to get in the program, she would be able to finish it. Ms. Didonna also said that for cadets who already have a PPL, the program would take 10 months and cost less.

405. American offered Plaintiff Anderson admission into the AACA, and relying on American's representations about the AACA, she signed American's Conditional Offer of Program Admission ("AACA Acceptance Letter") on July 9, 2021.

406. Plaintiff Anderson received the Welcome Email from Coast in June 2021 and reviewed Coast's website around that time.

407. Coast also provided Plaintiff Anderson with a copy of the Price Sheet stating the IFR phase would take 10 months and cost approximately $78,000.

408. Relying on American's and Coast's representations about the AACA, Plaintiff Anderson contracted with American and Coast to attend the AACA at Coast San Diego, finalized a $85,000 loan with Discover in July 2021, and signed Coast's funding disclosure on July 13, 2021.

409. When she began the AACA at Coast in San Diego on October 13, 2021, Plaintiff Anderson had already earned her PPL.

410. Plaintiff Anderson's training took significantly longer and was far more costly than advertised, due to factors outside her control, including scheduling delays and race-based bias from instructors and Coast management.

411. Plaintiff Anderson received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

412. Defendants scheduled Plaintiff Anderson's training at inopportune times (such as in the mornings, which typically have poor weather conditions in San Diego, or in the late afternoons, which often had higher winds). Her flights were often canceled, which delayed her training.

413. In addition, despite Plaintiff Anderson being ready to take her CFI checkride, Coast made her wait at least a month to be scheduled for the checkride, which delayed and interrupted her progress. Then, Coast gave last-minute notice of her scheduled checkride, which left her inadequate time to prepare for it.

414. Defendants never assigned Plaintiff Anderson an American pilot mentor during her 17 months in the program.

415. Defendants also subjected Plaintiff Anderson to unfair treatment because of her race. For example, Coast gave her white peers preferential treatment in flying time and scheduled white students' checkrides more quickly than Plaintiff Anderson's.

416. Defendants held Plaintiff Anderson to a higher and harsher standard than white cadets. Instructor Andrew Law doubted her abilities and disrespected and humiliated her by interrupting her presentation to her entire class. He did not treat white cadets in a similar way.

417. When Plaintiff Anderson requested specific times to fly, San Diego Site Director, Renee Cerrillo, became frustrated and indignant, but she did not do so when white cadets made the same requests.

418. Plaintiff Anderson's white peers were permitted to back-seat other cadets' lessons and borrow planes for leisure, though this was contrary to Coast's policy.

419. Plaintiff Anderson was placed in the remedial program, purportedly for not progressing quickly enough through the program, even though she was progressing at roughly the same rate as the white students in her training cohort who were not placed in the remedial program.

420. A white cadet, C.M., failed his IFR checkride three times in a row but was permitted to continue training, whereas Plaintiff Anderson was terminated from the AACA for failing three checkrides, even though they were for different ratings.

421. Plaintiff Anderson raised concerns about an unprofessional and biased DPE to Coast. Coast forced her to do a checkride with the DPE anyway, and the DPE unfairly failed Plaintiff Anderson.

422. Plaintiff Anderson reported concerns about her training and treatment at the AACA—including racial hostility, unequal treatment, and unprofessional instructors—to Coast and American administration several times during her training. She complained via monthly progress reports required by American, and to Ms. Cerrillo and Ms. Didonna. But Defendants never remedied and/or ignored the reported issues. In fact, Ms. Cerrillo denounced any possibility that there might be racism at Coast to Plaintiff Anderson.

423. Captain Young acknowledged to Plaintiff Anderson that race discrimination was a problem in the AACA, and said he would try to help, but advised Plaintiff Anderson to keep her head down and do her best.

424. Defendants removed Plaintiff Anderson from the AACA on March 31, 2023.

425. Plaintiff Anderson started the AACA with three white cadets and three other cadets of color. To her knowledge, all three white cadets finished the program while only one cadet of color finished the program.

426. Plaintiff Anderson suffered substantial economic losses as a result of Defendants' unlawful conduct. She spent more than $94,000 on training at Coast and lost more than two years' worth of wages. She increased her credit card usage in order to fund her training, and her credit score declined.

427. Plaintiff Anderson suffered significant emotional distress as a result of her experience at the AACA, including stress, anxiety, difficulty sleeping, and panic attacks.

**ii. Christopher Chodkowski**

428. Plaintiff Christopher Chodkowski, who is Black, was living in Battlefield, Missouri and working for a trucking company when he reviewed American's AACA website and applied to the AACA in mid-2022.

429. During Plaintiff Chodkowski's June 2022 AACA admission interview, Kerrie Bourne, Pilot Recruiting and Development Analyst for American, made misrepresentations to Plaintiff Chodkowski, including that American designed the AACA to support people from diverse and lower-income backgrounds to become pilots and that the loan would be sufficient to cover all of his training, housing, and food.

430. American offered Plaintiff Chodkowski admission into the AACA, and relying on American's representations about the AACA, he signed the AACA Acceptance Letter on June 14, 2022.

431. After gaining admission to the AACA, Plaintiff Chodkowski received the Welcome Email from Coast in June 2022 and reviewed Coast's website around the same time.

432. Relying on American's and Coast's representations about the AACA, Plaintiff Chodkowski contracted with American and Coast to attend the AACA at Coast San Marcos, signed Coast's funding disclosure in August 2022, finalized a $120,000 loan with AAFCU in September 2022, and moved to San Marcos, Texas to start the AACA at Coast on October 7, 2022.

433. Despite Defendants' assurances that he would complete the AACA within 12 months, Plaintiff Chodkowski faced scheduling delays, through no fault of his own, that delayed his progress through the program.

434. He received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

435. Plaintiff Chodkowski trained infrequently and was often scheduled at times that were likely to be canceled due to weather. He had to wait months for Coast to find a DPE to examine him—a constant issue throughout cadets' training at the AACA at Coast.

436. In spite of the substantial delays, Plaintiff Chodkowski completed all of his training at Coast in December 2023, with only his CFI and CFII checkrides to complete. The AACA informed Plaintiff Chodkowski that he was eligible for admission to an employment program with Envoy, a regionally owned partner of American. However, due to Coast's delay in scheduling checkrides, Ms. Didonna and San Marcos Site Director Tamra Reid subsequently informed Plaintiff Chodkowski that his endorsements (approvals given by instructors to qualify a cadet for a checkride) had expired and thus he actually was not eligible for the conditional offer opportunity.

437. Coast directly caused these endorsements to expire by engaging in continual and unwarranted delays in scheduling Plaintiff Chodkowski for flight training and checkrides. Plaintiff Chodkowski did not have sufficient funds to redo the training needed to renew his expired endorsements.

438. Defendants removed Plaintiff Chodkowski from the AACA in February 2024.

439. Additionally, Defendants subjected Plaintiff Chodkowski to unfair treatment because of his race.

440. For example, he observed that at the AACA, white cadets were being scheduled for flight training more frequently and at more opportune times than non-white cadets and thus progressed through the program faster than non-white cadets.

441. Plaintiff Chodkowski's white cohort-mate, H.S., advanced through the AACA more quickly, despite starting at the same time as Plaintiff Chodkowski and having less flying experience. H.S. was given favorable scheduling and treatment by Coast instructors and administrators (the majority of whom were white and had a close relationship with H.S.'s then-white instructor), whereas Plaintiff Chodkowski, whose instructor was Black, did not receive similar treatment. In fact, white students H.S., Z.P., and S.W. were sometimes scheduled for flight training so often that some of them complained to Coast. Meanwhile, Plaintiff Chodkowski observed that he and other non-white cadets were scheduled infrequently and at the most inopportune times for training, such as when the weather tended to be cloudiest or stormiest, which prevented him from progressing in his training.

442. Plaintiff Chodkowski reported concerns about his training and treatment at the AACA—including about preferential treatment of white cadets by instructors and administrators, unfair scheduling, and not receiving a mentor—to Coast and American administration several times during his training. He made complaints to Coast President Heath Jameson, Flight Lead Anna Bruick, Rey Morillo, and to Ms. Didonna, and in a campuswide townhall meeting in which President Jameson was present, but Defendants

never remedied and/or ignored the reported issues.

443. Plaintiff Chodkowski started the AACA with three white cadets and four other cadets of color. At least one white cadet finished, while none of the non-white cadets completed the program.

444. Plaintiff Chodkowski suffered substantial economic loss as a result of Defendants' unlawful conduct. He spent approximately $117,000 on training at Coast and moving to San Marcos to attend the AACA. He lost 14 months of wages.

445. Plaintiff Chodkowski also suffered significant emotional distress as a result of his experience at the AACA, including severe stress, anxiety, and problems sleeping.

446. He has continued flight training at another flight school but cannot afford to train regularly.

**iii. De'Andre Clark**

447. Plaintiff De'Andre Clark, who is Black, applied to the AACA and reviewed American's AACA website in early 2022. At the time, he was living in Hayward, California and working as a flight attendant for American.

448. During Plaintiff Clark's March 2022 admission interview, Ms. Webb made misrepresentations to Plaintiff Clark, including that American designed the AACA to encourage and support people from diverse and lower-income backgrounds to become pilots, that its unique financing and mentorship program has enabled people like him to complete the AACA. Ms. Webb stated that, in the AACA, he would be training five to six times per week and flying four to five days a week.

449. American offered Plaintiff Clark admission into the AACA, and relying on American's representations, he signed the AACA Acceptance Letter on March 25, 2022.

450. Plaintiff Clark received the "Welcome Email from Coast" in or around April 2022 and reviewed Coast's website around the same time.

451. In April 2022, Plaintiff Clark also spoke several times with Veronica Faucher, Director of Sales and Marketing at Coast (who, on information and belief, at all times relevant to the allegations herein, was based out of Coast's San Diego location). In

those conversations, Ms. Faucher emphasized Coast's 12-month completion timeline and that the full loan of $120,000 should cover 100% of his training and most of his living expenses during his training.

452. Relying on American's and Coast's representations about the AACA, Plaintiff Clark contracted with American and Coast to attend the AACA at Coast Dallas, finalized a $120,000 loan with AAFCU on June 15, 2022, signed Coast's funding disclosure on June 29, 2022, and moved to Dallas, Texas to start the AACA at Coast on October 7, 2022.

453. Plaintiff Clark's training took significantly longer and was significantly more costly than advertised, due to factors outside his control, including inconsistency and turnover in instructors, scheduling delays, and race-based bias from instructors and Coast management.

454. Plaintiff Clark had three different primary instructors in his first three months of the AACA, and seven primary instructors in total during his 10 months in the AACA. Such lack of continuity in instructors made it nearly impossible to progress in the program and resulted in redundant coursework that made the timeline and cost of the program longer and more expensive than advertised. Even one of his instructors, when she decided to leave Coast, acknowledged that his training had been inconsistent on Coast's part.

455. Plaintiff Clark faced extensive scheduling delays, through no fault of his own, that exacerbated his delayed timeline. He often went days and sometimes weeks without receiving flight training.

456. For example, in October 2022, he went 18 days without flying; in November 2022, he went 25 days without flying; in December 2022, he only flew three times. He consistently had more than 20 days of not flying in most months.

457. He received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

458. Additionally, despite Defendants' promise that he would promptly receive a mentor, Defendants never assigned a mentor to Plaintiff Clark, even after he requested

one on several occasions.

459. Defendants also subjected Plaintiff Clark to unfair treatment because of his race. In contrast to how white AACA students were treated, Plaintiff Clark's instructors, especially his primary instructor, Blake Wyse, were disproportionately critical in evaluating Plaintiff Clark.

460. Mr. Wyse unfairly held Plaintiff Clark back from progressing in his training, including giving him a bad score for a small mistake on an otherwise successful flight, blaming Plaintiff Clark for not knowing a skill that Mr. Wyse never taught him, and refusing to sign off on Plaintiff Clark flying solo. This prevented Plaintiff Clark from progressing in his flight training. Mr. Wyse graded white students with similar skills less harshly and allowed them to progress.

461. Mr. Wyse failed to show up for several of Plaintiff Clark's training events with no notice, causing additional delay to Plaintiff Clark's training.

462. Mr. Wyse also reposted a racial slur on social media, which increased Plaintiff Clark's feelings of discomfort and unease around Mr. Wyse and added an additional challenge to his training.

463. Although very few of the AACA students flew as often as Defendants had promised, white students were given preferential treatment that allowed them to fly more than non-white students. Plaintiff Clark observed that white students flew much more frequently and progressed more quickly through the program than he did.

464. Plaintiff Clark also noticed that white students received more support from Defendants; as just one example, more white cadets were assigned mentors than non-white cadets.

465. To Plaintiff Clark's knowledge, white cadets did not face the same amount of instructor turnover and inconsistency that he did.

466. Plaintiff Clark reported concerns about his training and treatment at the AACA—including about being paired with biased instructors, unfair scheduling and grading, and not receiving a mentor—to Coast and American administration several times

during his training. He complained to Coast President Jameson, Director of Operations Nick Carey, flight lead Kyle Challis, instructor Fray Lewis, Chief Pilot Chloe Cheung, Mr. Shope, and Ms. Didonna, but Defendants never remedied and/or ignored the reported issues.

467. Defendants placed Plaintiff Clark in the remedial program in April 2023 during a meeting in which he complained about Mr. Wyse to Coast administration—purportedly for lack of progress and for accumulating high hours, even though Coast admitted that delays that were outside of Plaintiff Clark's control were responsible for his slow start.

468. In contrast, several white students, such as A.Y., were at roughly the same stage as Plaintiff Clark, were not proficient at key skills, and/or had exceeded the allotted hours, but Defendants did not place them in the remedial program.

469. A white cadet, C.W., damaged a plane during training, yet did not face the same repercussions that Plaintiff Clark did for less drastic training errors.

470. Plaintiff Clark resigned from the AACA in August 2023 once he realized that he was not being given a fair chance to succeed in the program, Defendants were not delivering what they had promised, and they were treating him significantly worse than his white counterparts.

471. Plaintiff Clark started the AACA with five white cadets and four other cadets of color. To his knowledge, all five white cadets completed the program, while only two non-white cadets completed the program.

472. Plaintiff Clark suffered substantial economic losses as a result of Defendants' unlawful conduct. He spent more than $65,000 on training at Coast and moving to Dallas to attend the AACA, but he did not receive any ratings. He lost 10 months of wages. Plaintiff Clark's credit score decreased due to the large amount of loans he took out to attend the AACA and his resulting high debt to credit ratio.

473. Plaintiff Clark also suffered significant emotional distress as a result of his experience at the AACA, including severe stress, anxiety, and problems sleeping.

474. He continued flight training at another school but had to stop in 2023 because he could no longer afford to train regularly.

**iv. Andrew Fogel**

475. Plaintiff Andrew Fogel, who is Black, applied to the AACA in early 2021 and reviewed American's AACA website around the same time. At the time, he was living in Israel and working as a professional basketball player.

476. During a phone call in or around May 2021, Plaintiff Fogel spoke with a female Coast representative, who represented to him that the program cost was all-inclusive and the loan would be more than enough to complete all ratings, that the program boasted modern aircraft and facilities, and that the AACA would include mentorship from an American pilot and a guaranteed interview with American's regional airlines.

477. During Plaintiff Fogel's June 15, 2021 AACA admission interview, Ms. Didonna represented that the AACA was fast-paced and designed for people with no flight experience, that it would lead to an interview with one of American's regional airlines, that Coast had enough aircraft for him to complete his training quickly, and that American would support him along the way.

478. American offered Plaintiff Fogel admission into the AACA, and relying on American's and Coast's representations, he signed the AACA Acceptance Letter on June 22, 2021.

479. Plaintiff Fogel received the Welcome Email from Coast in or around June 2021 and reviewed Coast's website around the same time.

480. Plaintiff Fogel also had a telephone conversation with Ms. Faucher in August 2021, in which she assured him that the price on the Price Sheet included all training and was enough to cover any issues in his training, and that most people finish the AACA in 12 months even with no previous flight experience.

481. Relying on American's and Coast's representations about the AACA, Plaintiff Fogel contracted with American and Coast to attend the AACA at Coast San

Diego, finalized a $110,000 loan with Discover in December 2021, signed Coast's funding disclosure on December 14, 2021, and moved to San Diego, California.

482. Plaintiff Fogel started the AACA at Coast on January 7, 2022.

483. Plaintiff Fogel's training took significantly longer and was significantly more costly than advertised, due to factors outside his control, including scheduling delays, aircraft availability, instructor changes, and race-based bias from instructors and Coast management.

484. He received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

485. Defendants subjected Plaintiff Fogel to frequent scheduling delays, through no fault of his own, that exacerbated his delayed timeline. For example, he was often scheduled for morning flights during his PPL training, which are the most likely to be canceled due to poor weather in San Diego.

486. Defendants also delayed Plaintiff Fogel's training when Coast had aircraft shortages and equipment failures and scheduled an unqualified DPE to do Plaintiff Fogel's checkride.

487. Plaintiff Fogel's training was also delayed when his instructor suddenly left Coast, and he had to wait several weeks to start with another instructor.

488. Defendants never assigned Plaintiff Fogel a mentor during his 21 months in the AACA, despite his repeated requests for one.

489. Defendants also subjected Plaintiff Fogel to unfair treatment because of his race.

490. For example, one of his instructors, Andrew Law, shouted at Plaintiff Fogel and kicked him out of a ground tutorial in front of other cadets.

491. Mr. Law also made public comments that Plaintiff Fogel must have grown up "in the hood" and was "struggling" because of his race, among other disrespectful comments.

492. Instructor Ryan Thomas used racially coded language when he said to Plaintiff Fogel, who is Black, "you people like to give up, don't you?" Plaintiff Fogel understood Mr. Thomas to be referring to Black people as "you people."

493. Additionally, Plaintiff Fogel's instructors held him to a higher, harsher standard than white cadets. Instructors such as Mr. Law and Jake Rice gave Plaintiff Fogel "incomplete" and "unsatisfactory" grades after successful training events and failed to remedy computer errors that incorrectly left him with unsatisfactory grades. They spoke disrespectfully about him to other staff behind his back, and instructor Olivia Gourney, even vaped inside the aircraft with Plaintiff Fogel present. At least one white cadet, N.C., noted that Plaintiff Fogel was treated differently and markedly worse than white cadets.

494. Plaintiff Fogel reported concerns about his training and treatment at Coast—including about biased and unprofessional instructors, unfair scheduling and grading, lack of functional aircraft, and not receiving a mentor—to Ms. Didonna and Captain Young, but Defendants never remedied and/or ignored the reported issues.

495. Captain Young acknowledged that racism was a problem in the AACA, and said he would try to help, but advised Plaintiff Fogel to keep his head down and do his best.

496. Defendants placed Plaintiff Fogel in the remedial program in October 2022.

497. In January 2023, Coast presented Plaintiff Fogel with a letter of caution, and though he disagreed with the claims in the letter, he signed it because flight lead, Levi McKenzie, said it would "be worse for [him]" and "raise red flags" if he did not.

498. Plaintiff Fogel resigned from the AACA in October 2023 once he realized that he was not being given a fair chance to succeed in the program, that Coast and American were not delivering what they had promised, and they were treating him significantly worse than his white counterparts.

499. Plaintiff Fogel suffered substantial economic losses as a result of Defendants' unlawful conduct. He spent more than $145,000 on training at Coast and moving to San Diego to attend the AACA. He lost more than 21 months of wages. He

incurred significant credit card debt, and his credit score has declined.

500. Plaintiff Fogel also suffered significant emotional distress as a result of his experience at the AACA, including severe stress, migraines, anxiety, and insomnia, for which he attended therapy. This stress exacerbated existing medical issues and caused severe strain on his family.

501. He has not been able to continue his flight training since leaving the AACA.

**v. Ludgy Germain**

502. Plaintiff Ludgy Germain, who is Black, applied to the AACA in mid-2022 and reviewed American's AACA website around this time. At the time, he was living in Port St. Lucie, Florida and working as a flight attendant for Spirit Airlines.

503. In Plaintiff Germain's July 2022 AACA admission interview, Ms. Webb represented that the AACA is designed to be fast-paced and that he would receive a pilot mentor.

504. American offered Plaintiff Germain admission into the AACA, and relying on American's representations, he signed the AACA Acceptance Letter on August 8, 2022.

505. Plaintiff Germain received the Welcome Email from Coast in or around August 2022, and reviewed Coast's website around the same time.

506. Plaintiff Germain spoke with Ms. Faucher in or around August 2022, in which she assured him he would receive a mentor from American and said Coast had state-of-the-art aircraft and equipment. Plaintiff Germain told Ms. Faucher that he wanted to attend Coast's location in California. Ms. Faucher told Plaintiff Germain that Coast San Diego was at maximum occupancy, so Plaintiff Germain had to choose a different location at which to train.

507. Relying on American's and Coast's representations about the AACA, Plaintiff Germain contracted with American and Coast to attend the AACA at Coast San Marcos, secured a $120,000 loan with AAFCU on August 24, 2022, signed Coast's funding disclosure on August 30, 2022, and moved to San Marcos, Texas to start the

AACA at Coast on October 7, 2022.

508. Plaintiff Germain's training took significantly longer and was significantly more costly than advertised, due to factors outside his control, including scheduling delays and race-based bias from Coast management.

509. He received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

510. Plaintiff Germain faced inconsistency in instruction and scheduling delays, and contrary to Defendants' representations, there was a marked lack of planes available to train on, which substantially delayed his training.

511. Additionally, Defendants did not assign Plaintiff Germain a mentor until one year into his training.

512. Defendants also subjected Plaintiff Germain to unfair treatment because of his race. For example, white cadets, such as H.S., were scheduled for flight training by Defendants much more often and progressed through the AACA faster than he did. Plaintiff Germain would go days without being scheduled for training events while some white students were sometimes placed on the schedule twice in the same day.

513. In addition, Plaintiff Germain faced unprofessional and condescending behavior from his instructors. His instructors would arrive late to his training events, forcing them to rush through the event.

514. Plaintiff Germain reported concerns about his training and treatment at the AACA—including about unfair scheduling and treatment from instructors and not receiving a mentor—to Coast and American administration several times during his training, including to Ms. Reid, President Jameson and a lender representative, but Defendants never remedied and/or ignored the reported issues. President Jameson canceled the meetings that Plaintiff Germain scheduled with him, but, to Plaintiff Germain's knowledge, did not do so when white students scheduled meetings.

515. Plaintiff Germain performed well in the program but ran out of funds from his loan and could not afford to continue training.

516. Defendants removed Plaintiff Germain from the AACA on January 17, 2024.

517. Plaintiff Germain started the AACA with four white cadets and three other cadets of color. To his knowledge and understanding, one white cadet finished, while no cadets of color completed the program.

518. Plaintiff Germain suffered substantial economic losses as a result of Defendants' unlawful conduct. He spent more than $115,000 on training at Coast and moving to San Marcos but did not complete the program. He lost 15 months of wages, he was kicked out of his apartment, and his car was repossessed. He has not been able to make his loan payments on time, which has caused his credit score to drop substantially.

519. Plaintiff Germain also suffered emotional distress as a result of his experience at the AACA, including severe stress, anxiety, sleeplessness, difficulty concentrating, and difficulty breathing, for which he went to the doctor while at the AACA.

520. Plaintiff Germain continued flight training at another flight school and is working towards his CFI and CFII, but at substantial additional cost.

**vi. Disney-Sean Grannell**

521. Plaintiff Disney-Sean Grannell, who is Black, applied to the AACA in early 2022 and reviewed American's AACA website around the same time. At the time, he was living in Philadelphia, Pennsylvania and attending university on a partial scholarship.

522. During Plaintiff Grannell's February 2022 AACA admission interview, Ms. Didonna made misrepresentations to him including that he would receive support from American, including via a pilot mentor, throughout his training.

523. American offered Plaintiff Grannell admission into the AACA, and relying on American's representations, he signed the AACA Acceptance Letter on February 8, 2022.

524. Plaintiff Grannell received the Welcome Email from Coast in April 2022 and reviewed Coast's website around the same time.

525. Relying on American's and Coast's representations about the AACA, Plaintiff Grannell contracted with American and Coast to attend the AACA at Coast Dallas, finalized a $110,000 loan with Discover in April 2022, signed Coast's funding disclosure on April 18, 2022, and moved to Dallas, Texas to start the AACA at Coast on August 5, 2022.

526. Plaintiff Grannell's training took significantly longer and was significantly more costly than advertised, due to factors outside of his control, including scheduling delays and unfair, racially biased evaluations from instructors and Coast management.

527. In contrast to Defendants' representations that the AACA would take 12 months to complete and that he would train five to six days a week, Plaintiff Grannell went for long stretches without being scheduled for flights.

528. He received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

529. In or around May 2023, Defendants did not give Plaintiff Grannell the required 24-hours' notice before his scheduled stage check, which also caused him delay in training.

530. Defendants did not assign Plaintiff Grannell an American pilot mentor until more than 10 months after he started the AACA. Once he received a mentor, he had to share the mentor with six other cadets.

531. Defendants also subjected Plaintiff Grannell to unfair treatment because of his race.

532. For example, in the spring of 2023, Plaintiff Grannell waited months for his PPL checkride, and Coast would not allow him to advance in his training during that waiting period. In Plaintiff Grannell's observations and experience, white cadets had shorter waiting periods or were allowed to advance their training during waiting periods.

533. Additionally, Plaintiff Grannell's instructors held him to a higher, harsher standard than white cadets. Instructor Luke Bazaldua graded Plaintiff Grannell harshly and did not give him second chances to complete performance tasks on the spot without

receiving a failing grade. White cadets like J.C. and K.L. were not subjected to this treatment.

534. White cadets who made mistakes in training were, at most, given a warning by Coast administrators. Plaintiff Grannell is aware of a white cadet who falsified their hours but was not removed from the program.

535. Plaintiff Grannell raised concerns about his training and treatment at the AACA—including about unfair scheduling and grading and not receiving a mentor—to Coast and American administration several times. He complained to Ms. Ast and Ms. Didonna, but Defendants never remedied and/or ignored the reported issues.

536. Defendants placed Plaintiff Grannell in the remedial program in May 2023 purportedly for lack of progress and for accumulating high hours, even though white students were proceeding in the AACA at the same rate but were not put in the remedial program.

537. Several white students in Plaintiff Grannell's cohort, including J.C. and K.L., exceeded the number of hours Coast that permitted cadets to spend training for each pilot rating, but they were not placed in the remedial program, nor were they repeatedly threatened with removal as Plaintiff Grannell was.

538. Defendants removed Plaintiff Grannell from the AACA in June 2023.

539. Plaintiff Grannell suffered substantial economic losses as a result of Defendants' unlawful conduct. He spent more than $61,000 on training at Coast and moving to Dallas, but he did not complete the program. He gave up a valuable academic scholarship to attend the AACA.

540. Plaintiff Grannell also suffered emotional distress as a result of his experience at the AACA, including stress and anxiety.

541. Plaintiff Grannell is succeeding in his training at another flight school, having completed his IFR, CSEL, CFI, CFII, and CMEL, and now working as a CFI Instrument instructor, but at substantial additional cost.

**vii. Juan Hernandez**

542. Plaintiff Juan Hernandez, who is Hispanic/Latino, was living in Moreno Valley, California and working as leasing coordinator when he applied to the AACA in mid-2022. He reviewed American's AACA website and Coast's website, Instagram posts made by Defendants, and YouTube videos promoting Coast, around the same time.

543. Plaintiff Hernandez received an email on September 30, 2022 from Coast Enrollment Coordinator Natalie Medina with various Coast and AACA brochures attached. In her email, Ms. Medina stated, "Coast Academy includes flight training five to six times per week." In the same email, she wrote, "This program unlocks the opportunity to apply for a loan that covers all training and living costs. We offer in-house financing through Sallie Mae and Meritize and the American Airlines Cadet Academy also offers a unique financing option." She also wrote, "We are a proud partner of the American Airlines Cadet Academy which offers the Coast Academy training program to their cadets . . . This is a competitive program that is an ideal route for prospective pilots looking for a foot in the door with American Airlines!"

544. In or around October 2022, after reviewing and in reliance on Coast's website, brochures, and social media, Plaintiff Hernandez applied to train at Coast. In October, he was accepted and received the Welcome Email from Coast in or around October 7, 2022.

545. In or around October and November 2022, Plaintiff Hernandez spoke several times with Ms. Faucher and several other Coast representatives, who encouraged him to apply to the AACA and shared information about it with Plaintiff Hernandez. Ms. Faucher also confirmed that the timeline to complete the AACA was 10 to 12 months and that the loan would cover all of his training.

546. In or around October 2022, Plaintiff Hernandez reviewed the AACA website, brochures, advertisements, and its social media posts on Instagram. Such materials included several flyers from American disseminated to Plaintiff Hernandez in 2022, which included statements such as that the AACA was a fast-track program with

partner school Coast, that he would receive guidance from an American Airlines pilot mentor, and that the AACA included a guaranteed interview with American Airlines regional carriers.

547. During Plaintiff Hernandez's November 8, 2022 AACA admission interview, his interviewer made misrepresentations to Plaintiff Hernandez, including that Plaintiff Hernandez would be training at least three to five days a week and flying almost daily, that the program was very fast-paced and that it should take 12-14 months to complete, that he would receive a pilot mentor shortly after starting, that the program had abundant planes and minimal delays, and that he would receive a $100,000 sign-on bonus opportunity after graduation. The interviewer also mentioned that the AACA intends to encourage and increase diversity in the aviation field.

548. American offered Plaintiff Hernandez admission into the AACA, and relying on American's representations, Plaintiff Hernandez signed the AACA Acceptance Letter on or around November 22, 2022.

549. Relying on American's and Coast's representations about the AACA, Plaintiff Hernandez contracted with American and Coast to attend the AACA at Coast San Diego, finalized a $126,095.00 loan with Sallie Mae on October 5, 2022, signed Coast's funding disclosure on October 5, 2022, and moved to San Diego, California to start the AACA at Coast on February 1, 2023.

550. Plaintiff Hernandez's training took significantly longer and was significantly more costly than advertised due to factors outside of his control, including inconsistency and inadequate instruction by instructors, scheduling delays, lack of aircraft to train on, and race-based bias from instructors and Coast management.

551. Plaintiff Hernandez received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

552. Defendants never assigned Plaintiff Hernandez a mentor during his nine months in the AACA.

553. Defendants also subjected Plaintiff Hernandez to unfair treatment because of his race. For example, Defendants scheduled white cadets such as R.P. to fly while they consistently did not put Plaintiff Hernandez on the schedule, despite his repeated requests to train—causing him to fly often only once or twice a week, and greatly delaying his progress.

554. Defendants made Plaintiff Hernandez wait months to perform his checkride, despite his readiness in his training for one. Meanwhile, R.P. was on a similar timeline as Plaintiff Hernandez in her training yet Defendants scheduled her checkride immediately once she was ready.

555. As a result, Defendants set up Plaintiff Hernandez to fail his checkride, despite him being a strong student, as stated by Ms. Didonna.

556. At one point, in order to make up for his scheduling delays, Plaintiff Hernandez suggested to Coast that he fly in an easternly direction (as opposed to west over the ocean) for training. Although Ms. Cerrillo approved the idea, in the end, white students like R.P. were permitted to do so, but not Plaintiff Hernandez, which delayed his training further.

557. Thus, despite starting at the same time as R.P., Plaintiff Hernandez's training was delayed and while R.P. obtained her PPL in or around July 2023, Plaintiff Hernandez was not permitted to progress.

558. Plaintiff Hernandez experienced particular hostility from Coast administrators and staff. Multiple persons, including Assistant Chief Flight Instructor Will Hutchings, remarked to Plaintiff Hernandez, upon first meeting him and learning his name, that "you must be the first in your family to be in aviation"—stereotyping him based on his race and ethnicity. Mr. Hutchings did not address white cadets this way.

559. In contrast to his white peers, Plaintiff Hernandez faced hostile instruction from some instructors. One instructor, Leonardo Godefroy, continually failed and unfairly graded Plaintiff Hernandez while not instructing him on how to improve. In contrast, Mr. Godefroy showed white cadets like R.P. how to improve and did not fail her on a similar

mistake. For example, when R.P. forgot her Foggles, a tool used in aviation training, and made some maneuver mistakes at altitude, Mr. Godefroy provided her his own Foggles and gave her an impromptu lesson regarding her mistakes. Plaintiff Hernandez was not given the same lesson by Mr. Godefroy when Plaintiff Hernandez was practicing the same maneuvers and made the same mistakes R.P. made. Further, Mr. Godefroy's tone with Plaintiff Hernandez was hostile and intimidating, but supportive with R.P.

560. Plaintiff Hernandez observed that Coast provided white cadets with more flexibility and priority in scheduling, more consistent training assignments, and more time and support in recovering from setbacks than he and other cadets of color.

561. Plaintiff Hernandez raised concerns about his training and treatment at the AACA—including about unequal treatment based on race, and unfair scheduling and grading—to Coast and American administration several times over the course of his training. He complained to Ms. Didonna and Ms. Cerrillo in text and email communications, on phone calls, and in-person meetings during June, August, and November of 2023, but Defendants never remedied and/or ignored the reported issues.

562. On multiple occasions, Plaintiff Hernandez raised specific concerns with Ms. Didonna.

563. Starting in June 2023, Plaintiff Hernandez informed Ms. Didonna that he was not being placed on the schedule for weeks at a time. For example, on June 13, 2023, Plaintiff Hernandez informed Ms. Didonna that "this entire past week I was not on the schedule at all. This would be the third time this has happened to me (like previously mentioned). I was not on the schedule nor the standby list." Plaintiff Hernandez informed Ms. Didonna that he is wasting his money as the scheduling is so erratic that he cannot be adequately tested. Plaintiff Hernandez informed Ms. Didonna that "I feel like I am extremely behind and I would like to move forward as fast as I can" and even offered to relocate his training to a site in Texas.

564. In June 2023, Ms. Didonna responded to Plaintiff Hernandez by acknowledging that Defendants viewed Plaintiff Hernandez as a strong student and that

the delays were beyond his control. For example, on June 1, 2023, Ms. Didonna wrote to Plaintiff Hernandez:

> If it helps, it's clear on our (very frequent) progress meetings that you're only behind because of issues outside of your control! That said, you being proactive and professional about this issue speaks a lot about you as a student and as a future captain.

565. Defendants placed Plaintiff Hernandez in the remedial program in July 2023 purportedly for unsatisfactory progress, even though Defendants were responsible for this. In contrast, white cadets with performance issues were not placed in the remedial program. For example, R.P was not placed in the remedial program despite making the same mistakes for which Mr. Godefroy faulted Plaintiff Hernandez.

566. In or around August 2023, Plaintiff Hernandez once again communicated with Ms. Didonna that he was not being scheduled for long periods of time, despite her presumably having discussed the issue with Coast. On numerous occasions, Ms. Didonna represented that she would speak with Coast and address the issue, but no corrective action was ever taken.

567. Ms. Didonna wrote to Plaintiff Hernandez in November 2023,

> I want you to know you are NOT in trouble. Just me trying to figure out why you're so far behind on timeline when everything shows you're a good student I just want to make sure Coast is holding up their end of the bargain so feel free to respond honestly.

568. Ms. Didonna acknowledged that Plaintiff Hernandez had to wait five weeks for a checkride date, and then failed. In November 2023, Ms. Didonna wrote, "I'm so sorry Juan. I can't believe you went through that" and said "we'll get you sorted."

569. In a November 7, 2023 email to Plaintiff Hernandez, Ms. Didonna wrote,

> We have biweekly calls with Coast where we review all the students. Everything I see regarding you shows you're a great student with a good record of days off. That said, you're projected to finish the program with an 18-month timeline. I wanted to check in to see what

> exactly is holding you back. I know you've had issues with scheduling in the past, are you still seeing scheduling issues?

570. On November 10, 2023, Plaintiff Hernandez informed Ms. Didonna that "I am behind on my timeline significantly and I am starting to be concerned. I had to wait about 4-5 weeks just to get a check ride," and detailed issues with instructors and inadequate instruction. Plaintiff Hernandez also alerted Ms. Cerrillo to this delay and that he had been waiting weeks for a checkride date.

571. On November 13, 2023, while Plaintiff Hernandez was in the remedial program, Coast staff Levi McKenzie and Zachary Wild told Plaintiff Hernandez that Coast recognized his efforts to get back on schedule and would assist him so that he could move out of the remedial program. Around this same time, Ms. Didonna told Plaintiff Hernandez that he was still on pace given the circumstances outside of his control.

572. Instead, Defendants removed Plaintiff Hernandez from the AACA a week later on November 20, 2023.

573. When Plaintiff Hernandez asked Defendants why he was dismissed, he did not receive a reply.

574. Plaintiff Hernandez started the AACA with one white cadet and one other cadet of color. In his knowledge and understanding, the white cadet was not placed in the remedial program and is still training at Coast. Plaintiff Hernandez is unaware of the other cadet of color's status.

575. Plaintiff Hernandez suffered substantial economic losses as a result of Defendants' unlawful conduct. He spent more than $70,000 on training at Coast and moving to San Diego, but he did not receive any ratings. He lost 12 months of wages and had to take a lower paying job upon leaving the program than the one he had prior to the AACA. Plaintiff Hernandez's credit score decreased due to the large amount of loans he took out to attend the AACA and his resulting high debt to credit ratio. The significant drop in Plaintiff Hernandez's credit score and significant increase in his loan debt was also impacted by Coast's "administrative error" by not returning his unused loan to the

provider until nearly two years after Plaintiff Hernandez was dismissed from the AACA. Plaintiff Hernandez also suffered significant emotional distress as a result of his experience at the AACA, including stress, panic attacks, sleeplessness, and anxiety.

576. Plaintiff Hernandez continued flight training at another flight school, but has had to pause his training as he cannot afford it.

**viii. Jamaal Johnson**

577. Plaintiff Jamaal Johnson, who is Black, was living in Chicago, Illinois and working as a flight attendant for American when he applied to the AACA in mid-2020. He reviewed American's AACA website around the same time.

578. During Plaintiff Johnson's June 2020 AACA admission interview, Brad Morrison, Pilot Career Recruiting Manager for American, made misrepresentations to Plaintiff Johnson, including that American would be very involved in his training, that he would receive a pilot mentor, and that the AACA had a very low dropout rate compared to other flight schools.

579. American offered Plaintiff Johnson admission into the AACA, and relying on American's representations, he signed the AACA Acceptance Letter on July 7, 2020.

580. In or around July 2020, Plaintiff Johnson received the Welcome Email from Coast, and he reviewed Coast's website around the same time.

581. Plaintiff Johnson received an email on July 9, 2020 from Ms. Faucher attaching a letter from then-Coast President Bryan Simmons, stating:

> This program is designed to be a one of kind, world class learning experience, one that Coast, and American Airlines will be proud of, and a program that will ensure you a timely, cost-effective completion assurance.

582. On June 2, 2021, Plaintiff Johnson received an email from Ms. Faucher stating, "Coast Academy allows you to obtain all of the ratings you need to become an airline pilot and is designed to finish in 12 months. In that time, you will complete your PPL, IFR, CSEL, MEL, CFI & CFII. You will be flying 5-6 days a week."

583. Around the same time, Plaintiff Johnson also spoke with Ms. Faucher, who confirmed the 10 to 12 month timeline to complete the AACA and that the $120,000 loan would cover all of his training. She also verified that cadets would have mentors throughout the program and that American was hands-on and involved in the cadets' training.

584. In or around the spring of 2022, Plaintiff Johnson had several phone calls with Ms. Didonna, who reiterated that cadets were guaranteed mentors and confirmed that the loan would cover all costs of training. She emphasized that Coast had more than enough G1000 high standard and well-maintained aircraft for cadets to succeed in the program, and said that if Plaintiff Johnson could get into the program, he could finish it.

585. Plaintiff Johnson told Ms. Didonna and Ms. Faucher that he wanted to train at Coast San Diego to be closer to family. Ms. Faucher told Plaintiff Johnson that Coast San Diego was at maximum occupancy, so Plaintiff Johnson had to choose a different location at which to train.

586. Relying on American's and Coast's representations about the AACA, Plaintiff Johnson contracted with American and Coast to attend the AACA at Coast Dallas, finalized a $120,000 loan with AAFCU on June 17, 2022, signed Coast's funding disclosure on June 17, 2022, and moved to Dallas, Texas to start the AACA at Coast on October 7, 2022.

587. Plaintiff Johnson's training took significantly longer and was significantly more costly than advertised due to factors outside of his control, including inconsistency and turnover in instructors, scheduling delays, and race-based bias from instructors and Coast management.

588. He received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

589. Defendants did not assign Plaintiff Johnson an American pilot mentor until seven months after he started the AACA.

590. Defendants also subjected Plaintiff Johnson to unfair treatment because of his race. For example, Defendants scheduled white cadets such as J.H. and A.N. to fly twice a day while Plaintiff Johnson was only scheduled once a day and sometimes not at all.

591. In contrast to his white peers, Plaintiff Johnson faced high turnover and inconsistency in his instructors. He had six different instructors, and each change forced him to restart his training.

592. One instructor, Forrest Benson, forced Plaintiff Johnson to fly in unsafe weather conditions that were well beyond his training level, and unfairly graded Plaintiff Johnson.

593. Plaintiff Johnson experienced particular hostility from instructor Jeffrey Gill, who told him to "shut the fuck up" when Plaintiff Johnson asked a question in a group setting and announced to the group that he "ha[s] a tiny brain." Making a race-based assumption that Plaintiff Johnson is from an urban area, Mr. Gill also said that Plaintiff Johnson "should be able to take that type of treatment since [he is] from Chicago," even though Plaintiff Johnson is from California.

594. Plaintiff Johnson raised concerns about his training and treatment at the AACA—including about unfair scheduling and grading and biased instructors—to Coast and American administration several times over the course of his training. He complained to Mr. Carey, Ms. Cheung, Ms. Ast, and Mr. Shope in in-person meetings during May and June 2023, but Defendants never remedied and/or ignored the reported issues.

595. Defendants placed Plaintiff Johnson in the remedial program in May 2023 purportedly for unsatisfactory and incomplete events and high hours, even though Coast was responsible for these issues. In contrast, white cadets with performance issues were not placed in the remedial program. For example, one white peer, J.H., was not placed in the remedial program despite crashing a plane.

596. Two Coast instructors, B.J. and F.L., recommended that Plaintiff Johnson resign because, as a Black cadet, he would have to work twice as hard as his white peers.

597. Plaintiff Johnson resigned from the AACA on July 13, 2023, once he realized he was not being given a fair chance to succeed in the program and Defendants were prolonging his training to keep his tuition money flowing. He also realized that Coast and American were not delivering what they had promised, and they were treating him significantly worse than his white counterparts.

598. Plaintiff Johnson started the AACA with five white cadets and four other cadets of color. In his knowledge and understanding, none of the five white cadets were placed in the remedial program; four of the five cadets of color were placed in the remedial program. Only two cadets of color finished the AACA.

599. Plaintiff Johnson suffered substantial economic losses as a result of Defendants' unlawful conduct. He spent more than $70,000 on training at Coast and moving to Dallas, but he did not receive any ratings. He lost 11 months of wages. Plaintiff Johnson's credit score decreased due to the large amount of loans he took out to attend the AACA and his resulting high debt to credit ratio. Plaintiff Johnson also suffered significant emotional distress as a result of his experience at the AACA, including stress, anxiety, and depression, as well as weight loss.

600. Plaintiff Johnson has successfully continued flight training at another flight school and has now obtained his PPL, IFR, CFI, and CSEL ratings, but at substantial additional cost.

**ix. Krystall Jones**

601. Plaintiff Krystall Jones, who is Black, applied to the AACA in early 2022 and reviewed American's AACA website. At the time, she was living in Columbia, South Carolina and working as a flight attendant for an American Airlines subsidiary.

602. During Plaintiff Jones's November 2021 AACA admission interview, Ms. Didonna made misrepresentations to Plaintiff Jones, including that American designed the AACA to be fast-paced.

//

//

603. American offered Plaintiff Jones admission into the AACA, and relying on American's representations, she signed the AACA Acceptance Letter on November 23, 2021.

604. In subsequent phone calls and emails, Ms. Didonna represented to Plaintiff Jones that the loan would cover the full cost of the program, including housing, that American would provide her with a pilot mentor, and that she had a very high likelihood of completing the AACA and then being interviewed for a job. Ms. Didonna assured Plaintiff Jones that she would complete the program within the timeline. Ms. Didonna said that although she could not officially guarantee Plaintiff Jones a job after completing the program, she could say that everyone who has wanted to work for American received a job offer.

605. Plaintiff Jones received the Welcome Email from Coast in November 2021 and reviewed Coast's website around the same time.

606. Plaintiff Jones also had conversations with Ms. Faucher in December 2021 and April 2022, in which Ms. Faucher assured her that the loan would cover the full cost of training as well as housing and that the 12-month training timeline included time built in for any training delays.

607. Relying on American's and Coast's representations about the AACA, Plaintiff Jones contracted with American and Coast to attend the AACA at Coast San Marcos, finalized a $120,000 loan with AAFCU on June 1, 2022, signed Coast's funding disclosure on June 10, 2022, and moved to San Marcos, Texas to start the AACA at Coast on October 10, 2022.

608. Plaintiff Jones's training took significantly longer and was significantly more costly than advertised, due to factors outside her control, including scheduling delays and race-based bias from instructors and Coast management.

609. Plaintiff Jones received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

610. Plaintiff Jones's attempts to schedule flights were often thwarted by the unavailability of planes and instructors.

611. Plaintiff Jones cycled through several different instructors who all had vastly different teaching styles. As a result, she repeatedly had to stop then re-start her learning and adjust to new instructors, which significantly slowed her progress.

612. Defendants never assigned Plaintiff Jones a pilot mentor during her nine months in the AACA.

613. Defendants also subjected Plaintiff Jones to unfair treatment because of her race. For example, Defendants prevented Plaintiff Jones from securing consistent flying time, while white students flew often. Plaintiff Jones witnessed white student, H.S., fly one or two times a day while she was only flying one to two times a week.

614. Plaintiff Jones observed that white students seemed to be able to call Ms. Reid to ask for more events or preferential flight times, while Ms. Reid would refuse the same requests from students of color. H.S. noticed this disparity and expressed: "this is not right."

615. Plaintiff Jones's scheduled flight training events were often canceled by Coast, though white students were permitted to train during the same times.

616. By March 2023, Plaintiff Jones noticed that her flights were being canceled one or two hours before she was scheduled to fly and Ms. Reid would often list "not enough planes, instructor: plane ratio" as the reason for the cancellation. But when there *was* sufficient equipment, white students were given preferential treatment over Plaintiff Jones and were permitted to fly.

617. On one occasion in March 2023, Ms. Reid told Plaintiff Jones that a flight was canceled for plane maintenance. Ms. Reid then called H.S. minutes later and asked if he was available to fly and subsequently permitted H.S. to fly instead of Plaintiff Jones. H.S. reported to Plaintiff Jones that nothing was wrong with the plane he flew.

618. In late March 2023, Plaintiff Jones raised concerns about unfair and biased scheduling in an email to Ms. Didonna and September Doria, Operations Manager for

Coast, including one instance where Coast canceled all her upcoming flights seemingly in retaliation for requesting a different time. As a result, Plaintiff Jones was deprived of the opportunity to practice for an upcoming solo flight.

619. Plaintiff Jones noticed that white cadets were given preferential treatment in the AACA at Coast. For example, Ms. Reid was friendly to white students and let them study in the office and wear casual, non-uniform clothing (such as flip-flops), while ignoring cadets of color, preventing them from studying in the office and criticizing them for wearing casual attire.

620. Plaintiff Jones observed that her white instructors, including Connor Kahn, Alexa Aspan, and Anna Bruick, seemed uncomfortable when interacting with non-white cadets but were relaxed and friendly with white cadets. They were also far more lenient when white students made mistakes, while harshly criticizing non-white students.

621. For example, when Plaintiff Jones was doing her pre-solo flight in March 2023, the control tower made her extend her left down-wind for so long until she was out of the traffic pattern and when she could no longer see the airport, she called the tower back and they jokingly stated, "Oh, we forgot about you." Ms. Aspan reprimanded Plaintiff Jones for this and kept her off the schedule for four days even though Plaintiff Jones was only following the orders from the control tower.

622. A few days later, white student, B.D., crashed a plane, and another white student, S. L., interfered with another flight and almost caused a crash, but neither were reprimanded nor taken off the schedule. When these white cadets made these mistakes, Coast administrators comforted them and told them that it was not a problem. Plaintiff Jones never received such comfort or consolation when she made mistakes.

623. Plaintiff Jones was held to a higher and harsher standard than white cadets. White students like H.S. were told to "go home and study" if they failed a portion of a test, but Plaintiff Jones was negatively marked and reprimanded for answering incorrectly on a more advanced question. In Plaintiff Jones's understanding, H.S. failed an end of course exam several times and continued getting chances to retake the exam, while

Plaintiff Jones was not afforded the same leniency.

624. Defendants also made racist remarks to Plaintiff Jones, particularly when she spoke up about her unfair treatment in the AACA. Ms. Reid and Ms. Aspan called Plaintiff Jones "aggressive" and "hostile"—stereotypical criticisms of Black women. These remarks also came shortly after Plaintiff Jones complained to President Jameson about not being put on the schedule by Coast administrators. Ms. Ast called Plaintiff Jones not a "personality fit" for the AACA when she was removing her from the AACA—another remark that is racially coded.

625. Plaintiff Jones reported concerns about her training and treatment at the AACA—including about unfair scheduling and cancellations, and biased and/or retaliatory treatment—to Coast and American administration several times during her training, including via a required monthly progress report provided by American, and to Mr. Jameson and Ms. Didonna, but Defendants never remedied and/or ignored the reported issues. Plaintiff Jones also reported concerns about race-biased treatment at the AACA to American Airlines pilots and former cadets, Gustavia Cartwright and Damion Washington.

626. Defendants placed Plaintiff Jones in the remedial program in March 2023, shortly after she raised complaints, purportedly for excessive hours and "unsafe training tendencies" even though Coast caused these problems through biased scheduling and staff.

627. On at least one occasion, Coast conveyed its evaluation of Plaintiff Jones's "ineptitude" to be a pilot to American Airlines Captain Paul Pierre.

628. Defendants removed Plaintiff Jones from the AACA on June 13, 2023.

629. Plaintiff Jones started the AACA with four white cadets, and three cadets of color. In her understanding, at least some of the cadets of color were put in the remedial program and none of cadets of color finished the program.

630. Plaintiff Jones suffered substantial economic losses as a result of Defendants' unlawful conduct. She spent more than $58,000 on training at Coast and

moving to San Marcos to attend the AACA but received no ratings. She lost over 10 months of wages, accrued credit card debt and late rent fees, and was unable to make her loan payments on time. Plaintiff Jones's credit score declined as a result.

631. Plaintiff Jones also suffered significant emotional distress as a result of her experience at the AACA, including anxiety, stress, and depression, and fractured personal relationships.

632. Plaintiff Jones is succeeding in her training at another flight school, having now completed her PPL, but at substantial additional cost.

**x. Adam Khan**

633. Plaintiff Adam Khan, who is of Pakistani descent, applied to the AACA and reviewed American's AACA website in late 2022. At the time, he was living in New York City, New York and working as a flight attendant for American.

634. American offered Plaintiff Khan admission into the AACA, and relying on American's representations, he signed the AACA Acceptance Letter on December 4, 2022.

635. Plaintiff Khan received the Welcome Email from Coast in or around December 2022 and reviewed Coast's website around the same time.

636. In or around early 2023, Plaintiff Khan visited Coast's San Diego campus. The staff there reassured him that his loan would cover the entire cost of training, and that he could definitely complete the program with the support he would receive from both American and Coast.

637. Relying on American's and Coast's representations about the AACA, Plaintiff Khan contracted with American and Coast to attend the AACA at Coast San Diego, finalized a $120,000 loan with AAFCU in April 2023, signed Coast's funding disclosure on February 17, 2023, and moved to San Diego, California.

638. Plaintiff Khan started the AACA at Coast on July 7, 2023.

639. Plaintiff Khan's training took significantly longer and was far more costly than advertised, due to factors outside his control, including ineffective and inconsistent

instruction, scheduling delays, and race-based bias from instructors and Coast management.

640. Despite Defendants' promises about how often he would be training, Plaintiff Khan trained and flew less frequently, which delayed his progress.

641. He received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

642. During his two months in the program, Plaintiff Khan flew with many different instructors, each of whom had different standards and teaching styles. For example, one instructor rated Plaintiff Khan's communications as satisfactory, but another instructor rated the same skills as unsatisfactory. This delayed his progress and resulted in unsatisfactory events.

643. Defendants did not assign Plaintiff Khan a mentor until just days before he was removed from the AACA.

644. Defendants also subjected Plaintiff Khan to unfair treatment because of his race. Plaintiff Khan's instructors held him to a higher, harsher standard than white cadets. His first instructor, Shelby Hammer, made no effort to teach him, and would fail him or give him unsatisfactory marks for small mistakes, even though in most cases, he identified the mistakes himself and made appropriate corrections. In Plaintiff Khan's observations and experience, Ms. Hammer did not interact with white cadets in this manner.

645. Coast instructors and staff also perpetuated a culture of hostility to persons of color. Plaintiff Khan observed instructors, staff, and Ms. Cerrillo having friendly conversations and laughing with the white cadets, while they would rarely even acknowledge Plaintiff Khan or his non-white peers.

646. Additionally, upon information and belief, white cadets did not face the same extreme amount of instructor turnover and inconsistency that Plaintiff Khan did.

647. Defendants placed Plaintiff Khan in the remedial program in July 2023—less than a month after he started training and after he had received only seven unsatisfactory events—and threatened him with removal if he did not improve quickly.

648. By contrast, several white students had more unsatisfactory events than Plaintiff Khan did but were not placed in the remedial program or threatened with removal.

649. On August 28, 2023, Coast issued Plaintiff Khan a letter of caution and gave him just seven days to fix his deficiencies or be removed. Flight lead Damian DeMoray and instructor Alex Zarate said Coast had already been lenient with him and he should "just quit now instead of wasting [his] money."

650. Although Coast held the remedial program out as supportive to cadets, in reality, it set up Plaintiff Khan to fail. He was passed from instructor to instructor and not scheduled for training events on many days.

651. Plaintiff Khan reported concerns about his training and treatment at the AACA—including about unfair scheduling and grading and cadets being threatened with removal and removed—to Coast and American administration during his training, including to Ms. Cerrillo and Jerritt Brannock, a member of American's pilot recruitment team, but Defendants never remedied and/or ignored the reported issues.

652. In fact, despite Mr. Brannock's reassurance that he would look into Plaintiff Khan's concerns, Plaintiff Khan was removed from the AACA just three days later.

653. Defendants removed Plaintiff Khan from the AACA on September 11, 2023, purportedly for lack of progress and deficient performance; yet there were white students, including G.M. and A. [last name unknown], who had failed just as many training events as Plaintiff Khan or even more, but were still in the program.

654. Plaintiff Khan suffered substantial economic losses as a result of Defendants' unlawful conduct. He spent more than $32,000 on training at Coast and moving to San Diego to attend the AACA but received no ratings. He lost seven months of wages.

655. He also suffered significant emotional distress as a result of his experience at the AACA, including depression, anxiety, panic attacks, stress, and fatigue. He attended counseling sessions to cope with the emotional distress.

656. Plaintiff Khan continued his training at another flight school but had to stop due to lack of funds.

**xi. Ashley Kumar**

657. Plaintiff Ashley Kumar, who is Indian American, reviewed American's and Coast's AACA websites and applied to the AACA in 2020. She was living in Marion, Ohio and working as a clinical trial logistics coordinator prior to training.

658. In an email on October 28, 2020, Coast's Admission Coordinator, Emily Van Meter, informed Plaintiff Kumar that Coast and American offered "an all-inclusive, full-time flight training opportunity. This intensive program will allow you to obtain all of your ratings in a year [and] includes flight training five to six times per week."

659. In an email sent December 9, 2020, Coast Admissions and Marketing Assistant Brie Woody stated that Coast offers an "intensive program [that] will allow students to obtain all their certificates in a year! Cadets will obtain their PPL, IFR, CSEL, SMEL, CFI and CFII." She further stated that "The American Airlines Cadet Academy program includes flight training five times per week, housing, and food stipends," was "all-inclusive," and that the loan "covers all training and living costs."

660. In an email sent February 19, 2021, Ms. Woody informed Plaintiff Kumar, "This program allows you to obtain all of the ratings you need to become an airline pilot and is designed to finish in 10-12 months. In that time, you will complete your PPL, IFR, CSEL, MEL, CFI & CFII. You will be flying 5-6 days a week." She also wrote that with the Sallie Mae loan, "you can pay for all of your eligible professional training expenses, including the cost of the program, FAA certification fees, written exam fees, books, housing, meals, and equipment."

661. On or around April 23, 2021, Plaintiff Kumar visited Coast San Diego location for a discovery flight. Instructor Paul Zadrozny told Plaintiff Kumar that the AACA was designed to be completed in 10-12 months and most cadets had "no issue with finishing in 10 months."

662. Plaintiff Kumar also spoke with Ms. Van Meter in or around April 2021, who emphasized Coast's 12-month timeline and represented that a loan of $97,000 would cover the full cost of training with funds leftover for living expenses.

663. Relying on American's and Coast's representations about the AACA, Plaintiff Kumar contracted with American and Coast to attend the AACA at Coast San Diego, finalized a $114,000 loan with Sallie Mae on June 24, 2021, signed Coast's funding disclosure in July 2021, and moved to San Diego, California.

664. She started training at Coast (and then later the AACA) on July 9, 2021.

665. During Plaintiff Kumar's AACA admission interview in July 2021, AACA recruiter Jennifer Blum stated that the program was designed to be fast-paced and completed in one year.

666. American offered Plaintiff Kumar admission into the AACA, and relying on American and Coast's representations, she signed the AACA Acceptance Letter on July 21, 2021.

667. Plaintiff Kumar's training took significantly longer and was significantly more costly than advertised, due to factors outside her control, including scheduling delays, unfair grading, lack of instructor availability, and race-based bias from instructors and Coast management.

668. During the first month of Plaintiff Kumar's training, on more than one occasion, several Coast personnel verbally reaffirmed to her that she will be flying five to six days per week.

669. However, Plaintiff Kumar received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

670. Defendants delayed Plaintiff Kumar's training by forcing her to repeat lessons due to small, inconsequential mistakes during her Instrument training.

671. Defendants also delayed her training by making her wait more than a month for her Commercial checkride.

672. Instructor Will Hutchings failed Plaintiff Kumar on her Instrument end-of-course exam without justification. After Mr. Hutchings failed her, Coast required Plaintiff Kumar to move from its Part 141 training program to the less structured Part 61 program and also required Plaintiff Kumar to complete additional training hours, which interrupted her training and severely delayed her progress.

673. Not only did that delay Plaintiff Kumar's training and force her to spend more of her loan, but Coast's actions also made her training performance record appear worse to American than it actually was.

674. Additionally, Defendants would often schedule Plaintiff Kumar to fly at inopportune times of day that were more likely to be canceled because of weather.

675. Defendants never assigned Plaintiff Kumar a mentor during her 22 months in the program.

676. Defendants also subjected Plaintiff Kumar to unfair treatment because of her race. For example, Defendants held Plaintiff Kumar to a higher, harsher standard than her white peers. Coast granted a white peer, B.S., more leniency and more chances to complete her training, though she was progressing and performing similarly to Plaintiff Kumar.

677. Defendants also scheduled white cadets for training more frequently than Plaintiff Kumar, so they progressed more quickly.

678. Plaintiff Kumar witnessed Coast staff treating white cadets more favorably than cadets of color. Instructor Levi McKenzie was often late for his training with Plaintiff Kumar and stated he did not like flying with her, but in Plaintiff Kumar's observation, did not treat white students in a similar way. For example, Mr. McKenzie canceled Plaintiff Kumar's flight the day before her checkride, despite flying with multiple white students the same day.

679. Similarly, Instructor Grace Cornwall chatted and laughed while working with white cadets, such as B.S., but turned cold and rude when flying with Plaintiff Kumar and failed her for minor errors.

680. Plaintiff Kumar's white instructor, Damien DeMoray, seemed cold, frustrated, and uncomfortable when interacting with her, and yelled at her during training, but was friendly with white cadets and did not exhibit the same type of yelling or rude behavior.

681. Plaintiff Kumar reported concerns about her training and treatment at the AACA—including about unfair scheduling and grading—to Coast and American administration several times during her training, including to Site Director Katelyn Steffen, Ms. Cerrillo, and Ms. Didonna, but Defendants never remedied and/or ignored the reported issues.

682. Defendants placed Plaintiff Kumar in the remedial program in or around February 2022, purportedly for tardiness to events. Plaintiff Kumar's white peers were also tardy to events, but were not placed in the remedial program.

683. Defendants removed Plaintiff Kumar from the AACA on May 16, 2023.

684. White cadets, such as B.S., were in the program for just as long or longer but were not removed from the program.

685. Plaintiff Kumar suffered substantial economic losses as a result of Defendants' unlawful conduct. She spent more than $124,000 on training at Coast and moving to San Diego, but she did not complete the program. She lost at least 22 months of wages and had to take a lower paying job upon leaving the program than the one she had prior to the AACA. Plaintiff Kumar has struggled to make her loan payments, has had to significantly increase her credit card usage, and at one point was unable to pay her rent. Her credit score dropped substantially as a result.

686. Plaintiff Kumar also suffered emotional distress as a result of her experience at the AACA, including stress and anxiety.

687. Plaintiff Kumar continued training at a different flight school but has not completed her ratings due to lack of funds.

//

//

**xii. Faith Little**

688. Plaintiff Faith Little, who is Black, applied to the AACA and reviewed American's AACA website in mid-2021. At the time, she was living in Chicago, Illinois and turned down a job offer to work as a software engineer for an aviation defense company in order to attend the AACA.

689. In April 2021, Plaintiff Little received an email from Ms. Van Meter stating, among other things:

> This program [the AACA at Coast] allows you to finance all of the ratings you need to become an airline pilot ... The program is designed to finish in 10-12 months. In that time, you will complete your PPL, IFR, CSEL, MEL, CFI & CFII. You will be flying 5-6 days a week.

It also stated, "All of your supplies are covered in the cost, including an iPad mini with a Foreflight subscription. We fly brand new, 2019 Piper Archers with G1000 avionics that are exclusive to our American Airlines Cadet Program."

690. During Plaintiff Little's June 2021 AACA admission interview, Ms. Didonna represented that Plaintiff Little would receive an American pilot mentor in the AACA.

691. American offered Plaintiff Little admission into the AACA, and relying on American's and Coast's representations, Plaintiff Little signed the AACA Acceptance Letter on June 26, 2021.

692. Plaintiff Little received the Welcome Email from Coast in June 2021 and reviewed Coast's website around the same time.

693. During a phone call in or around July 2021, Ms. Faucher explained that, since Plaintiff Little already had her PPL, she could receive a "PPL refresher" and then start her IFR training. Ms. Faucher explained that the total program cost of $77,968 for the "IFR start" was inclusive of all her training, including the PPL refresher, and she would have no trouble finishing the AACA in less than a year.

694. Relying on American's and Coast's representations about the AACA, Plaintiff Little contracted with American and Coast to attend the AACA at Coast San Diego, finalized a $7,229 loan with Discover on August 19, 2021 (and later a second loan of $45,000 with Discover on June 1, 2022), signed Coast's funding disclosure in or around July 2021, and moved to San Diego, California.

695. She started the AACA at Coast on September 3, 2021. Plaintiff Little had already earned her PPL.

696. Plaintiff Little's training took significantly longer and was far more costly than advertised due to factors outside her control, including scheduling delays, inconsistency and turnover in instructors, and race-based bias from instructors and Coast management.

697. She received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

698. Defendants never assigned Plaintiff Little an American pilot mentor during her 17 months in the program.

699. Defendants also subjected Plaintiff Little to unfair treatment because of her race. For example, Plaintiff Little's instructors treated her less favorably than her white peers. Instructor Alana Courier made no effort to teach Plaintiff Little yet tested and graded her more harshly than her white peers, which delayed her progress.

700. Although Plaintiff Little made clear that she had received her PPL several years prior and needed a PPL refresher, Ms. Courier skipped the refresher and started her out in IFR training. This was tantamount to setting Plaintiff Little up to fail, and she struggled to recall everything from PPL training and learn new IFR material at once.

701. Ms. Courier treated Plaintiff Little with disrespect, yelling at her, slamming a door in her face, and telling her "no one cares" when Plaintiff Little raised a concern during her training. She repeatedly failed Plaintiff Little on small errors that she would allow white cadets to proceed on.

702. Plaintiff Little's white peer, who had no or little flight experience prior to the AACA, progressed faster than Plaintiff Little who already had her PPL prior to starting at Coast.

703. Throughout her training, Plaintiff Little experienced several periods of extremely sporadic scheduling, which delayed her progress.

704. Starting around October 2022, Plaintiff Little was assigned many different instructors, all with different teaching styles and standards for what was acceptable, which delayed her progress. Plaintiff Little's white peers did not face these issues.

705. White instructors, including Damien DeMoray, seemed cold, frustrated, and uncomfortable when interacting with Black cadets like Plaintiff Little, but were relaxed and friendly with white cadets. For example, Mr. DeMoray angrily yelled at and discouraged Plaintiff Little during her training but did not do so with his white students.

706. Plaintiff Little resigned from the AACA in February 2023 once she realized she was not being given a fair chance to succeed in the program, Coast and American were not delivering what they had promised, and they were treating her significantly worse than her white counterparts.

707. Plaintiff Little suffered substantial economic losses as a result of Defendants' unlawful conduct. She spent more than $80,000 on training at Coast and moving to San Diego, but she did not complete the program. She lost 17 months of wages, accrued significant credit card debt, and has struggled to make her loan payments. She has also incurred additional costs because she has been living in short-term rentals instead of an apartment due to concerns about being denied a lease because of the damage to her credit. Plaintiff Little has also suffered emotional distress as a result of her experience at the AACA, including stress, difficulty sleeping, and loss of self-confidence.

708. She completed flight training at another school at substantial additional cost.

//

//

//

**xiii. Honnah Lusby**

709. Plaintiff Honnah Lusby, who is Asian American, was living in Davidsonville, Maryland and working two jobs at the airport and a carwash when she reviewed American's AACA website and applied to the AACA in early 2022.

710. During Plaintiff Lusby's 2022 AACA admission interview, Ms. Didonna represented to Plaintiff Lusby that the AACA was a 12-month program with a 6-month buffer, that most students complete the program in 12 months, and few, if any, fail out. Ms. Didonna said the loan of $110,000 was more than enough to complete the AACA, that Plaintiff Lusby she would receive an American pilot mentor, and that interviewing with American regional airlines was "guaranteed" once she completed the AACA. When Plaintiff Lusby asked what would happen if a cadet were to fall behind, Ms. Didonna dismissed her concern by saying that would not happen.

711. American offered Plaintiff Lusby admission into the AACA, and relying on American's representations, she signed the AACA Acceptance Letter on February 29, 2022.

712. Plaintiff Lusby received the Welcome Email from Coast in March 2022 and reviewed Coast's website around the same time.

713. In or around the spring of 2022, Plaintiff Lusby spoke with Ms. Faucher, who emphasized that nearly everyone finishes the program in 12 months.

714. Relying on American's and Coast's representations about the AACA, Plaintiff Lusby contracted with American and Coast to attend the AACA at Coast San Marcos, finalized a $110,000 loan with Discover on August 30, 2022, signed Coast's funding disclosure on April 31, 2022, and moved to San Marcos, Texas to start the AACA at Coast on November 4, 2022.

715. Plaintiff Lusby's training took significantly longer and was significantly more costly than advertised, due to factors outside of her control, including scheduling delays and unfair, race-biased evaluations from instructors and Coast management.

716. She received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

717. Defendants never assigned Plaintiff Lusby an American pilot mentor during the eight months she was in the program.

718. In addition, Defendants subjected Plaintiff Lusby to unfair treatment because of her race. For example, unlike white cadets, Plaintiff Lusby went for long stretches without being scheduled for flights. She witnessed instructor Anna Bruick schedule white students, such as I.S., K.C., A.Z., and S.W., more frequently and at more opportune times to train, and they received ratings months before Plaintiff Lusby despite starting the AACA after her.

719. Unlike Plaintiff Lusby, her white peers were permitted to do multiple lessons a day and back-seat other cadets' lessons. Plaintiff Lusby's white peers were allowed to start IFR training right after their PPL end-of-course check (the step before a checkride). Coast forced Plaintiff Lusby to wait until she completed her checkride to advance to IFR training which delayed her training for months.

720. Additionally, Plaintiff Lusby's instructors held her to a higher, harsher standard than white cadets. Instructor Annika Rivera tested Plaintiff Lusby on harder and more detailed material than her white peers and did not permit her to utilize study materials during her exams unlike her white peers.

721. Ms. Rivera was also disrespectful to Plaintiff Lusby, often showing up late to her lessons and leaving lessons midway through to discuss non-training-related issues with friends—actions she did not take with white cadets.

722. White cadets such as S.L., I.S., and B.D. had approximately the same number of training hours as Plaintiff Lusby and had failed exams and checkrides, and one even damaged equipment, yet, none of them were placed in the remedial program or removed.

723. Plaintiff Lusby raised concerns about her training and treatment at the AACA—including about unfair scheduling and grading—to Coast and American administration several times over the course of her training, including to Ms. Didonna,

Ms. Bruick, instructor Felix Flores, American Airlines pilot Jennifer Olson, and President Jameson, but Defendants never remedied and/or ignored the reported issues.

724. Shortly after Plaintiff Lusby raised concerns to Ms. Didonna, Defendants placed her in the remedial program in May 2023, purportedly for lack of progress and for accumulating high hours, even though these were a result of Coast's actions.

725. Defendants removed Plaintiff Lusby from the AACA on July 6, 2023—even though she had completed her PPL checkride two days earlier.

726. Plaintiff Lusby started the AACA with four white cadets; in her understanding all four of them completed the program. Plaintiff Lusby was the only non-white cadet in her cohort and the only one not to complete the program.

727. Plaintiff Lusby suffered substantial economic losses as a result of Defendants' unlawful conduct. She spent more than $59,000 on training at Coast and moving to San Marcos to attend the AACA, but she did not complete the program. She turned down several college acceptances to attend the AACA and lost eight months of wages. Because she had to pay back her loans sooner than anticipated and was out of work for some time, Plaintiff Lusby missed a few loan payments, which caused her credit score to drop.

728. Plaintiff Lusby also suffered significant emotional distress as a result of her experience at the AACA, including depression, anxiety, stress, loss of sleep, rashes, suicidal thoughts, and fractured relationships with her family.

729. She has continued her training at another flight school, but at substantial cost.

**xiv. Samira McGowan**

730. Plaintiff Samira McGowan, who is Black, applied to the AACA in mid-2021. At the time, she was living in Dallas, Texas and working as a designer at an interior design company. She reviewed American's AACA website in 2021.

731. Plaintiff McGowan visited Coast's San Diego campus in June 2021. Ms. Steffen gave her a tour, and instructor Ryan Diaz took her on a discovery flight. Both Ms. Steffen and Mr. Diaz represented to her that the AACA takes 10-12 months to complete,

she would be flying five times a week, and Coast has more than enough aircraft for everyone to progress through the program quickly.

732. During Plaintiff McGowan's AACA admission interview in March 2022, Ms. Didonna represented that American's goal for the AACA was to increase diversity and provide opportunities to people of color. She said the program was designed to take students with zero flight experience into the flight deck and promised Plaintiff McGowan would receive a mentor.

733. American offered Plaintiff McGowan admission into the AACA, and relying on the representations from American and Coast, she signed the AACA Acceptance Letter on March 22, 2022.

734. Plaintiff McGowan received the Welcome Email from Coast in March 2022 and reviewed Coast's website around the same time.

735. In or around April 2022, Plaintiff McGowan spoke with Ms. Faucher, who emphasized that the full loan of $110,000 would cover 100% of her training and most of her living expenses for one year—the amount of time it took most cadets to finish.

736. Ms. Didonna stated in an April 27, 2022 email to Plaintiff McGowan, "[your] mentors will be in contact with you shortly after you begin on campus or right before," and linked to several blog posts about the AACA, which included information such as "The Cadet Academy is designed to be a turnkey, clear-cut pathway from zero flight experience to an American Airlines pilot. . . . About a month prior to starting flight training, each cadet is paired with a mentor"; "You should already be matched with a pilot mentor"; and "This program is designed to be full-time accelerated flight training program. Our turn-key program design is intended to provide for everything you need while in training."

737. Relying on American's and Coast's representations about the AACA, Plaintiff McGowan contracted with American and Coast to attend the AACA at Coast San Diego, finalized a $110,000 loan with Discover on July 22, 2022, signed Coast's funding disclosure on July 19, 2022, and moved to San Diego, California.

738. Plaintiff McGowan began the AACA at Coast on August 5, 2022.

739. Plaintiff McGowan's training took significantly longer and was significantly more costly than advertised, due to factors outside her control, including scheduling delays and race-based bias from instructors and Coast management.

740. She received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

741. Defendants scheduled Plaintiff McGowan's training flights at inopportune times, so her events were often canceled, which delayed her training.

742. Defendants did not assign Plaintiff McGowan a mentor until nine months after she started the AACA, and she shared the mentor with four other cadets.

743. Defendants also subjected Plaintiff McGowan to unfair treatment because of her race.

744. Plaintiff McGowan often had long gaps between training flights, which made it difficult for her to master skills and progress in her training. White students flew much more frequently and thus progressed faster.

745. In or around October 2023, Coast gave Plaintiff McGowan less than 36 hours' notice of a scheduled checkride. Meanwhile Coast gave white cadets at least one week's notice of their checkrides.

746. Defendants held Plaintiff McGowan to a higher, harsher standard than her white peers. Instructor Alex Prell graded her more harshly than her white peers, which delayed her progress. He repeatedly refused to endorse Plaintiff McGowan for her PPL checkride without specifying a reason, even though she had mastered the skills. When Plaintiff McGowan flew with two other instructors, Dejan Ballamy and Keely Stinner, both said she was ready for her checkride.

747. Coast threatened Plaintiff McGowan with immediate removal from the AACA if she failed her IFR checkride for a second time. White cadet C.M. failed the same checkride three times but was permitted to remain in the program and not threatened with removal.

748. Coast denied Plaintiff McGowan's time-off request to attend her best friend's wedding but granted white cadets' time-off requests freely.

749. Plaintiff McGowan reported concerns about her training and treatment at the AACA—including about biased instructors, unfair scheduling and grading, not receiving a mentor, unfair application of standards, and being forced to pay over the maximum loan amount—to Coast and American administration during her training, including to Ms. Cerrillo, Zach Harris, Captain Young, Ms. Ast, Ms. Didonna, and Mr. Shope, but Defendants never remedied and/or ignored the reported issues.

750. Captain Young agreed that racism was a problem in the AACA, and said he would try to help, but advised Plaintiff McGowan to keep just her head down and do her best.

751. Defendants placed Plaintiff McGowan in the remedial program in December 2022 shortly after she raised concerns about disparate treatment.

752. Defendants removed Plaintiff McGowan from the AACA on October 25, 2023.

753. Plaintiff McGowan started the AACA with five white cadets and two other cadets of color, none of whom completed the program.

754. Plaintiff McGowan suffered substantial economic losses as a result of Defendants' unlawful conduct. She spent more than $102,000 on training at Coast and moving to San Diego, but she did not complete the program. She lost more than 14 months of wages, had to increase her credit card usage, and was unable to make her loan payments on time. Plaintiff McGowan's credit score has declined significantly, and she filed for bankruptcy as a result of the financial hardship caused by Defendants.

755. Plaintiff McGowan also suffered emotional distress as a result of her experience at the AACA, including stress, anxiety, depression, problems sleeping, and panic attacks, which have led to significant medical bills.

756. She would like to continue flight training but cannot afford it.

**xv. Ketsia Mianda**

757. Plaintiff Ketsia Mianda, who is Black, was living in Charlotte, North Carolina and working as a customer service agent for American when she applied to the AACA in August 2022. She reviewed American's AACA website around the same time.

758. During the OBAP conference in August 2022, Plaintiff Mianda heard multiple American representatives state that its goal in creating the AACA was to increase racial diversity in the flight deck and to provide career opportunities to racial minorities who otherwise would not be able to afford flight training.

759. At the conference, Mr. Shope interviewed Plaintiff Mianda. He, and other American pilots at the conference, assured her she would receive an American pilot mentor, and the loan of $120,000 would fully cover the cost of training.

760. On August 23, 2022, Ms. Didonna sent Plaintiff Mianda an email that read "[your] mentors will be in contact with you shortly after you begin on campus or right before." In that same email, Ms. Didonna linked to several blog posts about the AACA, which included information such as "The Cadet Academy is designed to be a turnkey, clear-cut pathway from zero flight experience to an American Airlines pilot. . . . About a month prior to starting flight training, each cadet is paired with a mentor" and "You should already be matched with a pilot mentor" and "This program is designed to be full-time accelerated flight training program. Our turn-key program design is intended to provide for everything you need while in training."

761. American offered Plaintiff Mianda admission into the AACA, and relying on American's representations, she signed the AACA Acceptance Letter on August 30, 2022.

762. Plaintiff Mianda received the Welcome Email from Coast in August 2022 and reviewed Coast's website around the same time.

763. In or around September 2022, Plaintiff Mianda spoke with Ms. Faucher, who said that the full loan amount of $120,000 would cover the entire cost of training along with room and board for the 12 months it would take to finish the program.

764. On October 12, 2022, Ms. Faucher emailed Plaintiff Mianda that the $120,000 loan "covers the cost of the program and leaves you with a surplus of $22,077.00," which she could use to pay for a headset, tablet, or living expenses.

765. Relying on American's and Coast's representations about the AACA, Plaintiff Mianda contracted with American and Coast to attend the AACA at Coast San Marcos, signed Coast's funding disclosure on October 14, 2022, finalized a $120,000 loan with AAFCU on December 7, 2022, and moved to San Marcos, Texas.

766. Plaintiff Mianda started the AACA at Coast on January 6, 2023.

767. Plaintiff Mianda's training took significantly longer and was significantly more costly than advertised, due to factors outside of her control, including scheduling delays and unfair, race-biased evaluations from instructors and Coast management.

768. She received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

769. Coast regularly delayed Plaintiff Mianda's flight lessons, often forcing her to go a full week without flying—even though she asked to fly as much as possible so that she could finish in the allotted timeline.

770. Defendants subjected Plaintiff Mianda to unfair treatment because of her race.

771. Coast allowed white students, including S.L. and M.H., to take multiple flights a day, but never allowed Plaintiff Mianda to take more than one flight per day.

772. In April 2023, Plaintiff Mianda had a 24-day streak of not flying, supposedly due to poor weather conditions, but Coast allowed her white peers to fly during this time.

773. Additionally, Plaintiff Mianda's instructors held her to a higher, harsher standard than white cadets. Instructor Felix Flores refused to teach Plaintiff Mianda certain techniques, did not permit her to control the plane, and frequently yelled at her.

774. A white student, I.S., failed a checkride and was permitted to immediately redo it. Plaintiff Mianda was not given that option.

775. Despite stretches of not flying for reasons entirely beyond her control, Defendants placed Plaintiff Mianda in the remedial program in or around March 2023. Defendants did not inform Plaintiff Mianda that she was in the remedial program until about a month after she was actually placed in it.

776. Ms. Reid, Mr. Jameson, Ms. Doria, and Mr. Flores told Plaintiff Mianda that she should be able to leave the remedial program if she improved her landings—Mr. Flores let her know that if she could show she had mastered landings in three flights, she would have a clean slate. But, when Plaintiff Mianda met that benchmark, she was still not removed from the remedial program: two weeks later, Plaintiff Mianda failed a stage check and Coast informed her that she would be removed.

777. Defendants removed Plaintiff Mianda from the AACA on July 19, 2023.

778. Plaintiff Mianda started the AACA with two white cadets, and one other cadet of color. In her understanding, at least one of the white cadets finished the program, while the other non-white cadet also was placed in the remedial program and removed from the AACA.

779. Plaintiff Mianda suffered substantial economic losses as a result of Defendants' unlawful conduct. She spent more than $70,000 on training at Coast and moving to San Marcos to attend the AACA but received no ratings. She left her job to attend the AACA, and then experienced months of unemployment upon leaving the AACA.

780. Plaintiff Mianda also suffered significant emotional distress as a result of her experience at the AACA, including anxiety, stress, panic attacks, and stomach pain. She has been unable to make her loan payments every month, and thus her credit score has dropped.

781. She has not been able to continue her flight training since leaving the AACA, as Defendants denied her request to transfer to another school to use the remainder of her loan on training. She would like to continue flight training but cannot afford it.

**xvi. Thiago Ortega**

782. Plaintiff Thiago Ortega, who is Latino/Brazilian, reviewed American's AACA website and applied to the AACA in mid-2022. At the time, he was living in Philadelphia, Pennsylvania, and working as a flight attendant for American.

783. During Plaintiff Ortega's August 2022 AACA admission interview, Ms. Didonna represented that the program was designed to be fast-paced and told him that the AACA aimed to increase diversity in the pilot profession.

784. On September 28, 2022, Ms. Didonna also sent Plaintiff Ortega an email that read "[your] mentors will be in contact with you shortly after you begin on campus or right before." In that same email, Ms. Didonna linked several blog posts about the AACA, which included information such as "The Cadet Academy is designed to be a turnkey, clear-cut pathway from zero flight experience to an American Airlines pilot. . . . About a month prior to starting flight training, each cadet is paired with a mentor" and "You should already be matched with a pilot mentor" and "This program is designed to be full-time accelerated flight training program. Our turn-key program design is intended to provide for everything you need while in training."

785. American offered Plaintiff Ortega admission into the AACA, and relying on American's representations, he signed the AACA Acceptance Letter on September 20, 2022.

786. Plaintiff Ortega received the Welcome Email from Coast in September 2022 and reviewed Coast's website around the same time.

787. Relying on American's and Coast's representations about the AACA, Plaintiff Ortega contracted with American and Coast to attend the AACA at Coast San Marcos, finalized a $120,000 loan with AAFCU in October 2022, signed Coast's funding disclosure on October 19, 2022, and moved to San Marcos, Texas.

788. Plaintiff Ortega started the AACA at Coast on February 2, 2023.

789. Plaintiff Ortega's training took significantly longer and was far more costly than advertised due to factors outside his control, including scheduling delays and race-based bias from instructors and Coast management.

790. He received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

791. Plaintiff Ortega faced extensive scheduling delays, through no fault of his own, that exacerbated his delayed timeline. He routinely went many days, and at times more than a week, without being scheduled to fly.

792. Coast repeatedly changed Plaintiff Ortega's instructors and often scheduled him for unnecessary or incorrect events, which caused problems in continuity and wasted his time and money.

793. Defendants subjected Plaintiff Ortega to unfair treatment because of his race. For example, Coast scheduled white students, such as B.D., to fly far more often and gave them priority for preferred flight time slots.

794. Plaintiff Ortega's instructors were biased against him. His primary instructor, Jacob Hutto, was highly critical of and doubted Plaintiff Ortega's piloting ability. He refused to endorse Plaintiff Ortega to take his solo stage check, despite Plaintiff Ortega having completed stage checks and four solo flights safely. He never gave Plaintiff Ortega clear instructions in his training and refused to explain his reasoning behind his evaluations and grades.

795. Plaintiff Ortega reported concerns about his training and treatment in the AACA—including about the bias and hostility in instructors, lack of support for diverse students, disorganization of scheduling and training events, and unequal standards in grading—to Coast and American administrators, including to Ms. Reid, flight lead Anna Bruick, and Ms. Didonna, but Defendants never remedied and/or ignored the reported issues. Plaintiff Ortega also raised his concerns with Captain Young, who shared that cadets at the Coast San Diego site had faced similar issues.

796. Ms. Bruick in particular was dismissive and condescending to Plaintiff Ortega when he reported concerns about his instructors' inadequate and inconsistent teaching, and their preferential treatment of white students.

797. He later overheard Ms. Bruick mocking his complaint, and criticizing his abilities to other instructors, although she had never flown with him.

798. Shortly after he raised concerns to Ms. Didonna, Defendants placed Plaintiff Ortega in the remedial program in April 2023, purportedly for accumulating high hours, even though this was due to Coast's scheduling errors and scheduling unnecessary flights, uncooperative weather, and inconsistent instruction.

799. In Plaintiff Ortega's understanding, all of the other cadets of color that he met during his time at Coast were also placed in the remedial program.

800. Defendants removed Plaintiff Ortega from the AACA on August 3, 2023.

801. That day, he had a meeting scheduled with Chief Pilot Kyle Challis for the next stage of the remedial program, but instead, Ms. Reid, Ms. Bruick, and Ms. Didonna informed him that he was being removed for "unsafe practices."

802. Mr. Challis informed Plaintiff Ortega that American and Coast had discussed and came to the conclusion that he had "unsafe practices" and therefore was being removed.

803. Plaintiff Ortega never received written documentation of any "unsafe practices" in his removal letter, nor did anyone at Coast or American specify what those practices were when he asked.

804. By contrast, white students were not removed even when they had just as many hours as Plaintiff Ortega, failed exams, and/or received negative feedback in training.

805. For example, at least one white student, J.B., had as many hours or more as Plaintiff Ortega without improvement and failed checkrides but was not removed from the program.

806. Plaintiff Ortega was present when a white student steered off the runway during an exam—surely an "unsafe practice," but she was not removed.

807. Plaintiff Ortega suffered substantial economic losses as a result of Defendants' unlawful conduct. He spent more than $61,000 on training at Coast and moving to San Marcos to attend the AACA, but he did not receive any ratings. He lost 10 months of wages. Plaintiff Ortega's credit score decreased due to the large amount of loans he took out to attend the AACA and his resulting high debt to credit ratio.

808. Plaintiff Ortega also suffered significant emotional distress as a result of his experience at the AACA, including severe stress, panic attacks, anxiety, and insomnia, for which he has seen a therapist.

809. Plaintiff Ortega continued his training at another flight school, having obtained his PPL, Instrument, and Commercial ratings, but at substantial additional cost.

**xvii. Ivana Page**

810. Plaintiff Ivana Page, who is Black, applied to the AACA in mid-2020. At the time, she was living in Viera, Florida and working as a systems engineer at an aerospace defense company. She reviewed American's AACA website in 2020.

811. During Plaintiff Page's May 2020 AACA admission interview, Mr. Morrison represented that American thoroughly vetted its partner flight schools and was highly involved and supportive of the cadets, that the vast majority of cadets complete the program in the allotted timeframe, and that she would receive a mentor. Mr. Morrison said that, to date, everyone who had applied to one of American's wholly owned regional airlines through the AACA had been hired.

812. American offered Plaintiff Page admission into the AACA in July 2020, and relying on American's representations, she signed the AACA Acceptance Letter in or around May 2021.

813. Plaintiff Page received the Welcome Email from Coast in June 2021 and reviewed Coast's website around the same time.

814. On June 2, 2021, Ms. Faucher sent Plaintiff Page an email stating:

> Coast Academy allows you to obtain all of the ratings you need to become an airline pilot and is designed to finish in 12 months. In that time, you will complete your PPL, IFR, CSEL, MEL, CFI & CFII. You will be flying 5-6 days a week.

815. Plaintiff Page visited Coast's San Diego site in June 2021. The flight leads and instructors she met assured her that everyone who attended the AACA completed the program within 12 months and within budget, and that the price listed on the Price Sheet would cover all training and housing and that it even had a buffer for delayed training built into the price and schedule.

816. Relying on American's and Coast's representations about the AACA, Plaintiff Page contracted with American and Coast to attend the AACA at Coast San Diego, finalized a $110,000 loan with Discover on September 14, 2021, and a loan from Truist Bank for $58,000 on October 19, 2021, signed Coast's funding disclosure in December 2021, and moved to San Diego, California.

817. Plaintiff Page started the AACA at Coast on January 24, 2022.

818. Plaintiff Page's training took significantly longer and was far more costly than advertised, due to factors outside her control, including race-based bias from instructors and management at Coast and American and scheduling delays.

819. Plaintiff Page received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

820. Coast regularly scheduled her flights during the busiest times for air traffic which did not allow her a safe time to fly and forced her to cancel some training events.

821. Defendants belittled Plaintiff Page's previous flight training and experience in aviation. Instructors forced her to re-prove proficiencies repeatedly, which cost her money and delayed her timeline for completion of the program.

822. Plaintiff Page's various instructors also gave her inconsistent, conflicting instruction.

823. Defendants also subjected Plaintiff Page to unfair treatment because of her race. For example, Instructor Zachary Wild criticized her crochet-style hair braids (though they did not interfere with her headset and complied with Coast's policy). He was disrespectful, yelled at her during training, rarely showed up for her lessons on time and spent the first 10 minutes of many sessions chatting with other instructors.

824. Instructor Paul Zadrozny repeatedly yelled at Plaintiff Page during training, referring to her as "you people" (referring to Black people), mocked another Black student's accent, and spit in her direction.

825. Instructor Kelly Cannataro became upset when Plaintiff Page asked questions and on several events, failed her for unfair reasons. After a miscommunication during a flight, Ms. Cannataro blew up at Plaintiff Page, ended the flight, and refused to continue training her.

826. White cadets, such as C.R., did not have instructors question their abilities or show hostility the way they did with Plaintiff Page. C.R. said that when he made mistakes, no one belittled him or told him to quit training, they just told him what to fix and he was allowed to try again. In contrast, Coast employees constantly belittled Plaintiff Page, told her to quit aviation, and chastised her for every mistake.

827. Coast allowed C.R. to solo within weeks of starting the program, but never allowed Plaintiff Page to solo, even though she had already done so many times before arriving at Coast.

828. C.R. said Coast must be treating Plaintiff Page differently because of her race.

829. Plaintiff Page's mentor, First Officer Stephanie Hartsfield, a Black woman, said that Defendants had labeled Plaintiff Page as "difficult" and "aggressive"—stereotypes of Black women, and were likely building a case against her to remove her from the program. Ms. Hartsfield advised Plaintiff Page that because of her race, if Plaintiff Page wanted to succeed at Coast, she had to keep her head down, do as she was told, and be careful not to ruffle feathers.

830. Plaintiff Page reported her concerns about Mr. Wild to Ms. Spivey, Ms. Steffen, and Ms. Cerrillo and requested to switch instructors.

831. The next day, Coast issued Plaintiff Page a letter of caution and falsely accused her of slapping Mr. Wild's hands off the controls during a flight.

832. Plaintiff Page reported concerns about her training and treatment at the AACA—including about being paired with biased and unprofessional instructors, and unfair scheduling and grading—to Coast and American administration several times during her training, including to Ms. Spivey, Ms. Steffen, Ms. Cerrillo, Mr. Shope, Ms. Hartsfield, and Ms. Didonna, but Defendants never remedied and/or ignored the reported issues.

833. Defendants removed Plaintiff Page from the AACA on May 13, 2022.

834. Coast's termination letter and letter of caution contained false and disparaging information about Plaintiff Page, which, upon information and belief, Coast shared with American.

835. For example, the termination letter falsely accused Plaintiff Page of "[r]efusing to answer/respond to basic knowledge questions or requests to demonstrate comprehension of course material" and "[s]howing hostility and/or consistent behavioral issues with Staff and Flight Instructors."

836. Plaintiff Page suffered substantial economic losses as a result of Defendants' unlawful conduct. She spent more than $29,000 on training at Coast and moving to San Diego to attend the AACA, but she did not receive any ratings. She lost more than 12 months of wages.

837. She suffered significant emotional distress as a result of her experience at the AACA, including severe stress, depression, anxiety, difficulty sleeping and eating, constant nausea, and weight loss.

//

//

//

**xviii. Andrew Pearson**

838. Plaintiff Andrew Pearson, who is Black and Samoan, applied to the AACA in early 2023. At the time, he was living in Westminster, California and working as a casual longshoreman and as head of a nonprofit organization.

839. Plaintiff Pearson reviewed American's AACA website in early 2023. He saw representations on the website such as "your AACA interview will be the last one you'll ever need to do" as part of the pipeline to becoming a commercial pilot and that he would have a guaranteed pipeline to becoming a pilot with American Airlines. He also saw that cadets would be flying five to six days a week in the AACA.

840. In June 2023, Plaintiff Pearson toured Coast's San Diego campus and was given a tour of its hangar and equipment.

841. During Plaintiff Pearson's September 15, 2023 AACA admission interview, Mr. Brannock represented that the AACA would take 12-15 months to complete, Plaintiff Pearson would be flying five to six times a week, the loan would cover all of his training, and that he would be on a track to get an interview with American Airlines after completing the AACA.

842. American offered Plaintiff Pearson admission into the AACA in September 2023, and relying on American's representations, he signed the AACA Acceptance Letter on September 21, 2023.

843. Plaintiff Pearson received the Welcome Email from Coast in September 2023 and reviewed Coast's website around the same time. He also viewed Instagram posts made by Coast and about Coast.

844. On October 23, 2023, Ms. Faucher sent Plaintiff Pearson an email stating, "The Academy is a full-time program that is going to keep you very busy! You will have 3-5 hours of training events 5 days per week."

845. Relying on American's and Coast's representations about the AACA, Plaintiff Pearson contracted with American and Coast to attend the AACA at Coast San

Diego, finalized a $120,000 loan with AAFCU on December 7, 2023, signed Coast's funding disclosure on October 17, 2023, and moved to San Diego, California.

846. Plaintiff Pearson started the AACA at Coast on January 5, 2024.

847. Plaintiff Pearson's training took significantly longer and was far more costly than advertised, due to factors outside his control, including inconsistency and turnover in instructors, scheduling delays, and race-based bias from instructors and Coast management.

848. Plaintiff Pearson received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

849. Plaintiff Pearson faced extensive scheduling delays, through no fault of his own, that exacerbated his delayed timeline. He often went days and sometimes up to a week without receiving flight training.

850. For example, after Plaintiff Pearson complained to Coast staff that, among other issues, he had gone several weeks without being put on the schedule to fly, Coast subsequently started scheduling him less and after scheduling others in his cohort for flying slots first.

851. Moreover, when Plaintiff Pearson asked Ms. Cerrillo if he could be permitted to transfer to Coast's general training (as opposed to the AACA timeline) as he was not progressing within the AACA timeline, she would not let him; meanwhile, white cadets from his cohort, G.B. and C.G., were permitted to transfer—despite being in AACA training for a longer time than Plaintiff Pearson and despite struggling with certain aspects of training.

852. Plaintiff Pearson even recalls at one point when he was too sick to fly but could not afford a cancellation, he threw up in a trashcan on campus so that he could run to his lesson and force himself through it.

853. Defendants also delayed Plaintiff Pearson's training when Coast had aircraft shortages and equipment failures.

854. Coast's instructional staff was constantly turning over, which caused Plaintiff Pearson inconsistent, conflicting instruction.

855. Defendants also subjected Plaintiff Pearson to unfair treatment because of his race. For example, an instructor told Plaintiff Pearson, "you're Brown, so you can't be professional."

856. Another instructor offensively said to Plaintiff Pearson, talking about a broken plane, "that plane is ghetto, like you."

857. Coast instructors did not question the abilities of white cadets, such as G.B. and C.G, nor show hostility the way they did with Plaintiff Pearson. When white cadets made mistakes or had delays in training, Coast accommodated them.

858. Defendants placed Plaintiff Pearson in the remedial program in June 2024, purportedly for failing a checkride. Yet, Coast did not place white students, such as G.B, who had failed as many checkrides and had high hours, in the remedial program. Instead, Coast permitted her to switch to the general training program while prohibiting Plaintiff Pearson from doing so.

859. Plaintiff Pearson's father took out $10,000 from his 401k to support Plaintiff Pearson's training when Plaintiff Pearson ran out of loan money.

860. Plaintiff Pearson reported concerns about his training and treatment at the AACA—including about unfair scheduling, lack of training and equipment, and grading—to Coast and American administration several times during his training, including to Ms. Cerrillo, his instructors, and Ms. Butterfield, but Defendants never remedied and/or ignored the reported issues.

861. Defendants removed Plaintiff Pearson from the AACA on May 21, 2025.

862. Plaintiff Pearson suffered substantial economic losses as a result of Defendants' unlawful conduct. He spent more than $125,000 on training at Coast and moving to San Diego to attend the AACA, but he did not complete the program. He lost over nine months of wages and had no choice but to take a lower paying job upon leaving

the program than the one he had prior to the AACA. He incurred substantial credit card debt and has struggled to make his loan payments. His credit score has declined.

863. Plaintiff Pearson suffered significant emotional distress as a result of his experience at the AACA, including severe stress, depression, anxiety, difficulty sleeping and eating, increased sickness, and weight loss.

864. Plaintiff Pearson continued his training at another flight school, but at substantial additional cost.

**xix. Triston Sanderson**

865. Plaintiff Triston Sanderson, who is Black, applied to the AACA in 2020 and again in late 2021. At the time, he was living in Dallas, Texas and working as an accountant.

866. Plaintiff Sanderson reviewed American's and Coast's AACA websites in 2020 and 2021.

867. On August 10, 2020, Plaintiff Sanderson received an email from Coast's Emily Van Meter stating:

> American Airlines has partnered with Coast Flight Training to offer students an all-inclusive flight training opportunity! . . . This intensive program will allow you to obtain all of your ratings in a year! In this time, you will obtain your PPL, IFR, CSEL, CFI, CFII & MEL. The Cadet Academy includes flight training five to six times per week, housing, a monthly food stipend, supplies, and exam fees.

The email also stated, "You can begin this program with either zero flight experience or with a completed private pilot's license. This program also unlocks the opportunity to apply for a loan that covers all training and living costs."

868. On March 15, 2021, Plaintiff Sanderson received an email from Coast's Brie Woody stating, Coast "allows you to obtain all of the ratings you need to become an airline pilot and is designed to finish in 10-12 months. In that time, you will complete your PPL, IFR, CSEL, MEL, CFI & CFII. You will be flying 5-6 days a week."

869. On March 31, 2021, Plaintiff Sanderson received another email from Ms. Van Meter stating Coast is "an all-inclusive, full-time flight training opportunity. This intensive program will allow you to obtain all of your ratings in a year [and] includes flight training five to six times per week." The email reiterates that the loan "covers all training and living costs."

870. When Plaintiff Sanderson visited Coast in San Diego in June 2021, Ms. Cerrillo assured him that most students finished the program and received all their ratings in 10-12 months (mentioning that one student completed the program in just seven months) and said he would be flying five to six days per week. She touted the large fleet of state-of-the-art aircraft and emphasized that the price of the program was all-inclusive. She said the loan would cover the full cost of training and most of his living expenses.

871. Plaintiff Sanderson attended a Future Airlines Pilots Association event in September 2021, where a Black pilot working for American spoke to a group of aspiring aviators about his journey to the captain's seat. Afterwards, American's Brad Morrison told the group that the Black pilot was earning more than $350,000 per year and said the AACA was the best way to put themselves in his shoes quickly. He said the application process was highly competitive but if you can gain admission, the AACA offered a fail-proof path to the airlines. Mr. Morrison assured them the loan would cover the full cost of training, which was typically completed in under 12 months. When they spoke one-on-one, Mr. Morrison said Plaintiff Sanderson seemed like a perfect fit for the program.

872. During his interview for the AACA in October 2021, American representative Kerrie Bourne assured Plaintiff Sanderson that through the AACA, he would receive all of his ratings in 10-12 months, the loan would cover the full cost of the program, and American would provide a pilot mentor to guide him through his training.

873. American offered Plaintiff Sanderson admission into the AACA, and relying on American's and Coast's representations, he signed the AACA Acceptance Letter in October 2021.

874. Plaintiff Sanderson received the Welcome Email from Coast in October 2021 and reviewed Coast's website around the same time.

875. In January 2022, he spoke with Ms. Faucher, who highlighted the 12-month-or-less timeline and that a loan of $110,000 would cover the entire cost of the program.

876. Relying on American's and Coast's representations about the AACA, Plaintiff Sanderson contracted with American and Coast to attend the AACA at Coast San Diego, finalized a $110,000 loan with Discover on January 26, 2022, signed Coast's funding disclosure on February 4, 2022, and moved to San Diego, California.

877. Plaintiff Sanderson started the AACA at Coast on April 4, 2022.

878. Contrary to Defendants' representations, Plaintiff Sanderson's training took significantly longer and was significantly more costly than advertised, due to factors outside his control, including scheduling delays and race-based bias from instructors and Coast management.

879. Plaintiff Sanderson received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

880. Defendants scheduled Plaintiff Sanderson's training at inopportune times, which further delayed his training.

881. Defendants failed to provide consistent instruction. Plaintiff Sanderson was forced to start over with a new instructor after Coast fired his first instructor after six weeks.

882. Defendants further failed to provide consistent access to aircraft. In June 2023, Coast moved half its fleet of Piper Archers to its Dallas location, thereby reducing the aircraft available for Plaintiff Sanderson to train on, further delaying his training.

883. Defendants did not assign Plaintiff Sanderson an American pilot mentor until more than 11 months after he started the AACA.

884. Defendants also subjected Plaintiff Sanderson to unfair treatment throughout the program because of his race. Defendants held him to a higher, harsher standard than white cadets, and were less supportive of him than white cadets.

885. Plaintiff Sanderson's instructor Nayef Howar gave him unsatisfactory marks for small mistakes but did not do so for white cadets. Mr. Howar was insulting and critical of Plaintiff Sanderson and rushed through his training sessions, but spent significant time debriefing, offering advice to, and comforting white cadets.

886. Plaintiff Sanderson was punished for requesting time off for sickness or important events, but white cadets were not punished for similar events.

887. Furthermore, Coast scheduled flight training for white cadets, such as L.R. and J.B., more frequently and at more advantageous times than Plaintiff Sanderson.

888. Plaintiff Sanderson reported concerns about his training and treatment at the AACA—including about unfair, biased scheduling and grading, inconsistent instructors, delayed scheduling, insufficient and poorly maintained aircraft, the cost of living and training far exceeding what was advertised, lack of support from American, and not receiving a mentor—to Coast and American administration several times during his training, including to Ms. Cerrillo, Ms. Ast, Mr. Shope, and to Captain Young, but Defendants never remedied and/or ignored the reported issues.

889. Captain Young agreed that racism was a problem in the AACA, and said he would try to help, but advised Plaintiff Sanderson to keep his head down and do his best.

890. Defendants placed Plaintiff Sanderson in the remedial program in July 2023, purportedly for failing a checkride, accumulating high hours, and cancelling events. Yet, Coast did not place several white students, such as C.M., C.D., and G.B., who had failed multiple checkrides and had high hours, in the remedial program.

891. Ms. Cerrillo repeatedly threatened Plaintiff Sanderson with removal.

892. Ms. Cerrillo made false and disparaging statements about Plaintiff Sanderson to American, including that he had poor performance and lacked basic knowledge and that no instructors wanted to work with him.

893. Defendants removed Plaintiff Sanderson from the AACA on December 7, 2023.

894. Plaintiff Sanderson suffered substantial economic losses as a result of Defendants' unlawful conduct. He spent more than $113,000 on training at Coast and moving to San Diego but did not complete the program. He lost over two years of wages and had to take a lower paying job upon leaving the program than the one he had prior to the AACA. He incurred substantial credit card debt and has struggled to make his loan payments. His credit score has declined.

895. Plaintiff Sanderson also suffered emotional distress as a result of his experience at the AACA, including stress, anxiety, depression, and insomnia.

896. He has continued his training at another flight school so far, having now completed his CSEL, CFI, and CFII ratings, but at significant additional cost.

**xx. Mathias Thelus**

897. Plaintiff Mathias Thelus, who is Black, reviewed American's website and applied to the AACA in mid-2021. At the time, he was living in Portland, Oregon and working as a ramp agent for American.

898. During Plaintiff Thelus's June 2021 AACA admission interview, Mr. Shope represented that the AACA took 11 to 12 months for those with no flight experience. Mr. Shope represented that most cadets completed the AACA, earned their livings as instructors, then worked for American's regional airlines.

899. American offered Plaintiff Thelus admission into the AACA, and relying on American's representations, he signed the AACA Acceptance Letter on July 1, 2021.

900. Plaintiff Thelus received the Welcome Email from Coast in June 2021 and reviewed Coast's website around the same time.

901. Relying on American's and Coast's representations about the AACA, Plaintiff Thelus contracted with American and Coast to attend the AACA at Coast San Diego, finalized a $82,000 loan with Discover on September 16, 2021, signed Coast's funding disclosure on October 18, 2021, and moved to San Diego, California.

902. Plaintiff Thelus started the AACA at Coast on November 8, 2021. Plaintiff Thelus had already earned his PPL.

903. Plaintiff Thelus's training took significantly longer and was far more costly than advertised, due to factors outside his control, including scheduling delays, instructor inconsistency, and race-based bias from instructors and Coast management.

904. He received, on average, far fewer days of flight training per week than the five to six days that Defendants promised.

905. Poor weather, aircraft grounded for maintenance, and instructor turnover caused Plaintiff Thelus to face substantial training delays.

906. Despite their promises, Defendants never assigned Plaintiff Thelus a mentor.

907. Defendants also subjected Plaintiff Thelus to unfair treatment because of his race. Defendants held Plaintiff Thelus to a higher, harsher standard than white cadets.

908. For example, white students J.B., I.K., and A.H. were given second chances when they made mistakes. Meanwhile, instructors Paul Allen and Sam Mier gave Plaintiff Thelus low grades and harsh criticisms for small mistakes.

909. Defendants scheduled Plaintiff Thelus's white peers, such as J.B., I.K., and A.H., for flight training more frequently and at more opportune times. As a result, his white peers progressed faster in the AACA, despite having less prior experience than Plaintiff Thelus.

910. In November 2022, Coast issued Plaintiff Thelus a remedial training plan, which falsely stated he had "unsafe flying habits" and had "shown a lack of commitment."

911. In December 2022, Coast issued Plaintiff Thelus a letter of caution that falsely accused him of having an argumentative attitude and engaging in unsafe practices.

912. Defendants placed Plaintiff Thelus in the remedial program in December 2022, purportedly because he had received three "unsatisfactory" grades in his CFI training. Yet, white cadets who failed on more events were not placed in the remedial program.

913. Defendants removed Plaintiff Thelus from the AACA on January 30, 2023.

914. Plaintiff Thelus only failed one checkride during the AACA, whereas Defendants did not remove white students who had failed multiple checkrides.

915. Plaintiff Thelus started the AACA with three white cadets and five other cadets of color. In his understanding, all three white cadets and only one non-white cadet finished the program.

916. Plaintiff Thelus suffered substantial economic losses as a result of Defendants' unlawful conduct.

917. He spent more than $75,000 on training at Coast and moving to San Diego to attend the AACA, and he only received his IFR and CSEL ratings. He lost 14 months of wages, incurred significant credit card debt, and has been unable to make his loan payments on time, which has caused his credit score to drop substantially.

918. Plaintiff Thelus has suffered emotional distress as a result of his experience in the AACA, including severe stress, anxiety, depression, problems sleeping, loss of appetite, and negative impact on relationships with friends and family.

919. He has continued his training at another flight school, so far having completed his CMEL, but at substantial additional cost.

## V. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Fraud / Intentional Misrepresentation

### (All Plaintiffs against All Defendants)

920. Plaintiffs incorporate by reference all preceding paragraphs.

921. On Defendants' websites, in Defendants' advertising materials, and in Defendants' emails and verbal conversations with Plaintiffs, Defendants represented:

a. That Plaintiffs would complete the AACA at Coast in 12 months (or, in 10 months for those who already had their PPL) and receive all the ratings needed to become commercial airline pilots (PPL, IFR, CSEL, CFI, CFII, and CMEL) through the AACA at Coast;

b. That the entire AACA program at Coast, including most of their living expenses for one year, was a set price ($97,923, $97,712, $103,495, or

$77,968, depending on the Plaintiff), which would be covered by a single loan of no more than $110,000 (or $120,000, depending on the Plaintiff);

c. That Plaintiffs would train five to six days per week during the AACA at Coast; and

d. That Plaintiffs would be assigned an American Airlines pilot as a mentor shortly before or shortly after starting in the AACA at Coast to assist and guide them throughout the program.

922. These representations were false.

923. Defendants knew these representations were false at the time they made them, or they made these representations recklessly without any knowledge of their truth and as a positive assertion.

924. Defendants made these misrepresentations with the intent that Plaintiffs would rely on them in making their decisions to attend the AACA at Coast.

925. Defendants' misrepresentations were material to Plaintiffs in making the decision to attend the AACA at Coast.

926. Plaintiffs reasonably relied on Defendants' representations in making the decisions to attend the AACA at Coast.

927. Plaintiffs have been harmed by their reasonable reliance on Defendants' representations in that Plaintiffs gave up valuable opportunities and borrowed and spent significant amounts of money to attend the AACA at Coast, but they did not receive the ratings Defendants promised. Progress through the program took substantially longer and cost substantially more than Defendants represented, Plaintiffs did not train five to six days per week, and few Plaintiffs received mentors. Plaintiffs were either terminated or forced to resign from the AACA at Coast.

928. Plaintiffs' reliance on these false representations was a substantial factor in causing their harm. Plaintiffs have been harmed in an amount to be proven at trial, but includes: (a) the amount they spent on flight training at Coast; (b) the amount they spent moving to their chosen Coast location; (c) the amount they spent on living expenses while

at Coast over and above what they would have spent on living expenses had they not attended the AACA at Coast; (d) the wages or scholarship funds Plaintiffs gave up to attend the AACA at Coast; (e) medical expenses arising from injuries Plaintiffs endured during and after the AACA at Coast; (f) the economic harm caused by the damage to Plaintiffs' credit scores; (g) the cost each Plaintiff must pay to obtain the ratings they were told they would earn through the AACA at Coast; and (h) compensatory damages for the emotional distress Plaintiffs endured during and after their experience in the AACA at Coast.

929. Defendants acted individually and on behalf of each other when they made each of the representations, and when one Defendant made a representation, the others ratified the representation and/or knew of the misrepresentation and failed to correct it.

930. Defendants also acted in a conspiracy when they committed this fraud as: (a) each of the Defendants had knowledge of and agreed to both the objective and course of action to injure Plaintiffs; (b) pursuant to their agreement, Defendants intentionally misled Plaintiffs at the time and place and via the manner set forth above; and (c) pursuant to their agreement, Defendants injured Plaintiffs, as set forth above.

931. Defendants' actions were fraudulent, oppressive, and malicious and therefore warrant an award of punitive damages under Section 3294 of the California Civil Code.

## SECOND CAUSE OF ACTION

### Fraudulent Concealment / Fraud by Non-Disclosure

### (All Plaintiffs against All Defendants)

932. Plaintiffs incorporate by reference all preceding paragraphs.

933. On Defendants' websites, in Defendants' advertising materials, and in Defendants' emails and verbal conversations with Plaintiffs, Defendants actively concealed and deliberately failed to disclose material facts, including that:

a. Only a small percentage of cadets in the AACA at Coast complete the program and receive all the ratings needed to become commercial airline pilots (PPL, IFR, CSEL, CFI, CFII, and CMEL);

b. Most of the cadets that do finish the AACA at Coast take far longer than 12 months to do so;

c. Most of the cadets that do finish the AACA at Coast spend far more than the quoted price ($97,923, $97,712, $103,495, or $77,968, depending on the cadet), and need to borrow far more than the single loan of $110,000 (or $120,000, depending on the cadet);

d. Very few, if any, cadets in the AACA at Coast train five to six days per week; and

e. Very few cadets in the AACA at Coast receive an American Airlines pilot as a mentor shortly before or shortly after starting in the program.

934. Defendants owed Plaintiffs duties to disclose these facts because (a) Defendants provided some information to Plaintiffs, but intentionally failed to disclose the full truth, making Defendants' disclosures deceptive; and (b) Defendants intentionally failed to disclose these facts, which were known only to Defendants and could not have been discovered by Plaintiffs.

935. Plaintiffs did not know of these facts and did not have an equal opportunity to discover them.

936. Defendants knew of these facts and knew they were material and unknown to Plaintiffs but intentionally concealed or deliberately failed to disclose them with the intent to induce Plaintiffs to uproot their lives, decline valuable opportunities, and borrow and spend tens of thousands of dollars to attend the AACA at Coast.

937. Defendants intended to deceive Plaintiffs by concealing or deliberately failing to disclose these facts.

938. Plaintiffs relied on the nondisclosure of these facts in deciding to attend the AACA at Coast. Had these facts been disclosed, Plaintiffs would have behaved differently in that they would not have chosen to attend the AACA at Coast.

939. These facts were objectively material to any reasonable person, and their concealment or nondisclosure caused Plaintiffs to alter their positions to their detriment.

940. Plaintiffs have been harmed by Defendants' fraudulent concealment or deliberate non-disclosure in an amount to be proven at trial, but includes: (a) the amount they spent on flight training at Coast; (b) the amount they spent moving to their chosen Coast location; (c) the amount they spent on living expenses while at Coast over and above what they would have spent on living expenses had they not attended the AACA at Coast; (d) the wages or scholarship funds Plaintiffs gave up to attend the AACA at Coast; (e) medical expenses arising from injuries Plaintiffs endured during and after the AACA at Coast; (f) the economic harm caused by the damage to Plaintiffs' credit scores; (g) the cost each Plaintiff must pay to obtain the ratings they were told they would earn through the AACA at Coast; and (h) compensatory damages for the emotional distress Plaintiffs endured during and after their experience in the AACA at Coast.

941. Defendants' concealment or non-disclosure of these material facts to Plaintiffs was a substantial factor in causing Plaintiffs' harm.

942. Defendants were acting individually and on behalf of each other when they failed to disclose material facts, and when one Defendant omitted material facts, the others ratified the omission and/or knew of the omission and failed to correct it.

943. Defendants also acted in a conspiracy when they committed this fraud as: (a) each of the Defendants had knowledge of and agreed to both the objective and course of action to injure Plaintiffs; (b) pursuant to their agreement, Defendants intentionally misled Plaintiffs at the time and place and via the manner set forth above; and (c) pursuant to their agreement, Defendants injured Plaintiffs, as set forth above.

944. Defendants' actions were fraudulent, oppressive, and malicious and therefore warrant an award of punitive damages pursuant to Section 3294 of the California Civil Code.

**THIRD CAUSE OF ACTION**

**Promissory Fraud / Fraudulent Inducement**

**(All Plaintiffs against All Defendants)**

945. Plaintiffs incorporate by reference all preceding paragraphs.

946. On Defendants' websites, in Defendants' advertising materials, and in Defendants' emails and verbal conversations with Plaintiffs, Defendants promised that:

a. Plaintiffs would receive all the ratings needed to become commercial airline pilots (PPL, IFR, CSEL, CFI, CFII, and CMEL) through the AACA at Coast and complete the AACA in 12 months (or, in 10 months for those who already had their PPL);

b. The cost of the entire AACA program at Coast was $97,923, $97,712, $103,495, or $77,968, depending on the Plaintiff, which would be covered entirely, including most of their living expenses for one year, by a single loan of $110,000 or $120,000 depending on the Plaintiff (or, even less for those who had their PPL);

c. Plaintiffs would train five to six days per week during the AACA at Coast; and

d. Plaintiffs would receive an American Airlines pilot as a mentor shortly before or shortly after starting in the AACA at Coast to assist and guide them throughout the program.

947. Defendants did not intend to perform these promises at the time they made them and have not performed as promised.

948. Defendants made these promises with the intent to induce Plaintiffs to pay substantial sums of money and materially alter their positions to attend the AACA at Coast.

949. Defendants' affirmative promises were of objectively material facts to any reasonable person in Plaintiffs' shoes, and they were subjectively material to Plaintiffs, as Plaintiffs would not have chosen to attend the AACA at Coast if Defendants had not made them.

950. Defendants intended to induce Plaintiffs to alter their positions in reliance on the promises by declining other opportunities, borrowing substantial sums of money, and uprooting their lives to attend the AACA at Coast.

951. Plaintiffs did not know that Defendants' promises were false.

952. Plaintiffs justifiably and reasonably relied on Defendants' promises when they decided to attend the AACA at Coast.

953. Defendants' false promises and Plaintiffs' justifiable reliance were the actual and proximate causes of substantial harm to Plaintiffs in that Plaintiffs gave up valuable opportunities and borrowed and spent significant amounts of money to attend the AACA at Coast, but they did not receive the ratings Defendants promised. Progress through the program took substantially longer and cost substantially more than Defendants promised, Plaintiffs did not train five to six days per week, and few Plaintiffs received mentors. Plaintiffs were either terminated or forced to resign from the AACA at Coast.

954. Plaintiffs' justifiable reliance on Defendants' false promises was a substantial factor in causing Plaintiffs' harm. Plaintiffs have been harmed in an amount to be proven at trial, but includes: (a) the amount they spent on flight training at Coast; (b) the amount they spent moving to their chosen Coast location; (c) the amount they spent on living expenses while at Coast over and above what they would have spent on living expenses had they not attended the AACA at Coast; (d) the wages or scholarship funds Plaintiffs gave up to attend the AACA at Coast; (e) medical expenses arising from injuries Plaintiffs endured during and after the AACA at Coast; (f) the economic harm caused by the damage to Plaintiffs' credit scores; (g) the cost each Plaintiff must pay to obtain the ratings they were told they would earn through the AACA at Coast; and (h)

compensatory damages for the emotional distress Plaintiffs endured during and after their experience in the AACA at Coast.

955. Defendants were acting individually and on behalf of each other when they made each of the promises, and when one Defendant made a promise, the others ratified the promise and/or knew of the false promise and failed to correct it.

956. Defendants also acted in a conspiracy when they committed this fraud as: (a) each of the Defendants had knowledge of and agreed to both the objective and course of action to injure Plaintiffs; (b) pursuant to their agreement, Defendants intentionally misled Plaintiffs at the time and place and via the manner set forth above; and (c) pursuant to their agreement, Defendants injured Plaintiffs, as set forth above.

957. Defendants' actions were fraudulent, oppressive, and malicious and therefore warrant an award of punitive damages pursuant to Section 3294 of the California Civil Code.

## FOURTH CAUSE OF ACTION

### Negligent Misrepresentation

### (All Plaintiffs against All Defendants)

958. Plaintiffs incorporate by reference all preceding paragraphs.

959. On Defendants' websites, in Defendants' advertising materials, and in Defendants' emails and verbal conversations with Plaintiffs, Defendants represented:

a. That Plaintiffs would receive all the ratings needed to become commercial airline pilots (PPL, IFR, CSEL, CFI, CFII, and CMEL) through the AACA at Coast and complete the AACA at Coast in 12 months (or, in 10 months for those who already had their PPL);

b. That the entire AACA program at Coast was a set price ($97,923, $97,712, $103,495, or $77,968, depending on the Plaintiff), which would be covered, along with most of their living expenses for one year, by a single loan of no more than $110,000 or $120,000 depending on the Plaintiff (or even less for those who had their PPL);

c. That Plaintiffs would train five to six days per week during the AACA at Coast; and

d. That Plaintiffs would be assigned an American Airlines pilot as a mentor shortly before or shortly after starting in the AACA at Coast to assist and guide them throughout the program.

960. These representations were false, and Defendants either knew they were false or if Defendants honestly believed the representations were true, they had no reasonable grounds for believing the representations were true when they made them.

961. Defendants intended that Plaintiffs rely on the above representations when each Plaintiff decided to attend the AACA at Coast.

962. Plaintiffs reasonably relied on these representations in making the decision to attend the AACA at Coast.

963. Plaintiffs have been harmed by their reasonable reliance on Defendants' representations in that Plaintiffs gave up valuable opportunities and borrowed and spent significant amounts of money to attend the AACA at Coast, but they did not receive the ratings Defendants promised. Progress through the program took substantially longer and cost substantially more than Defendants represented, Plaintiffs did not train five to six days per week, and few Plaintiffs received mentors. Plaintiffs were either terminated or forced to resign from the AACA at Coast.

964. Plaintiffs' reliance on these false representations was a substantial factor in causing their harm. Plaintiffs have been harmed in an amount to be proven at trial, but includes: (a) the amount they spent on flight training at Coast; (b) the amount they spent moving to their chosen Coast location; (c) the amount they spent on living expenses while at Coast over and above what they would have spent on living expenses had they not attended the AACA at Coast; (d) the wages or scholarship funds Plaintiffs gave up to attend the AACA at Coast; (e) medical expenses arising from injuries Plaintiffs endured during and after the AACA at Coast; (f) the economic harm caused by the damage to Plaintiffs' credit scores; (g) the cost each Plaintiff must pay to obtain the ratings they were

told they would earn through the AACA at Coast; and (h) compensatory damages for the emotional distress Plaintiffs endured during and after their experience in the AACA at Coast.

## FIFTH CAUSE OF ACTION

### Violations of California Unfair Competition Law

### Cal. Bus. & Prof. Code § 17200 *et seq*.

### (All Plaintiffs against All Defendants)

965. Plaintiffs incorporate by reference all preceding paragraphs.

966. California Business & Professions Code § 17200 *et seq*. ("Section 17200") prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising" and any act prohibited by Cal. Bus. & Prof. Code § 17500.

967. Defendants' conduct constitutes a "business practice" under Section 17200.

968. Defendants violated Section 17200's prohibition against engaging in an "***unlawful***" business act or practice by making material misrepresentations, omissions, and/or false promises regarding the AACA at Coast in violation of Cal. Civ. Code §§ 1572 (actual fraud), 1573 (constructive fraud), 1709 and 1710 (deceit), 1750 *et seq.* (CLRA); Cal. Bus. & Prof. Code §17500 (FAL); Tex. Bus. & Com. Code § 17.01 *et seq*. (DTPA), and Texas common law. Defendants also violated Section 17200's prohibition against engaging in an "***unlawful***" business act or practice by targeting racial minorities with a predatory product in violation of ECOA, and by discriminating against Plaintiffs on the basis of their race in violation of Title VI, the Unruh Civil Rights Act, and Section 1981. Plaintiffs reserve the right to allege other violations of law which constitute other unlawful business acts and practices.

969. Defendants violated Section 17200's prohibition against "***fraudulent***" business acts or practices through their misrepresentations and omissions regarding the AACA at Coast that had a tendency to—and did—mislead the public and with intent to induce reliance of Plaintiffs.

970. Defendants violated Section 17200 by issuing unfair, deceptive, untrue, or misleading statements to Plaintiffs and the public about the AACA at Coast, including:

a. That Plaintiffs would receive all the ratings needed to become commercial airline pilots (PPL, IFR, CSEL, CFI, CFII, and CMEL) through the AACA at Coast and complete the AACA at Coast in 12 months (or, for those who already had their PPL, in 10 months);

b. That the entire AACA program at Coast was a set price ($97,923, $97,712, $103,495, or $77,968, depending on the Plaintiff), which would be covered in its entirety, including most of their living expenses for one year, by a single loan of $110,000 or $120,000, depending on the Plaintiff (or, less for those who had their PPL);

c. That Plaintiffs would train five to six days per week during the AACA at Coast;

d. That Plaintiffs would be assigned an American Airlines pilot as a mentor shortly before or shortly after starting in the AACA at Coast to assist and guide them throughout the program; and

e. That Coast had sufficient resources, including aircraft, instructors, and other staff, policies, and practices, to ensure Plaintiffs could train regularly and progress through the AACA program on time and on budget.

971. Defendants violated Section 17200 by making unfair, deceptive, untrue, or misleading statements by failing to disclose material facts about the AACA at Coast to Plaintiffs and the public that were known only to Defendants and could not have been discovered by Plaintiffs or the public, including that:

a. Only a small percentage of cadets in the AACA at Coast complete the program and receive all the ratings needed to become commercial airline pilots (PPL, IFR, CSEL, CFI, CFII, and CMEL);

b. Most of the cadets that do finish the AACA at Coast take far longer than 12 months to do so;

c. Most of the cadets that do finish the AACA at Coast spend far more than the quoted price ($97,923, $97,712, $103,495, or $77,968, depending on the cadet) and need to borrow far more than the single loan of $110,000 (or $120,000, depending on the cadet);

d. Very few, if any, cadets in the AACA at Coast train five to six days per week;

e. Very few cadets in the AACA at Coast receive an American Airlines pilot as a mentor shortly before or shortly after starting in the program; and

f. Coast does not have sufficient aircraft, instructors, staff, policies, and/or practices to ensure Plaintiffs could train regularly and progress through the AACA program on time and on budget.

972. Defendants knew these misrepresentations and omissions were likely to deceive the public, and they did in fact deceive the public, including Plaintiffs.

973. Defendants' conduct also constitutes "***unfair***" business acts and practices within the meaning of Section 17200 because they induced Plaintiffs (and other members of the public) to spend tens of thousands of dollars to attend the AACA at Coast, but Defendants did not deliver what they promised. Defendants' practices offend public policy and are unethical, oppressive, unscrupulous and violate the laws stated. Defendants' conduct caused and continues to cause substantial injury to Plaintiffs and other members of the public. The gravity of Defendants' alleged wrongful conduct outweighs any purported benefits attributable to such conduct. There were also reasonably available alternatives to Defendants to further their business interests.

974. Relying on Defendants' representations, Plaintiffs spent tens of thousands of dollars on training in the AACA at Coast, but they did not receive the ratings they were promised, the training took far longer and was far more expensive than was promised, they did not train five to six days per week, and they did not receive mentors as promised. Plaintiffs were either terminated or forced to resign from the program before they received all the ratings they needed to start their careers as pilots.

975. Plaintiffs have suffered injury in fact and have lost money and/or property as a result of Defendants' unlawful, fraudulent, and unfair business acts and practices and are entitled to relief in the form of restitution to restore to Plaintiffs any money or property which Defendants acquired by means of such practices.

976. Plaintiffs are also entitled to injunctive relief to prevent Defendants from continuing to harm members of the public and the flight training industry with their unlawful, fraudulent, and unfair business acts and practices.

## **SIXTH CAUSE OF ACTION**

### **Violations of California False Advertising Law**

### **Cal. Bus. & Prof. Code § 17500 *et seq*.**

### **(All Plaintiffs against All Defendants)**

977. Plaintiffs incorporate by reference all preceding paragraphs.

978. California Business and Professions Code § 17500 ("Section 17500") prohibits making or disseminating to members of the public "any statement" that is "untrue or misleading" concerning property or services offered for sale, and "which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

979. Through their websites, promotional materials, emails, and conversations with applicants, Defendants made and disseminated untrue or misleading statements regarding the AACA at Coast to Plaintiffs and the public, including:

a. That Plaintiffs would receive all the ratings needed to become commercial airline pilots (PPL, IFR, CSEL, CFI, CFII, and CMEL) through the AACA at Coast and complete the AACA at Coast in 12 months (or, for those who already had their PPL, in 10 months);

b. That the entire AACA program at Coast was a set price ($97,923, $97,712, $103,495, or $77,968, depending on the Plaintiff), which would be covered in its entirety, including most of their living expenses for one year, by a

single loan of $110,000 or $120,000, depending on the Plaintiff (or, less for those who had their PPL);

c. That Plaintiffs would train five to six days per week during the AACA at Coast;

d. That Plaintiffs would be assigned an American Airlines pilot as a mentor shortly before or shortly after starting in the AACA at Coast to assist and guide them throughout the program; and

e. That Coast had sufficient resources, including aircraft, instructors, and other staff, policies, and practices, to ensure Plaintiffs could train regularly and progress through the AACA program on time and on budget.

980. At the time Defendants made or disseminated these untrue and misleading statements, they knew, or through the exercise of reasonable care should have known, they were untrue and misleading.

981. Defendants made these untrue and misleading statements and omissions with the intent to induce members of the public, including Plaintiffs, to enter into obligations relating to the AACA at Coast, including but not limited to entering into loan agreements to borrow substantial sums of money to pay for flight training at the AACA at Coast, along with moving costs and living expenses associated with attending the AACA at Coast.

982. Defendants caused these untrue and misleading statements to be made or disseminated as part of a plan or scheme with the intent not to sell the services associated with the AACA at Coast as advertised and/or at the price advertised.

983. Relying on Defendants' untrue and misleading statements, Plaintiffs spent tens of thousands of dollars on training in the AACA at Coast, but they did not receive the ratings they were promised, the training took far longer and was far more expensive than was promised, they did not train five to six days per week, and they did not receive mentors as promised. Plaintiffs were either terminated or forced to resign from the program before they received all the ratings they needed to start their careers as pilots.

984. Plaintiffs have suffered injury in fact and have lost money and/or property as a result of Defendants' untrue and misleading advertising and are entitled to relief in the form of restitution to restore to Plaintiffs any money or property which Defendants acquired by means of such practices.

985. Plaintiffs are also entitled to injunctive relief to prevent Defendants from continuing to harm members of the public and the flight training industry with their untrue and misleading advertising.

## <u>SEVENTH CAUSE OF ACTION</u>

### Violations of California Consumer Legal Remedies Act

### Cal. Civil Code § 1750 *et seq*.

### (All Plaintiffs against All Defendants)

986. Plaintiffs incorporate by reference all preceding paragraphs.

987. The California Consumers Legal Remedies Act, Cal. Civil Code § 1750 *et seq*. (CLRA) makes unlawful specific "unfair or deceptive acts or practices" undertaken in a transaction for the sale of goods or services to any consumer.

988. Plaintiffs are consumers as defined by Cal. Civ. Code § 1761(d).

989. The flight training program through the AACA at Coast constitutes "services" and/or "products" as defined by Cal. Civ. Code §§ 1761(a) and (b).

990. Defendants constitute "persons" under Cal. Civ. Code § 1761(c).

991. Plaintiffs' purchases of flight training at Coast through the AACA and the loans they took out in order to do so constitute "transactions" as that term is defined in Cal. Civ. Code § 1761(e).

992. Defendants violated and continue to violate the CLRA by engaging in the following unfair or deceptive acts or practices specifically proscribed by Cal. Civ. Code § 1770(a), in transactions with Plaintiffs that were intended to result, or which resulted in the sale of goods or services to a consumer:

a. In violation of Cal. Civ. Code § 1770(a)(5), Defendants represented that the AACA's flight training program at Coast had characteristics and benefits it did not have;

b. In violation of Cal. Civ. Code § 1770(a)(7), Defendants represented the AACA at Coast was "of a particular standard, quality, or grade" when the program was of another standard, quality, or grade; and

c. In violation of Cal. Civ. Code § 1770(a)(14), Defendants represented that the transactions between Defendants, Plaintiffs, and the lenders from whom Plaintiffs borrowed money to attend the AACA at Coast would "confer or involve rights, remedies, or obligations" that they did not have or involve.

993. Through their websites, promotional materials, emails, and conversations with applicants, Defendants made false, deceptive, and/or misleading representations about the AACA at Coast to Plaintiffs and the public in violation of the CLRA, including:

a. That Plaintiffs would complete the AACA program at Coast and receive all the ratings needed to become commercial airline pilots (PPL, IFR, CSEL, CFI, CFII, and CMEL) through the AACA at Coast in 12 months (or, for those who already had their PPL, in 10 months);

b. That the entire AACA program at Coast was a set price ($97,923, $97,712, $103,495, or $77,968, depending on the Plaintiff), which would be covered in its entirety, along with most of their living expenses for one year, by a single loan of no more than $110,000 or $120,000, depending on the Plaintiff (or, even less for those who had their PPL);

c. That Plaintiffs would train five to six days per week during the AACA at Coast;

d. That Plaintiffs would be assigned an American Airlines pilot as a mentor shortly before or shortly after starting in the AACA at Coast to assist and guide them throughout the program; and

e. That Coast had sufficient resources, including aircraft, instructors, and other staff, policies, and practices, to ensure Plaintiffs could train regularly and progress through the AACA program on time and on budget.

994. Through their websites, promotional materials, emails, and conversations with applicants, Defendants made and disseminated false, deceptive, and/or misleading statements about the AACA at Coast to Plaintiffs and the public by failing to disclose material facts that were known to Defendants but could not have been discovered by Plaintiffs or the public, including that:

a. Only a small percentage of cadets in the AACA at Coast complete the program and receive all the ratings needed to become commercial airline pilots (PPL, IFR, CSEL, CFI, CFII, and CMEL);
b. Most of the cadets that do finish the AACA at Coast take far longer than 12 months to do so;
c. Most of the cadets that do finish the AACA at Coast spend far more than the quoted price ($97,923, $97,712, $103,495, or $77,968, depending on the cadet), and need to borrow far more than the single loan of $110,000 or $120,000 depending on the cadet (or less for those who had their PPL);
d. Very few, if any, cadets in the AACA at Coast train five to six days per week;
e. Very few cadets in the AACA at Coast receive an American Airlines pilot as a mentor shortly before or shortly after starting in the program; and
f. Coast does not have sufficient aircraft, instructors, staff, policies, and/or practices to ensure Plaintiffs could train regularly and progress through the AACA program on time and on budget.

995. As a result of Defendants' CLRA violations, each Plaintiff suffered ascertainable monetary losses, which they would not have incurred but for Defendants' unlawful practices, including: (a) the amount each Plaintiff spent on flight training at Coast; (b) the amount each Plaintiff spent moving to their chosen Coast location; (c) the amount each Plaintiff spent on living expenses while at Coast in excess of what they

would have spent on living expenses had they not attended the AACA at Coast; (d) the wages or scholarship funds Plaintiffs gave up to attend the AACA at Coast; (e) medical expenses arising from injuries some Plaintiffs endured during and after the AACA at Coast; (f) the economic harm caused by the damage to Plaintiffs' credit scores; and (g) the cost each Plaintiff must pay to obtain the ratings they were told they would earn through the AACA at Coast.

996. Plaintiffs also suffered emotional distress as a direct and proximate result of Defendants' unlawful conduct.

997. Pursuant to Cal. Civ. Code § 1782, on September 3, 2025 (and, in the cases of Plaintiffs Hernandez and Pearson, March 9, 2026), Plaintiffs gave each and every Defendant written notice of the violations of Cal. Civ. Code § 1770 and demanded that Defendants rectify the problems associated with the actions detailed above.

998. Defendants failed to rectify the problems within 30 days after receipt of the Cal. Civ. Code § 1782 notice.

999. Plaintiffs seek actual damages and punitive damages for violation of the CLRA pursuant to Cal. Civ. Code § 1780(a)(1), (4).

1000. Plaintiffs are also entitled to recover attorneys' fees, costs, and expenses, pursuant to Cal. Civil Code § 1780(e).

1001. Plaintiffs seek a Court order enjoining wrongful acts and practices that violate Cal. Civ. Code § 1770 under Cal. Civ. Code § 1780(a)(2).

## EIGHTH CAUSE OF ACTION

**Violation of Texas Deceptive Trade Practices-Consumer Protection Act**

**Tex. Bus & Com. Code § 17.41 *et seq.***

**(All Plaintiffs against All Defendants)**

1002. Plaintiffs incorporate by reference all preceding paragraphs.

1003. The Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code § 17.41 *et seq*. ("DTPA"), makes unlawful false, misleading, and deceptive business acts or practices in the conduct of any trade or commerce.

1004. Plaintiffs are "[c]onsumer[s]" as defined by Tex. Bus. & Com. Code § 17.45(4).

1005. Defendants are "[p]erson[s]" as defined by Tex. Bus. Com. Code § 17.45(3).

1006. The AACA at Coast's flight training program constitutes "[s]ervices" as defined by Tex. Bus. Com. Code § 17.45(2).

1007. Defendants engaged in "[t]rade" and "commerce" as defined by Tex. Bus. Com. Code § 17.45(6) because they advertised and offered for sale flight training services through the AACA at Coast at locations in California and Texas to Plaintiffs and the public, including the people of Texas, thereby directly or indirectly affecting the people of Texas.

1008. Defendants engaged in false, misleading, and deceptive acts and practices in violation of Tex. Bus. Com. Code § 17.46(b), including:

a. By representing that the AACA's flight training program at Coast had characteristics and benefits it did not have, in violation of Tex. Bus. & Com. Code § 17.46(b)(5);

b. By representing that the transaction between Plaintiffs, Defendants, and/or the lenders from whom Plaintiffs borrowed money to attend the AACA at Coast would "confer or involve rights, remedies, or obligations" that it did not have or involve, in violation of Tex. Bus. & Com. Code § 17.46(b)(12);

c. By representing the AACA at Coast was "of a particular standard, quality, or grade" when the program was of another, in violation of Tex. Bus. & Com. Code § 17.46(b)(7); and

d. By failing to disclose information concerning material aspects of the AACA at Coast that was known at the time of the transaction with the intent to induce the Cadets to enter into transactions that they would not have agreed to if the information had been disclosed, in violation of Tex. Bus. & Com. Code § 17.46(b)(24).

1009. Through their websites, promotional materials, emails, and conversations with applicants, Defendants made false, misleading, and deceptive representations about the AACA at Coast to Plaintiffs and the public in violation of the DTPA, including:

a. That Plaintiffs would receive all the ratings needed to become commercial airline pilots (PPL, IFR, CSEL, CFI, CFII, and CMEL) through the AACA at Coast and complete the AACA at Coast in 12 months (or, for those who already had their PPL, in 10 months);
b. That the entire AACA program at Coast would cost a set price ($97,923, $97,712, $103,495, or $77,968, depending on the cadet), which would be covered, along with most of their living expenses for one year, by a single loan of no more than $110,000 or $120,000, depending on the cadet (or less for those who had their PPL);
c. That Plaintiffs would train five to six days per week during the AACA at Coast;
d. That Plaintiffs would be assigned an American Airlines pilot as a mentor shortly before or shortly after starting in the AACA at Coast to assist and guide them throughout the program; and
e. That Coast had sufficient resources, including aircraft, instructors, and other staff, policies, and practices, to ensure Plaintiffs could train regularly and progress through the AACA program on time and on budget.

1010. Through their websites, promotional materials, emails, and conversations with applicants, Defendants made false, misleading, and deceptive statements about the AACA at Coast to Plaintiffs and the public by failing to disclose material facts, including that:

a. Only a small percentage of cadets in the AACA at Coast complete the program and receive all the ratings needed to become commercial airline pilots (PPL, IFR, CSEL, CFI, CFII, and CMEL);

b. Most of the cadets that do finish the AACA at Coast take far longer than 12 months to do so;

c. Most of the cadets that do finish the AACA at Coast spend far more than the quoted price ($97,923, $97,712, $103,495, or $77,968, depending on the Plaintiff) and need to borrow far more than the single loan of $110,000 or $120,000, depending on the Plaintiff;

d. Very few, if any, cadets in the AACA at Coast train five to six days per week;

e. Very few cadets in the AACA at Coast receive an American Airlines pilot as a mentor shortly before or shortly after starting in the program; and

f. Coast does not have sufficient aircraft, instructors, staff, policies, and/or practices to ensure Plaintiffs could train regularly and progress through the AACA program on time and on budget.

1011. Defendants concealed these material facts with the intent to induce Plaintiffs to borrow and pay money to attend the AACA at Coast, to give up valuable opportunities, and incur other substantial costs and expenses to attend the AACA at Coast. Plaintiffs would not have entered these transactions if the information had been disclosed.

1012. Defendants failed to inform Plaintiffs of these material facts and continued advertising and selling the AACA at Coast, notwithstanding its knowledge of the false, misleading, and deceptive nature of their statements and omissions.

1013. Defendants had a duty to disclose the above facts due to: (a) Defendants' possession of exclusive knowledge regarding the true facts about the AACA at Coast at the time of Plaintiffs agreeing to attend the AACA at Coast; (b) Defendants' active concealment of the true facts about the AACA at Coast; and (c) Defendants' incomplete representations about the characteristics, benefits, standard, quality, and grade of the AACA at Coast, and the rights, remedies, and obligations associated with the AACA at Coast.

1014. Defendants intended to mislead Plaintiffs and induce them to rely on their misrepresentations and omissions.

1015. Defendants' misrepresentations and omissions were material because they were likely to and did in fact deceive reasonable consumers.

1016. Plaintiffs lacked knowledge about the above business acts, practices, omissions, and misrepresentations because this information was known exclusively by Defendants.

1017. Plaintiffs relied on Defendants' false, misleading, and deceptive acts and practices when they decided to borrow and pay substantial amounts of money, give up valuable opportunities, and pay significant other costs and expenses to move to their chosen Coast location and attend the AACA at Coast.

1018. Defendants acted intentionally, knowingly, and maliciously to violate the DTPA, and recklessly disregarded Plaintiffs' rights. Defendants' knowledge of the false, misleading, and deceptive nature of their statements put them on notice that the AACA at Coast was not as they advertised.

1019. As a result of Defendants' DTPA violations, each Plaintiff suffered ascertainable monetary losses, which they would not have incurred but for Defendants' unlawful practices, including: (a) the amount each Plaintiff spent on flight training at Coast; (b) the amount each Plaintiff spent moving to their chosen Coast location; (c) the amount each Plaintiff spent on living expenses while at Coast in excess of what they would have spent on living expenses had they not attended the AACA at Coast; (d) the wages or scholarship funds Plaintiffs gave up to attend the AACA at Coast; (e) medical expenses arising from injuries some Plaintiffs endured during and after the AACA at Coast; (f) the economic harm caused by the damage to Plaintiffs' credit scores; and (g) the cost each Plaintiff must pay to obtain the ratings they were told they would earn through the AACA at Coast.

1020. As a direct and proximate result of Defendants' false, misleading, and deceptive acts and practices, Plaintiffs suffered mental anguish, including, but not limited to, loss of sleep, loss of appetite, upset stomach, inability to concentrate, inability to find enjoyment in everyday activities, interference with relationships with friends and family,

humiliation, depression, anxiety, excessive worry, panic attacks, paranoia, stomach ulcers, and loss of self-esteem.

1021. Plaintiffs did not receive the benefit of their bargains in paying to attend the AACA at Coast and spent increased time and expenses dealing with the many ways the AACA at Coast did not live up to what Defendants promised. Defendants' deceptive acts or practices were a producing cause of Plaintiffs' injuries, ascertainable losses, economic damages, and non-economic damages.

1022. Plaintiffs seek all monetary and non-monetary relief allowed by law, including economic damages, damages for mental anguish, treble damages for each act committed intentionally or knowingly, court costs, reasonable and necessary attorneys' fees, injunctive relief, and any other relief which the court deems proper.

1023. Plaintiffs demand judgment against Defendants, for all actual and compensatory damages together with interest, if applicable, and all costs of this action and for such other and further relief as this Court and/or jury may deem just and proper.

1024. Plaintiffs suffered direct financial damages and/or benefit of the bargain damages by borrowing and paying a substantial amount of money to attend the AACA, giving up valuable opportunities and paying significant other costs and expenses to attend the AACA at Coast, but not receiving the benefits they paid for. Plaintiffs seek these direct economic damages.

1025. Plaintiffs also suffered incidental damages as a result of the reasonable expenses incurred to earn the ratings they were told they would receive at the AACA at Coast. Plaintiffs seek these incidental damages.

1026. Plaintiffs have been required to incur attorneys' fees and court costs to pursue the claims alleged herein and seek recovery for the same. Plaintiffs seek to recover all attorneys' fees and costs pursuant to Tex. Civ. Prac. & Rem. Code. § 38.001(8) and the Tex. Bus. & Com. Code § 17.50(d).

1027. Pursuant to Tex. Bus. & Com. Code § 17.505, on September 3, 2025 (and, in the cases of Plaintiffs Hernandez and Pearson, March 9, 2026), Plaintiffs gave each and

every Defendant written notice of their specific complaints in reasonable detail, including the conduct they claim violates the DTPA and the amounts of economic damages, damages for mental anguish, and expenses, including attorneys' fees, they had reasonably incurred to date asserting their claims against Defendants.

1028. Plaintiffs gave Defendants the opportunity to correct their violations of the DTPA, but Defendants failed to take any actions to remedy the harm that they caused.

**NINTH CAUSE OF ACTION**

**Violation of California Unruh Civil Rights Act**

**California Civil Code § 51 *et seq*.**

**(Plaintiffs Anderson, Fogel, Hernandez, Khan, Kumar, Little, McGowan, Page, Pearson, Sanderson, and Thelus against All Defendants)**

1029. Plaintiffs incorporate by reference all preceding paragraphs.

1030. Section 51(b) of the California Civil Code provides that "All persons within the jurisdiction of this state are free and equal, and no matter what their . . . race, color," or "ancestry, national origin" "are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

1031. Section 51.5 of the California Civil Code provides that:

> No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51 . . . because the person is perceived to have one or more of those characteristics, or because the person is associated with a person who has, or is perceived to have, any of those characteristics.

1032. Defendants are a business establishment under the Unruh Civil Rights Act. Defendants have a fixed location of business in California and/or constitute a permanent commercial force, have an online place of business that sells a service to consumers

throughout California, and Defendants earn revenue or other benefits from their business activities in California.

1033. Through the actions described above, Defendants have intentionally discriminated against and/or refused to provide services to persons of non-white races, color, ancestry, and/or national origin, including by terminating or forcing Plaintiffs to resign from the AACA at Coast, and also by discriminating against Plaintiffs during their time in the AACA at Coast, for no legitimate reason.

1034. Defendants also inadequately responded to complaints of discrimination, including those by Plaintiffs, which also constitutes a denial of/to advantages, facilities, privileges, and services.

1035. Pursuant to Section 52(a) of the California Civil Code, Defendants are liable to Plaintiffs for each and every offense for the actual damages suffered by Plaintiffs, which include (a) the amount each Plaintiff spent on flight training at Coast; (b) the amount each Plaintiff spent moving to their chosen Coast location; (c) the amount each Plaintiff spent on living expenses while at Coast in excess of what they would have spent on living expenses had they not attended the AACA at Coast; (d) the wages or scholarship funds Plaintiffs gave up to attend the AACA at Coast; (e) medical expenses arising from injuries some Plaintiffs endured during and after the AACA at Coast; (f) the economic harm caused by the damage to Plaintiffs' credit scores; (g) the cost each Plaintiff must pay to obtain the ratings they were told they would earn through the AACA at Coast, and (h) emotional distress, including anxiety, depression, sadness, humiliation, embarrassment, and mental anguish.

1036. Defendants are also liable to Plaintiffs for any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage, as well as Plaintiffs' attorneys' fees.

1037. Plaintiffs are further entitled to all other legal and equitable relief available, including injunctive relief.

**TENTH CAUSE OF ACTION**

**Race Discrimination in Violation of the Equal Credit Opportunity Act**

**15 U.S.C. § 1691 *et seq*.**

**(All Plaintiffs against All Defendants)**

1038. Plaintiffs incorporate by reference all preceding paragraphs.

1039. 15 U.S.C. § 1691(a)(1) provides that it is "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age."

1040. American and Coast are each a "creditor" within the meaning of 15 U.S.C. § 1691a(e) because they "regularly arrange[d] for the extension, renewal, or continuation of credit," and/or were assignees of an original creditor and participated in the decision to extend, renew, or continue credit to each Plaintiff.

1041. Defendants designated specific lenders as "partnered" lenders from which applicants could apply for a loan to cover the cost of the AACA. Both American and Coast published on their websites and sent Plaintiffs emails with information and links to the lenders' application websites. All Plaintiffs took out loans from partnered lenders that were specifically identified, offered, and recommended by Defendants.

1042. Each Plaintiff chose a lender and informed Coast of their choice. Each Plaintiff signed a funding disclosure with Coast. Coast certified the loan with the lender before the Plaintiff was permitted to use the loan.

1043. As set out in Coast's funding disclosure, the loan amount to be used for a Plaintiff's training funds is disbursed directly from the lender to Coast. Coast held these funds in in its own "prepaid" accounts and Cadets were able to request disbursements from Coast's online Student Portal. Coast direct-deposited disbursements of the loan for "student paid items," such as housing, food, equipment, supplies, and exam costs, into Plaintiffs' bank account.

1044. Coast arranged for and participated in the extension, renewal, and continuation of the loans to each Plaintiff. Coast arranged for the lenders cadets could

choose from, set the schedule and terms for the distribution of loan funds, held the funds in its own accounts, distributed loan funds to cadets, and paid itself from the prepaid accounts for cadets' training costs. Cadets coordinated with Coast if and when they needed to make changes to their loan disbursement schedule or amount, and Coast made decisions on such change.

1045. Coast is therefore considered a "creditor" as defined by ECOA, 15 U.S.C. § 1691a *et seq*., and subject to its prohibitions on discrimination. Coast specifically chose, approved of, and partnered with the lender options for the AACA. Coast sent the Plaintiffs information and links to the lender websites and applications. Coast arranged for and participated in the extension, renewal, and continuation of the loans offered to Plaintiffs, and is subject to ECOA's prohibitions on discrimination.

1046. American is also a "creditor" as defined by ECOA, 15 U.S.C. § 1691a *et seq*. American specifically chose, approved of, and partnered with the lender options for the AACA. American sent the Plaintiffs information and links to the lender websites and applications. American arranged for and participated in the extension, renewal, and continuation of the loans offered to Plaintiffs, and is subject to ECOA's prohibitions on discrimination.

1047. Each Plaintiff is an "applicant" as defined by 15 U.S.C. § 1691a(b) as they were qualified for credit and applied to a creditor (Defendants) directly for an extension, renewal, or continuation of credit.

1048. Defendants, creditors within the meaning of ECOA, maintained racially discriminatory policies and engaged in acts of racial discrimination as a matter of regular procedure, including by targeting non-white people with their misleading advertisements and false claims.

1049. Defendants' credit transactions with the Plaintiffs were predatory and were intentionally discriminatory and/or had a disparate negative impact on non-white people, in violation of 15 U.S.C. § 1691(a)(1).

1050. As "the purpose of [ECOA] is to promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age" and prevent discrimination against those applying for credit, *see* 12 C.F.R. § 202.1(b), ECOA still applies when members of a protected class were targeted, as they were here, even if the terms of a loan themselves are not necessarily discriminatory.

1051. Under 15 U.S.C. § 1691e(a), Defendants, who have failed to meet the requirements of ECOA, are liable to Plaintiffs for any actual damages Plaintiffs have sustained, which include: (a) the amount each Plaintiff spent on flight training at Coast; (b) the amount each Plaintiff spent moving to their chosen Coast location; (c) the amount each Plaintiff spent on living expenses while at Coast in excess of what they would have spent on living expenses had they not attended the AACA at Coast; (d) the wages or scholarship funds Plaintiffs gave up to attend the AACA at Coast; (e) medical expenses arising from injuries some Plaintiffs endured during and after the AACA at Coast; (f) the economic harm caused by the damage to Plaintiffs' credit scores; (g) the cost each Plaintiff must pay to obtain the ratings they were told they would earn through the AACA at Coast, and (h) emotional distress, including anxiety, depression, sadness, humiliation, embarrassment, and mental anguish.

1052. Defendants are liable to Plaintiffs for their reasonable attorneys' fees. 15 U.S.C. § 1691e(d).

1053. Defendants are also liable for punitive damages up to $10,000. 15 U.S.C. § 1691e(b).

## ELEVENTH CAUSE OF ACTION

**Violation of Section 1981 of the Civil Rights Act of 1866**

**42 U.S.C. § 1981**

**(All Plaintiffs Against All Defendants)**

1054. Plaintiffs incorporate by reference all preceding paragraphs.

//

//

1055. Federal law provides that:

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

1056. The right to "make and enforce contracts" is defined as including the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Such rights "are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).

1057. Both American and Coast have a contractual relationship with Plaintiffs, as set forth *infra* ¶¶ 1070-1086, which are incorporated into this paragraph as if set out in full herein.

1058. Defendants discriminated against the Plaintiffs in the performance of the contracts when they intentionally discriminated against them based on race. Specifically, Defendants intentionally prevented Plaintiffs from having a fair and equal opportunity to complete their training at the AACA at Coast and impaired Plaintiffs' enjoyment of all benefits, privileges, terms, and conditions of the contractual relationships—including by dismissing them from the program or forcing them to resign—based on their race.

1059. Plaintiffs seek damages for the injuries they have sustained as a result of Defendants' violations of 42 U.S.C. § 1981, which include, but are not limited to, compensatory, consequential, and emotional distress damages.

1060. Plaintiffs seek and Defendants are liable for punitive damages because they violated 42 U.S.C. § 1981 with malice and/or reckless indifference.

1061. Plaintiffs seek and Defendants are liable for Plaintiffs' reasonable attorneys' fees and costs. 42 U.S.C. § 1988(b).

## TWELFTH CAUSE OF ACTION

**Violation of Title VI of the Civil Rights Act of 1964**

**42 U.S.C. § 2000d**

**(All Plaintiffs Against Coast)**

1062. Plaintiffs incorporate by reference all preceding paragraphs.

1063. 42 U.S.C. § 2000d provides that:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

1064. Coast receives "Federal financial assistance" within the meaning of 42 U.S.C. § 2000d because it receives (and since at least January 2019 has received) federal funds through the "GI Bill," including the Post-9/11 GI Bill, the Montgomery GI Bill Active Duty, and the Montgomery GI Bill Selected Reserve.

1065. Coast denied Plaintiffs the benefits of attending the AACA, including by discriminating against Plaintiffs in scheduling flight times, instructor assignments, grading, placement in the remedial program and dismissal, and mentor assignments. Coast's actions, including but not limited to these, caused disparities in Plaintiffs' training, flight, and testing frequency and time, evaluation and grading, enforcement of policies, punishment for policy violations, placement into and treatment in the remedial program, and dismissal from the program—all of which contributed to Plaintiffs' termination or forced resignation from the AACA.

1066. Plaintiffs received fewer opportunities and harsher treatment than their white peers.

1067. Coast's acts, policies, and practices are intentionally discriminatory against non-white cadets and subject non-white cadets to intentional discrimination in Coast's programs and activities.

1068. Plaintiffs seek damages for the injuries they have sustained as a result of Defendants' intentional discrimination, which include, but are not limited to, compensatory, consequential, and emotional distress damages.

1069. Plaintiffs seek and Defendants are liable for Plaintiffs' reasonable attorneys' fees and costs.

## THIRTEENTH CAUSE OF ACTION

### Breach of Contract

### (All Plaintiffs Against Coast)

1070. Plaintiffs incorporate by reference all preceding paragraphs.

1071. Coast entered into a valid contract with each Plaintiff through emails and writings (including but not limited to the funding disclosure and program guide, examples of which are enclosed as **Exhibits A** and **B**), oral statements, mutual understandings, and courses of action and dealing. The contractual relationship was one of "flight academy operator" to "student": broadly speaking, Coast agreed to operate the AACA as a flight school operator and each Plaintiff agreed to pay Coast money for its flight school services.

1072. Each Plaintiff performed in full under his or her contract with Coast.

1073. Each contract incorporated the following representations by Coast:

a. that Plaintiffs would complete the AACA at Coast in 12 months (or, in 10 months for those who already had their PPL) and receive all the ratings needed to become commercial airline pilots (PPL, IFR, CSEL, CFI, CFII, and CMEL) through the AACA at Coast;

b. that the entire AACA program at Coast was a set price ($97,923, $97,712, $103,495, or $77,968, depending on the Plaintiff), which would be covered in its entirety, including most of their living expenses for one year, by a

single loan of $110,000 or $120,000, depending on the Plaintiff (or, less for those who had their PPL);

c. that Plaintiffs would train five to six days per week during the AACA at Coast;

d. that Plaintiffs would be assigned an American Airlines pilot as a mentor shortly before or shortly after starting in the AACA at Coast to assist and guide them throughout the program; and

e. that Coast had sufficient resources, including aircraft, instructors, and other staff, policies, and practices, to ensure Plaintiffs could train regularly and progress through the AACA program on time and on budget.

1074. Coast breached its contract with each Plaintiff *inter alia* by failing to allow Plaintiffs to train five or six days per week, failing to provide mentorship, failing to provide training sufficient to complete the AACA in 12 months (or in 10 months for Plaintiffs who already had their PPL) and at the advertised price, and failing to provide sufficient resources to ensure Plaintiffs could train regularly and progress through the AACA program on time and on budget.

1075. Coast also breached its implied covenant of good faith and fair dealing by performing unreasonably and in bad faith and by interfering with and/or preventing each Plaintiff's advancement in the AACA (1) by failing to allow Plaintiffs to train five or six days per week, failing to provide mentorship, and failing to provide training sufficient to complete the AACA in 12 months (or in 10 months for Plaintiffs who already had their PPL) and at the advertised price, and failing to provide sufficient resources to ensure Plaintiffs could train regularly and progress through the AACA program on time and on budget, and/or (2) by subjecting Plaintiffs to poor and/or bad faith treatment with regard to (a) scheduling, (b) instructor assignment, (c) grading/evaluation, (d) mentorship, (e) placement and treatment in the remedial program, and (f) forced withdrawal and termination from the Cadet Academy.

1076. Plaintiffs have suffered damages as the direct and proximate result of Coast's breach of contract and/or breach of its implied duty of good faith and fair dealing, including *inter alia* the cost of flight training.

1077. Plaintiffs also suffered special damages, including *inter alia* increased living expenses and loss of business reputation, that were caused by Coast's breach and were foreseeable.

## FOURTEENTH CAUSE OF ACTION

### Breach of Contract

### (All Plaintiffs Against American)

1078. Plaintiffs incorporate by reference all preceding paragraphs.

1079. American entered into a valid contract with each Plaintiff through writings (including but not limited to the offer letter, one of which is enclosed as **Exhibit C**), emails and other written communications, oral statements, mutual understandings, and courses of action and dealings. The contractual relationship was one of "flight academy administrator" to "student": broadly speaking, American promised to operate the AACA as an administrator including by assisting each Plaintiff in finding a flight school, overseeing cadet progress, ensuring availability of resources, and ensuring competent training by Coast; and, in exchange, Plaintiffs promised to serve as faithful cadets, promised to pay Coast, and promised in many or all cases that American could use their name, image, and likeness to advertise the AACA. Through Plaintiffs' agreement to serve as Cadets, American furthered its goal of building an Academy through which it could build a pipeline of future pilot recruits; American told investors "[w]e must develop a strong pipeline of pilot candidates, and doing so requires a long-term outlook and commitment [and] [t]he American Airlines Cadet Academy is one of the initiatives that will help us achieve this goal."

1080. American Airlines Inc., in return, communicated that it expected Plaintiffs to serve as a professional "representative" of American and to "represent th[e] brand."

1081. Each Plaintiff performed in full under his or her contract with American Airlines, Inc.

1082. Each contract incorporated the following representations by American Airlines, Inc.:

a. That Plaintiffs would complete the AACA at Coast in 12 months (or, in 10 months for those who already had their PPL) and receive all the ratings needed to become commercial airline pilots (PPL, IFR, CSEL, CFI, CFII, and CMEL) through the AACA at Coast;

b. That the entire AACA program at Coast was a set price ($97,923, $97,712, $103,495, or $77,968, depending on the Plaintiff), which would be covered in its entirety, including most of their living expenses for one year, by a single loan of $110,000 or $120,000, depending on the Plaintiff (or, less for those who had their PPL);

c. That Plaintiffs would train five to six days per week during the AACA at Coast;

d. That Plaintiffs would be assigned an American Airlines pilot as a mentor shortly before or shortly after starting in the AACA at Coast to assist and guide them throughout the program; and

e. That Coast had sufficient resources, including aircraft, instructors, and other staff, policies, and practices, to ensure Plaintiffs could train regularly and progress through the AACA program on time and on budget.

1083. American Airlines, Inc. breached its contract with each Plaintiff *inter alia* by failing to ensure Plaintiffs could train five or six days per week, failing to provide mentorship, failing to ensure Plaintiffs had training sufficient to complete the AACA in 12 months (or in 10 months for Plaintiffs who already had their PPL) and at the advertised price, and failing to ensure that Plaintiffs were provided sufficient resources to ensure Plaintiffs could train regularly and progress through the AACA program on time and on budget.

1084. American Airlines, Inc. also breached its implied covenant of good faith and fair dealing by performing unreasonably and in bad faith and by interfering with and/or preventing each Plaintiff's advancement in the AACA (1) by failing to ensure that Plaintiffs were able to train five or six days per week, failing to provide mentorship, and failing to ensure that Plaintiffs were provided training sufficient to complete the AACA in 12 months (or in 10 months for Plaintiffs who already had their PPL) and at the advertised price, and failing to ensure that Plaintiffs were provided sufficient resources to ensure Plaintiffs could train regularly and progress through the AACA program on time and on budget, and/or (2) by failing to prevent and/or remedy Coast's poor and/or bad faith treatment of Plaintiffs with regard to (a) scheduling, (b) instructor assignment, (c) grading/evaluation, (d) mentorship, (e) placement and treatment in the remedial program, and (f) forced withdrawal and termination from the Cadet Academy.

1085. Plaintiffs have suffered damages as the direct and proximate result of American's breach of contract and/or breach of its implied duty of good faith and fair dealing including but not limited to the cost of flight training.

1086. Plaintiffs also suffered special damages, including *inter alia* increased living expenses and loss of business reputation, that were caused by American's breach and were foreseeable.

## FIFTEENTH CAUSE OF ACTION

**Breach of Quasi-Contract**

**(All Plaintiffs Against All Defendants)**

1087. Plaintiffs incorporate by reference all preceding paragraphs.

1088. Alternatively, in the event that it is determined there was no breach of contract in this case against all or any Defendant(s), Plaintiffs assert this cause of action in addition and/or in the alternative for breach of quasi-contract.

1089. Defendants have and will continue to benefit and be unjustly enriched as a direct result of their conduct described herein to the detriment of Plaintiffs.

1090. Specifically, Defendants enticed Plaintiffs to pay for and enroll in the AACA program through their false and misleading statements.

1091. Defendants currently have been unjustly enriched at the expense of Plaintiffs as a result, thereby creating a quasi-contractual obligation on behalf of Defendants to restore these ill-gotten gains to Plaintiffs.

1092. As a direct and proximate result of Coast's breach of its quasi-contractual obligations by unjustly enriching themselves at Plaintiffs' expense, Plaintiffs are entitled to equitable relief in the form of restitution in an amount to be determined at trial among other remedies.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally:

a. Award actual damages to Plaintiffs in an amount no less than $40 million pursuant to Cal. Civ. Code § 52(2); 15 U.S.C. § 1691e(a); and other applicable law;

b. Award compensatory damages to Plaintiffs in an amount to be determined by the jury that would fully compensate Plaintiffs for their injuries caused by the conduct of Defendants alleged herein, including but not limited to the compensation for the funds Plaintiffs have paid or owe for tuition at Coast;

c. Award punitive damages to Plaintiffs in an amount to be determined by the jury;

d. Award to Plaintiffs their reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1691e(d), 42 U.S.C. § 1988(b), Cal. Civ. Code § 52(b); and other applicable law;

e. Award to Plaintiffs equitable relief, including but not limited to rescission and/or restitution, pursuant to 15 U.S.C. § 1691e(c); Cal. Bus. & Prof. Code § 17200; and other applicable law;

f. Award to Plaintiffs declaratory relief including by finding that Defendants violated the ECOA, the Unruh Civil Rights Act, Section 1981, and Title VI by acting in a discriminatory fashion toward non-white cadets;

g. Award injunctive relief directing Defendants and their directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the conduct described in this Complaint and to prevent additional instances of such conduct or similar conduct from occurring in the future, including but not limited to requiring Defendants to cease discriminating against current and former AACA cadets, and to cease collecting outstanding amounts and interest on Plaintiffs' loans;

h. Award Plaintiffs pre-judgment and post-judgment interest; and

i. Grant such other and further relief as this Court deems just and equitable.

## VII. DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all triable issues of fact.

Respectfully submitted,

SANFORD HEISLER SHARP MCKNIGHT, LLP

Dated: April 8, 2026 By: *<u>/s/ Hilary Rosenthal</u>*

HILARY ROSENTHAL
Cara Van Dorn
hrosenthal@sanfordheisler.com
cvandorn@sanfordheisler.com

Saba Bireda (*pro hac vice*)
Christine Dunn (*pro hac vice*)
Carolin Guentert (*pro hac vice*)
Michael Lockman (*pro hac vice*)
sbireda@sanfordheisler.com
cdunn@sanfordheisler.com
cguentert@sanfordheisler.com
mlockman@sanfordheisler.com

*Attorneys for Plaintiffs*