**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KENDALL ANDERSON, *et al.*,<br>Plaintiffs,<br>v.<br>AMERICAN AIRLINES, INC., *et al.*,<br>Defendants. | Case No. 25-cv-03609-BAS-MSB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT COAST FLIGHT TRAINING AND MANAGEMENT, INC.'S MOTION TO DISMISS (ECF No. 68)** |

Presently before the Court is Defendant Coast Flight Training and Management, Inc.'s ("Coast") Motion to Dismiss ("Motion"). (ECF No. 68.) For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** Coast's Motion and **DISMISSES WITHOUT PREJUDICE** the claims identified below. (*Id.*) For dismissed claims, Plaintiffs may file an Amended Complaint by **November 5, 2026**.

## I. BACKGROUND

American Airlines, Inc. and American Airlines Group, Inc. ("AA Defendants") announced the American Airlines Cadet Academy ("AACA") in April 2018, describing it as a "first-of-its-kind" program to give aspiring pilots the training, financing, and mentoring needed to fly for the world's largest airline. ("FAC," ECF No. 62 ¶¶ 1, 52, 99.) AA Defendants told investors that they needed a pipeline of pilot candidates and that the AACA was one of the initiatives that would deliver it. (*Id.* ¶ 53.) Publicly, AA Defendants

framed the program's purpose as diversifying a profession that had long excluded people of color. (*Id.* ¶¶ 52, 57–58, 231–32.)

Beginning in January 2019, AA Defendants partnered with Coast to run the AACA at Coast's campuses in San Diego, Dallas, and San Marcos. (*Id.* ¶¶ 41, 60.) AA Defendants recruited, interviewed, and selected the cadets; Coast provided the training. (*Id.* ¶¶ 42, 61.) Both AA Defendants are alleged to have operated the program jointly. (*Id.* ¶¶ 40, 62.) Defendants also designated "partner lenders"—Discover, Sallie Mae, and the American Airlines Federal Credit Union—and emailed cadets links to loan applications; Coast then certified the loans, received disbursements directly, held the funds in its own prepaid accounts, and controlled the release of living-expense money to cadets. (*Id.* ¶¶ 66–78.)

All 20 Plaintiffs are non-white, and most came to the AACA from careers outside aviation. (*Id.* ¶¶ 402, 428, 447, 475, 502, 521, 542, 577, 601, 633, 657, 688, 709, 730, 757, 782, 810, 838, 865, 897.) Plaintiffs Kendall Anderson, Faith Little, and Mathias Thelus, however, had already earned a Private Pilot License before they began, and the AACA was marketed to such cadets on a shortened 10-month track. (*Id.* ¶¶ 409, 695, 902, 921, 946, 1073.)

Plaintiffs allege that upon seeing AACA program advertising, they believed the AACA program would make them commercial pilots in 12 months for a fixed, loan-covered price. (*Id.* ¶¶ 100–06, 144–49.) To pursue the AACA program, Plaintiffs quit jobs, declined college offers, and borrowed $52,000 to $126,000 to cover training and living expenses. (*Id.* ¶¶ 4, 7, 380.) Each relocated to a Coast campus, several across the country. (*Id.* ¶¶ 7, 17–36.) None of the Plaintiffs finished the AACA program. (*Id.* ¶ 117.) Sixteen were terminated, and four were allegedly forced to resign. (*Id.* ¶¶ 15, 326, 329.)

Plaintiffs claim Coast's instructors racially discriminated against them by, among other things, depriving them of training opportunities (*e.g.*, failing to provide Plaintiffs individual mentors or five or six days per week of training) and imposing harsher penalties for Plaintiffs' mistakes than for those of their white peers (*e.g.*, placing Plaintiffs in a

remedial program for relatively minor errors). (*Id.* ¶¶ 299–306, 346, 416, 459–460, 493, 533, 623.)

Despite leaving the AACA program without obtaining all of the ratings it promised—nine Plaintiffs received no ratings at all, and the remainder received only some (*id.* ¶ 161)—Plaintiffs currently carry loans from the program, averaging about $90,000, some at 14% interest, with missed payments, damaged credit, and at least one default. (*Id.* ¶¶ 379, 385–86.)

On December 16, 2025, Plaintiffs filed the present action against Defendants American Airlines Federal Credit Union ("AAFCU"), Coast, and AA Defendants (collectively, "Defendants"). (ECF No. 1.) On April 7, 2026, Plaintiffs voluntarily dismissed all claims against AAFCU. (ECF No. 55.) Two weeks later, Plaintiffs filed the FAC. (ECF No. 62.)

In the FAC, Plaintiffs bring the following causes of action:

1. **Count 1: Fraud / Intentional Misrepresentation** (FAC ¶¶ 920–31). Common law (punitive damages sought under Cal. Civ. Code § 3294, *id.* ¶ 931). Brought by all 20 Plaintiffs against all Defendants.
2. **Count 2: Fraudulent Concealment / Fraud by Non-Disclosure** (FAC ¶¶ 932–44). Common law (punitive damages sought under Cal. Civ. Code § 3294, *id.* ¶ 944). Brought by all 20 Plaintiffs against all Defendants.
3. **Count 3: Promissory Fraud / Fraudulent Inducement** (FAC ¶¶ 945–57). Common law (punitive damages sought under Cal. Civ. Code § 3294, *id.* ¶ 957). Brought by all 20 Plaintiffs against all Defendants.
4. **Count 4: Negligent Misrepresentation** (FAC ¶¶ 958–64). Common law. Brought by all 20 Plaintiffs against all Defendants.
5. **Count 5: Unfair Competition Law ("UCL")** (FAC ¶¶ 965–76). Cal. Bus. & Prof. Code § 17200 *et seq.* Brought by all 20 Plaintiffs against all Defendants.
6. **Count 6: False Advertising Law ("FAL")** (FAC ¶¶ 977–85). Cal. Bus. & Prof. Code § 17500 *et seq.* Brought by all 20 Plaintiffs against all Defendants.

7. **Count 7: Consumers Legal Remedies Act ("CLRA")** (FAC ¶¶ 986–1001). Cal. Civ. Code § 1750 *et seq.* (actual and punitive damages sought, *id.* ¶ 999). Brought by all 20 Plaintiffs against all Defendants.
8. **Count 8: Texas Deceptive Trade Practices–Consumer Protection Act** (FAC ¶¶ 1002–1028). Tex. Bus. & Com. Code Ann. § 17.41 *et seq.* Brought by all 20 Plaintiffs against all Defendants.
9. **Count 9: Unruh Civil Rights Act ("Unruh")** (FAC ¶¶ 1029–37). Cal. Civ. Code § 51 *et seq.* Brought by 11 Plaintiffs (Anderson, Fogel, Hernandez, Khan, Kumar, Little, McGowan, Page, Pearson, Sanderson, Thelus) against all Defendants.
10. **Count 10: Race Discrimination—Equal Credit Opportunity Act ("ECOA")** (FAC ¶¶ 1038–53). 15 U.S.C. § 1691 *et seq.* (punitive damages up to $10,000 sought under § 1691e(b), *id.* ¶ 1053). Brought by all 20 Plaintiffs against all Defendants.
11. **Count 11: Civil Rights Act of 1866** (FAC ¶¶ 1054–61). 42 U.S.C. § 1981 (punitive damages sought, *id.* ¶ 1060). Brought by all 20 Plaintiffs against all Defendants.
12. **Count 12: Title VI, Civil Rights Act of 1964** (FAC ¶¶ 1062–69). 42 U.S.C. § 2000d. Brought by all 20 Plaintiffs against Coast.
13. **Count 13: Breach of Contract** (FAC ¶¶ 1070–77). Common law; includes breach of the implied covenant of good faith and fair dealing (*id.* ¶ 1075). Brought by all 20 Plaintiffs against Coast.
14. **Count 14: Breach of Contract** (FAC ¶¶ 1078–86). Common law; includes breach of the implied covenant of good faith and fair dealing (*id.* ¶ 1084). Brought by all 20 Plaintiffs against AA Defendants.
15. **Count 15: Breach of Quasi-Contract** (FAC ¶¶ 1087–1092). Common law; pleaded in the alternative to Counts 13 and 14 (*id.* ¶ 1088). Brought by all 20 Plaintiffs against all Defendants.

Coast moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' claims on grounds of field preemption, and to dismiss Count 3 (Promissory Fraud / Fraudulent Inducement), Count 8 (Texas Deceptive Trade Practices–Consumer Protection Act), and Count 10 (Race Discrimination—Equal Credit Opportunity Act) of the FAC. ("Coast MTD," ECF No. 68.) The Parties fully briefed Coast's Motion. (ECF Nos. "Plaintiffs' Opp. to Coast MTD," 72; "Coast MTD Reply," 76.)

## II. LEGAL STANDARD

Rule 12(b)(6) allows a party to move to dismiss based on the legal sufficiency of the claims asserted in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The court must accept all factual allegations pleaded in the complaint as true and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

## III. ANALYSIS

### A. FAA Field Preemption

The Supremacy Clause provides that the Constitution, federal statutes, and treaties constitute "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. When a state law confers rights or imposes restrictions that conflict with federal law, the federal law takes precedence, and the state law is preempted. *Kansas v. Garcia*, 589 U.S. 191, 202 (2020). Preemption analysis is guided by two principles: first, that the purpose of Congress is the touchstone in every preemption case, and second, that the historic police powers of the

states are not to be superseded by federal law unless that is the clear and manifest purpose of Congress. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

Under the doctrine of field preemption, state law is preempted when it regulates a field that Congress intended the federal government to occupy exclusively. *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Field preemption can be inferred either from a pervasive scheme of federal regulation that leaves no room for states to supplement it or from a congressional act that touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws in that field. *Id.* The Ninth Circuit Court of Appeals has adopted a two-step framework for evaluating field preemption. *See Nat'l Fed'n of the Blind v. United Airlines, Inc.*, 813 F.3d 718, 734 (9th Cir. 2016). "The first step in determining whether [field preemption] exists is to delineate the pertinent regulatory field; the second is to survey the scope of the federal regulation within that field." *Id.* With respect to the first step, the Ninth Circuit has emphasized the need to define the relevant field "with specificity." *Id.* (citation omitted).

Although the Ninth Circuit held in *Montalvo* that "Congress intended to have a single, uniform system for regulating aviation safety" through the Federal Aviation Act and its implementing Federal Aviation Regulations (collectively, the "FAA"), *Martin* clarified that "[i]n areas without pervasive regulations or other grounds for preemption, the state standard of care remains applicable." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470–73 (9th Cir. 2007); *Martin ex rel. Heckman v. Midwest Express Holdings, Inc.*, 555 F.3d 806, 811 (9th Cir. 2009). More specifically, *Martin* held that airstairs were not "pervasively regulated" under the FAA—and thus that plaintiff's state tort claim based on her fall resulting from defectively designed airstairs was not field preempted—because "the only regulation on airstairs [an airplane's stairs] is that they can't be designed in a way that might block the emergency exits." *Martin*, 555 F.3d at 811–12 (citing 14 C.F.R. § 25.810).

In *Gilstrap*, the Ninth Circuit established a "two-part framework for evaluating field preemption under the FAA." *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1006 (9th

Cir. 2013). "First, we ask whether the particular area of aviation commerce and safety implicated by the lawsuit is governed by 'pervasive [federal] regulations.' " *Id.* (alteration in original) (quoting *Martin*, 555 F.3d at 811). If that is the case, "any applicable state standards of care are preempted." *Id.* Even so, "the scope of field preemption extends only to the standard of care" and "local law still govern[s] the other negligence elements (breach, causation, and damages)." *Id.* (citations omitted). *Gilstrap* ultimately held that, while the FAA provided standards of care for air carriers to provide assistance to passengers with disabilities that supplant any standard of care provided by California tort law, the FAA did not provide standards regarding "other elements" of plaintiff's tort claim (*i.e.*, breach, causation, damages, and remedies)—meaning plaintiff's claim was only partially preempted. *Id.* at 1007. *Gilstrap* then remanded the case to the district court to decide "whether the California causes of action would survive under California tort law, incorporating [FAA] standards as to negligence and duty of common carriers but not as to negligent and intentional infliction of emotional distress." *Id.* at 1008.

Shortly thereafter, the Ninth Circuit held in *Ventress* that "the FAA . . . occup[ies] the field of pilot qualifications, including the medical fitness of airmen"—and thus, it preempted the plaintiff's employment retaliation claims based on the plaintiff's allegations that he was subjected to unnecessary psychiatric evaluations that led to his constructive termination. *Ventress v. Japan Airlines*, 747 F.3d 716, 722 (9th Cir. 2014). At least one court within the Ninth Circuit has treated *Ventress*'s holding as narrow and as applying only where state law claims would "require the factfinder to intrude upon the federally occupied field of aviation safety by deciding questions of pilot medical standards and qualifications." *Yates v. Superior Air Charter, LLC*, No. SACV 15-00847-AG (DFMx), 2015 WL 4464806, at *2 (C.D. Cal. July 20, 2015) (citing *Ventress*, 747 F.3d at 719); *see id.* (holding that, where the underlying factual allegations are that defendant retaliated after plaintiff "sent written complaints and within a short period he was terminated," plaintiff's claims did not require a factfinder to consider "questions of pilot medical standards and qualifications").

Here, Coast moves to dismiss Plaintiffs' common law and statutory claims (Counts 1–13, 15) on grounds that they are preempted under the doctrine of field preemption, and more specifically, under the FAA since "pilot training is fundamentally a matter of aviation safety." (Coast MTD 12:26–27.)

Coast argues Plaintiffs' claims are based on problems arising during Plaintiffs' pilot training, including not progressing quickly enough through the program (FAC ¶ 419), checkride failures and irregularities (*id.* ¶¶ 421, 436, 556), weather-related training delays (*id.* ¶ 441), flight skill issues (*id.* ¶¶ 460, 642), incomplete and unsatisfactory grades in training (*id.* ¶ 493), scheduling delays in training and with American Airlines mentors (*id.* ¶¶ 529–530), and errors on tests (*id.* ¶¶ 622–623, 672). (Coast MTD 12:23–13:9.)

Coast also cites various provisions of the FAA addressing requirements for a pilot to be certified to operate an aircraft. (*See id.* (discussing 14 C.F.R. §§ 61.3 (requiring a pilot to be certificated to operate an aircraft in the U.S.), 61.5 (providing that certification is only issued to those who have accomplished training), 61.81–61.95 (setting forth student pilot eligibility requirements), 61.102–61.120 (establishing eligibility and knowledge requirements for private pilots), 61.121–61.141 (establishing eligibility, knowledge, and proficiency requirements for commercial pilots)).)

For purposes of resolving this Motion, the Court assumes without deciding that the FAA has pervasively regulated pilot schools' assessment of the readiness of student pilots. For instance, under 14 C.F.R. § 61.85(b), an applicant for a student pilot certificate may submit the application to, among others, an airman certification representative associated with a pilot school or a flight instructor. Section 61.87(c)(2) requires a student pilot to have "[d]emonstrated satisfactory proficiency and safety, as judged by an authorized instructor" prior to any solo flights. Sections 61.87(d)–(m) set forth requirements for the types of procedures a student pilot should be trained on prior to flying certain aircraft. Section 61.89 imposes general limitations on student pilots—including that a student pilot may not operate a multi-pilot aircraft "except when receiving flight training from an authorized instructor on board an airship." 14 C.F.R. § 61.89(b).

### 1. Fraud-Based and Consumer Protection Claims (Counts 1–8)

First, Plaintiffs' fraud-based and consumer protection claims rest on Coast's purported misrepresentations as to the AACA program—including misrepresenting (1) completion in 12 months (FAC ¶ 970(a)); (2) a set price for the program including living expenses covered by a single loan (*id.* ¶ 970(b)); (3) five or six days per week of training (*id.* ¶ 970(c)); (4) a mentor assigned from American Airlines (*id.* ¶ 970(d)); and (5) provision of adequate Coast resources (*id.* ¶ 970(e)). Plaintiffs plead the same five representations under each of Counts 1–8. (*See id.* ¶¶ 921, 933, 946, 959, 970, 979, 993, 1009.)

Plaintiffs also allege Coast omitted key information about the AACA program, including that completion rates were low overall, that completion timelines were longer than 12 months, that costs were higher than initially represented, that very few, if any, cadets trained five or six days per week, that very few cadets received an American Airlines pilot mentor at or near the start of the program, and that Coast lacked sufficient aircraft, instructors, and staff for cadets to progress on time and on budget. (FAC ¶¶ 933(a)–(e), 971(a)–(f), 994(a)–(f).)

Plaintiffs' fraud-based and consumer protection claims revolve around Coast's purported misrepresentations about the training methods and costs of the AACA program to induce Plaintiffs' enrollment. None of the FAA provisions cited by Coast establishes a standard of care for pilot schools to not misrepresent the nature of their services. More specifically, the provisions of the FAA cited by Coast (14 C.F.R. pt. 61) establish training requirements for prospective pilots to obtain certain kinds of licenses, rather than requirements for pilot schools to not misrepresent their services. Furthermore, the provision of the FAA that does set forth advertising limitations (14 C.F.R. § 141.23) prohibits a school from making false or misleading statements regarding its certification and ratings, and requires a school that advertises its certification to clearly differentiate between approved and non-approved courses.

Since Coast's alleged misrepresentations do not require a factfinder to evaluate the application of pilot qualification standards or other areas covered by the FAA, the Court finds Plaintiffs' fraud-based and consumer protection claims (Counts 1–8) are not preempted. *See Martin*, 555 F.3d at 811 ("In areas without pervasive regulations or other grounds for preemption, the state standard of care remains applicable."); *cf. Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011) ("Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area.").

**2. Contract and Quasi-Contract Claims (Counts 13, 15)**

**i. Breach of Contract**

The U.S. Supreme Court held in *Wolens* that breach of contract claims are not preempted by the Airline Deregulation Act where the obligations breached are "self-imposed" via contractual terms and not based on laws or policies external to the agreement at issue. *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 222, 228 (1995) ("[T]he [Airline Deregulation Act]'s preemption prescription bars state-imposed regulation of air carriers, but allows room for court enforcement of contract terms set by the parties themselves."); *see also Hickcox-Huffman v. US Airways, Inc.*, 855 F.3d 1057, 1062 (9th Cir. 2017) (finding plaintiff's breach of contract claim was not preempted by the Airline Deregulation Act because it was "for breach of contract of a voluntarily assumed contractual undertaking"); *cf. Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004) (holding a breach of contract claim alleges an extra element—the "bilateral expectation of compensation"—that avoids federal preemption under the Copyright Act, which only preempts state law claims dealing with exclusive rights within the scope of copyright), *amended on denial of reh'g*, 400 F.3d 658 (9th Cir. 2005).

Though *Wolens* and its progeny do not explicitly analyze field preemption under the FAA, their holdings comport with *Gilstrap*'s holding that field preemption extends only to areas in which the relevant "standard of care" is provided by the FAA rather than by state law. 709 F.3d at 1006.

Taking these authorities together, the Court reasons that where the conduct underlying a plaintiff's breach of contract claims depends upon violation of express terms in the parties' contracts that do not reference standards set by the FAA, the applicable "standard of care" is supplied by state contract law rather than the FAA.

Here, Plaintiffs claim Coast entered into a contract with each Plaintiff, in which Coast purportedly agreed to operate the AACA as a flight school and each Plaintiff agreed to pay Coast money for flight school services. (FAC ¶¶ 1071–1073.) Coast purportedly breached its contract with each Plaintiff by, among other things, failing to allow Plaintiffs to train five or six days per week, failing to provide mentorship, and failing to provide training sufficient to complete the AACA in 12 months (or in 10 months for Plaintiffs who already had a Private Pilot License) and at the advertised price. (*Id.* ¶¶ 1073–1074.)

Plaintiffs' breach of contract claims seek "court enforcement of contract terms set by the parties themselves," *Wolens*, 513 U.S. at 222, in Plaintiffs' alleged express contract with Coast (*i.e.*, training opportunities five or six days per week, individual mentors, and training sufficient to finish the AACA within the promised timeline and at the advertised price). Even assuming the FAA provides standards of care regarding pilot schools' assessment of the readiness of student pilots, it does not have specific requirements regarding setting the price and timeline of pilot training programs. *See supra* §§ III.A, III.A.1; *Martin*, 555 F.3d at 811 ("In areas without pervasive regulations or other grounds for preemption, the state standard of care remains applicable.").

Since Plaintiffs' breach of contract claims depend entirely upon a "bilateral expectation" provided by state law (and not the FAA), *Grosso*, 383 F.3d at 968, the Court finds Plaintiffs' breach of contract claims are not field preempted by the FAA. *See Gilstrap*, 709 F.3d at 1006 (explaining that field preemption under the FAA does not extend to determining elements of state law, such as breach).

**ii. Breach of Implied Covenant**

Plaintiffs claim Coast breached the implied covenant of good faith and fair dealing by affording Plaintiffs fewer resources than their white peers, placing Plaintiffs in remedial

programs, and forcing Plaintiffs' withdrawal from the AACA program at higher rates than their white peers. (FAC ¶ 1075.) Notably, unlike Plaintiffs' breach of contract claims, Plaintiffs' breach of implied covenant of good faith and fair dealing claims are not based solely upon the terms of the express contract itself. *Cf. Nw., Inc. v. Ginsberg*, 572 U.S. 273, 286–88 (2014) (finding plaintiff's claim for breach of the implied covenant was preempted by the Airline Deregulation Act because, under Minnesota law, the covenant was a state-imposed obligation the parties could not contract around).

On the one hand, Plaintiffs' implied covenant claims could be field preempted by the FAA because they could require evaluating whether, as a matter of fact, Plaintiffs were qualified to progress in the AACA program under FAA standards. *See, e.g., Mercer v. Sw. Airlines Co.*, No. 13-CV-05057-MEJ, 2014 WL 4681788, at *5 (N.D. Cal. Sept. 19, 2014) (finding plaintiff's negligence claim was field preempted by the FAA because it required "the Court to determine whether Plaintiff, in fact, posed a safety threat in order to assess whether Defendant's conduct was justified" and the field of aviation safety, "including authorization to remove someone from a flight," is field preempted). Coast allegedly cited a "lack of progress, high hours, and poor performance," "unsatisfactory and incomplete events," and inability "to maintain the Coast Training Expectations" when placing Plaintiffs in a remedial program. (FAC ¶¶ 313, 317, 320, 322, 419.) Coast also allegedly cited "accruing too many hours," "receiving unsatisfactory events," "failing too many checkrides," and "'unsafe' practices" as reasons for terminating Plaintiffs from the AACA program. (*Id.* ¶ 327.) And, as discussed *supra* § III.A, the Court assumes without deciding that the FAA has pervasively regulated pilot schools' assessment of the readiness of student pilots.

On the other hand, Plaintiffs claim Coast deprived Plaintiffs of contractual benefits in bad faith *because* such deprivation was rooted in racial discrimination. Plaintiffs were given fewer training resources and placed in remedial programs or expelled at higher rates than their white peers, despite similar performance. (FAC ¶¶ 319–320, 322, 328, 330, 420.) For example, Plaintiffs claim their white counterparts with the same performance issues

(*i.e.*, accruing the same hours, failing the same number of exams and checkrides) were not placed in a remedial program or removed from the AACA. (*Id.*) Plaintiffs also claim instructors even refused to help them learn required material, but did not refuse to help their white counterparts. (*Id.* ¶ 337.)

Put differently, the operative bad faith conduct is that Plaintiffs were treated more harshly and denied contractual benefits more readily than their white peers—irrespective of whether Coast properly exercised discretion in assessing student pilot readiness under FAA standards. Along this line of reasoning, Plaintiffs' implied covenant claims would not require "the finder of fact to determine whether [Coast] had 'a legitimate . . . explanation for its acts' or its 'explanation is merely a pretext for [bad faith conduct].' " *Cf. Ventress*, 747 F.3d at 722.

Moreover, this case can be distinguished from others where the plaintiff brought anti-discrimination claims, but cited only facts relating to a pilot's discretion to enforce aviation safety. *See, e.g., Mercer*, 2014 WL 4681788, at *5 (finding plaintiff's race discrimination state law claims were field preempted by the FAA because plaintiff failed to allege any facts surrounding discrimination beyond a flight crew member telling plaintiff that the captain considered him a security threat).

Thus, the Court finds Plaintiffs' implied covenant claims are not field preempted by the FAA.

**3. Unruh Claim (Count 9)**

Plaintiffs' Unruh cause of action (Count 9) rests on underlying factual allegations that Defendants treated them more harshly than their white peers—including by affording Plaintiffs fewer resources than their white peers, placing Plaintiffs in remedial programs, and forcing Plaintiffs' withdrawal from the AACA program at higher rates than their white peers. Plaintiffs also allege Coast failed to act on their complaints of discrimination. (FAC ¶¶ 235, 269–311, 324, 377, 1033–1034.)

Again, as with Plaintiffs' implied covenant claims, which are also based on Coast's alleged racial discrimination, these allegations do not require a factfinder to consult the

FAA (*i.e.*, to evaluate Plaintiffs' readiness and safety as student pilots). As discussed *supra* § III.A.2.ii, Plaintiffs have alleged Coast treated their white peers more favorably despite equivalent meritocratic performance as student pilots.

Therefore, the Court finds Plaintiffs' Unruh claims are also not preempted. *See Marcus v. Ctrs. for Disease Control & Prevention*, No. 2:22-CV-02383-SSS-ASX, 2024 WL 4005896, at *7 (C.D. Cal. June 12, 2024) (finding against preemption where the defendant "fail[ed] to present the Court any FAA regulations relating to Plaintiffs' Unruh Act claim"—which was based on allegations of disability discrimination rather than defendant's decisions related to aviation safety).

**4. Federal Claims (Counts 10–12)**

As a threshold matter, a regulation promulgated by a federal agency cannot supersede a federal law enacted by Congress. *Wheeler v. Premiere Credit of N. Am., LLC*, 80 F. Supp. 3d 1108, 1114 (S.D. Cal. 2015) (citing *United States v. Maes*, 546 F.3d 1066, 1068 (9th Cir. 2008) ("A regulation does not trump an otherwise applicable statute unless the regulation's enabling statute so provides.")).

Since the FAA's enabling statute, 49 U.S.C. §§ 40113, 44701, does not explicitly displace other federal statutes—including the ECOA, 15 U.S.C. § 1691 *et seq.* (Count 10); the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Count 11); and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Count 12)—Plaintiffs' federal statutory claims are not preempted by the FAA. *Cf. Columbia Exp. Terminal, LLC v. Int'l Longshore & Warehouse Union*, 23 F.4th 836, 844 (9th Cir. 2022) (holding plaintiff's claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, were precluded by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, which expressly preempts claims that "substantially depend[] on analysis of a [collective bargaining agreement]").

* * *

For the reasons above, the Court **DENIES** Coast's Motion to the extent it seeks dismissal of Plaintiffs' claims as field preempted by the FAA. The Court follows other

courts in denying this portion of Coast's Motion without prejudice, to be renewed after discovery if appropriate, since "it is difficult to resolve the preemption issue without discovery and a clear understanding of what the facts actually are." *Chowdhury v. Nw. Airlines Corp.*, 238 F. Supp. 2d 1153, 1157 (N.D. Cal. 2002); *see also Makhzoomi v. Sw. Airlines Co.*, No. 18-CV-00924-DMR, 2018 WL 3861771, at *5 (N.D. Cal. Aug. 14, 2018).

**B. Promissory Fraud / Fraudulent Inducement (Count 3)**

A plaintiff can state a tort claim for promissory fraud if a defendant fraudulently induces him to enter a contract. *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (1996). Under California law, a cause of action for fraud requires the plaintiff to establish: (1) a knowingly false misrepresentation by the defendant ("scienter"), (2) made with the intent to deceive or to induce reliance by the plaintiff, (3) justifiable reliance by the plaintiff, and (4) damages. *Croeni v. Goldstein*, 21 Cal. App. 4th 754, 758 (1994). While mere failure to perform on a contract does not constitute fraud, *Rheingans v. Smith*, 161 Cal. 362, 366 (1911), a promise made *without intent to perform* can be actionable. *Locke v. Warner Bros., Inc.*, 57 Cal. App. 4th 354, 367 (1997).

**1. Rule 9(b)**

Federal Rule of Civil Procedure 9(b) requires that promissory fraud, like all fraud claims, be stated with particularity. *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). Under Rule 9(b), "the circumstances constituting the alleged fraud [must] be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Lincoln Imports Ltd., Inc. v. Weaver Flower Co.*, No. SACV 11-1098-JST (ANx), 2012 WL 1048531, at *2 (C.D. Cal. Mar. 27, 2012) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1106 (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).

Coast moves to dismiss Plaintiffs' promissory fraud claims on grounds that Plaintiffs do not attribute the alleged statements to any specific Coast employee, rather than to Coast

as a collective entity. (Coast MTD 17:1–13.) Coast also moves to dismiss Plaintiffs' claims on the basis that Plaintiffs impermissibly plead collective scienter under Rule 9(b) and that Plaintiffs must allege each Defendant's conduct separately (*id.* at 19:14–17).

Although the AACA program is alleged to be jointly run by Coast and AA Defendants and several statements were attributed to Defendants collectively (FAC ¶¶ 946–947), Plaintiffs have also identified specific alleged misrepresentations in Coast's materials and when those statements were made. These include:

1. The AACA program would take 12 months to complete, as stated on Coast's website starting in approximately September 2020 (FAC ¶ 124) and in Coast's Program Guide (*id.* ¶ 128), and would be "designed to finish in 10-12 months" in Coast's emails to several Plaintiffs in 2021 (*id.* ¶ 129);
2. The AACA program training and "some or all of your cost of living" would be covered by a single loan (*id.* ¶¶ 149–155) in Coast's Welcome Email sent to each Plaintiff between 2020 and 2023 (*id.* ¶ 150 & n.32) and in the accompanying Price Sheet (*id.* ¶¶ 152–155);
3. AACA program enrollees would be flying five or six days per week, as stated in specific emails from Coast (*id.* ¶¶ 172, 582, 660, 689, 814, 868); and
4. AACA program enrollees would receive an "American Airline's Pilot Mentor," as advertised on Coast's landing page from "at least May 2021 to present" (*id.* ¶ 189).

Plaintiffs also allege a timeframe for each of the misrepresentations above. Though not all the alleged misrepresentations were made by an identified Coast employee (*e.g.*, statements on Coast's website and in Coast's Program Guide), the Court finds Plaintiffs meet the standard for Rule 9(b). Plaintiffs identify each statement with sufficient particularity to give Coast notice as to what charge Coast is defending against. *See Przybylak v. Bissell Better Life LLC*, No. CV 19-2038 PA (GJSx), 2019 WL 8060076, at *5 (C.D. Cal. July 19, 2019) (finding plaintiff met the Rule 9(b) standard where the plaintiff identified "specific representations made on Defendant's website").

**2. Intent**

Coast moves to dismiss Plaintiffs' claim on the basis that Plaintiffs failed to allege Coast's "scienter" (*i.e.*, Plaintiffs did not identify a "specific person at Coast who knew at the time of any enrollment that any promise was impossible" or any "document, meeting, or projection showing Coast had awareness at enrollment time that the program could not deliver"). (Coast MTD 17:1–13 (citing *Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30 (1985)).)

Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Under the standard for promissory fraud, "something more than nonperformance is required to prove the defendant's intent not to perform." *Tenzer*, 39 Cal. 3d at 30.

Regarding Coast's alleged misrepresentation that the AACA program would take twelve months to complete, Plaintiffs claim that, of the approximately 91 program participants who enrolled at the same time as Plaintiffs (between July 2020 and September 2023), they recall only four finishing within a 12-month timeline. (FAC ¶¶ 135, 579, 841.) Plaintiffs also allege that, starting from around September 2020, Coast has stated (and currently does state) on its website that the AACA program would take 12 months to complete. (*Id.* ¶ 124.) Since Plaintiffs allege Coast operates the AACA program, the Court finds Plaintiffs have properly alleged Coast is aware of the low 12-month completion rate—and thus, the falsity of its website representations. Additionally, Plaintiffs state cadets complained to AA Defendants and to Coast about the missing mentors in 2022 and 2023, and cadets received emails acknowledging that not all AACA enrollees had received mentors. (*Id.* ¶¶ 199–203.) Despite the low AACA program 12-month completion rate (knowable after the first 12 months of the program) and explicit acknowledgment of enrollees not receiving mentors, Coast continued to make its misrepresentations.

Construing facts in favor of Plaintiffs at the motion to dismiss stage, the Court finds Coast's alleged continued misrepresentations—despite purported knowledge otherwise—are sufficient to allege intent. *See HDR Env't, Operations & Constr., Inc. v. Deason,* No.

15CV1402 JAH (NLS), 2018 WL 1627229, at *12 (S.D. Cal. Mar. 29, 2018) (denying defendant's motion to dismiss plaintiff's promissory fraud claim where "[p]laintiff asserts . . . that the statements were false, [d]efendant had knowledge of the falsity and, at the time the statements were made, he had no intent to execute a second modification or pay additional monies—only to induce HDR to continue providing services.").

* * *

Thus, the Court finds Plaintiffs have pleaded their promissory fraud claims with the requisite particularity and have sufficiently alleged Coast's intent, and **DENIES** Coast's Motion to Dismiss Plaintiffs' promissory fraud claims (Count 3).

### C. Texas Deceptive Trade Practices–Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41 *et seq.* (Count 8)

The Texas Deceptive Trade Practices–Consumer Protection Act ("TDTPA"), Tex. Bus. & Com. Code Ann. § 17.41 *et seq.*, provides a cause of action to a consumer based on either (1) unlawful practices specifically enumerated in the TDTPA, or (2) any "[u]nconscionable action or course of action by any person," Tex. Bus. & Com. Code Ann. § 17.50(a)(3), defined as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer *to a grossly unfair degree*," *id.* § 17.45(5) (emphasis added).

#### 1. Extraterritoriality

Plaintiffs bring a TDTPA claim against all Defendants. (FAC ¶¶ 1002–1028.) The TDTPA allows consumers to sue when any "false, misleading, or deceptive act or practice" mentioned in the statute is relied upon by the consumer and is a producing cause of the consumer's damages. Tex. Bus. & Com. Code Ann. § 17.50(a)(1); *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 478 (Tex. 1995). The statute is directed at *Texas* consumers. *See* Tex. Bus. & Com. Code Ann. § 17.45(6) (defining statutory terms "trade" and "commerce" in terms of activity "directly or indirectly affecting the people of this state"); *Deburro v. Apple, Inc.*, No. A-13-CA-784-SS, 2013 WL 5917665, at *5 n.5 (W.D. Tex. Oct. 31, 2013); *Bass v. Hendrix*, 931 F. Supp. 523, 536 (S.D. Tex. 1996) (holding the

TDTPA does not apply to activities that "took place in New York or Connecticut and were not directed toward a Texas resident"); *Birdsong v. Toyota Motor Credit Corp.*, No. 2000-CI-06279, 2002 WL 32830975, at *4 (Tex. Dist. Ct. May 15, 2002) ("The DTPA does not extraterritorially apply to acts occurring outside of Texas.").

As a threshold matter, the Parties do not dispute that Plaintiffs residing in Texas or Plaintiffs participating in the AACA program on a Texas campus can bring causes of action under the TDTPA for harm stemming from Coast's conduct that Plaintiffs experienced in Texas.

Thus, based on the standard set forth above, the Court finds Plaintiffs who are alleged neither to reside in Texas (and to have been exposed to Coast's purportedly deceptive advertising there) nor to have participated in the AACA program on a Texas campus have insufficient ties to Texas to bring TDTPA claims against Coast. These Plaintiffs are Plaintiff Andrew Fogel (FAC ¶ 20), Plaintiff Juan Hernandez (*id.* ¶ 23), Plaintiff Adam Khan (*id.* ¶ 26), Plaintiff Faith Little (*id.* ¶ 28), Plaintiff Ivana Page (*id.* ¶ 33), Plaintiff Andrew Pearson (*id.* ¶ 34), and Plaintiff Mathias Thelus (*id.* ¶ 36). The remaining Plaintiffs, each of whom either resided in Texas or participated in the AACA program on a Texas campus ("Texas Plaintiffs"), are Plaintiff Kendall Anderson (FAC ¶ 17), Plaintiff Christopher Chodkowski (*id.* ¶ 18), Plaintiff De'Andre Clark (*id.* ¶ 19), Plaintiff Ludgy Germain (*id.* ¶ 21), Plaintiff Disney-Sean Grannell (*id.* ¶ 22), Plaintiff Jamaal Johnson (*id.* ¶ 24), Plaintiff Krystall Jones (*id.* ¶ 25), Plaintiff Ashley Kumar (*id.* ¶ 27), Plaintiff Honnah Lusby (*id.* ¶ 29), Plaintiff Samira McGowan (*id.* ¶ 30), Plaintiff Ketsia Mianda (*id.* ¶ 31), Plaintiff Thiago Ortega (*id.* ¶ 32), and Plaintiff Triston Sanderson (*id.* ¶ 35).

**2. Reliance under the TDTPA**

"To state a claim under the [TDTPA], plaintiffs must allege that (1) they were consumers of Defendants' goods or services; (2) Defendants violated a specific provision of the [TDTPA], and [(3)] that Defendants['] acts were a 'producing cause' of actual damages." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1121 (N.D. Cal. 2015) (citing

*Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996)).[1] Regarding the third prong, "[t]he [TDTPA] requires a showing of reliance." *In re Clorox Consumer Litig.*, 301 F.R.D. 436, 446 (N.D. Cal. 2014); Tex. Bus. & Com. Code Ann. § 17.50(a)(1)(B).

Section 17.46(a) of the TDTPA makes unlawful false, misleading, or deceptive acts or practices in the conduct of any trade or commerce, and Section 17.46(b) enumerates specific acts that fall within that prohibition. Tex. Bus. & Com. Code Ann. § 17.46(a)–(b). Misleading or deceptive representations to induce purchases are actionable under the TDTPA. *McPeters v. LexisNexis*, 910 F. Supp. 2d 981, 987 (S.D. Tex. 2012), *on reconsideration*, 11 F. Supp. 3d 789 (S.D. Tex. 2014).

Plaintiffs allege that they are consumers because they all enrolled in the AACA program and that Coast's representations about loan coverage, program length, training frequency, mentorship, and program resources are false. Therefore, the remaining issue is whether Plaintiffs relied upon Coast's representations when enrolling in the program. *In re Clorox Consumer Litig.*, 301 F.R.D. at 446; Tex. Bus. & Com. Code Ann. § 17.50(a)(1)(B).

**i. Loan Coverage and Program Length**

The Court finds Texas Plaintiffs have alleged reliance on Coast's statements regarding the 10–12-month length of the AACA program and loan coverage.

Most Texas Plaintiffs allege speaking and emailing with specific Coast representatives prior to enrolling in the AACA program—and relying on Coast's statements when deciding to enroll. For example, Plaintiffs Clark (FAC ¶ 451), Johnson (*id.* ¶ 583), Jones (*id.* ¶ 606), Lusby (*id.* ¶ 713), McGowan (*id.* ¶ 735), and Mianda (*id.* ¶ 763) allege speaking with Veronica Faucher, Director of Sales and Marketing at Coast, prior to each of their respective enrollments. Faucher allegedly represented to each of the aforementioned Plaintiffs other than Lusby that the AACA program would take 12 months to complete and that a single loan would cover training and most living expenses. (*Id.* ¶¶

[1] The TDTPA does not require proof of intent to deceive.

451, 583, 606, 735, 763.) As to Plaintiff Lusby, Faucher is alleged to have addressed only the completion timeline. (*Id.* ¶ 713.) Faucher also emailed the same representations to Plaintiffs Johnson and Mianda. (*Id.* ¶¶ 582, 764.) In addition, Plaintiffs Kumar and Sanderson allege speaking and/or emailing with Coast representatives Emily Van Meter and Brie Woody regarding program length and loan coverage prior to enrollment. (*Id.* ¶¶ 658–660, 662, 867–869.)

Further, though Plaintiffs Anderson, Chodkowski, Germain, Grannell, and Ortega do not describe any conversations with specific Coast representatives regarding program length or loan coverage, they describe receiving "Welcome Email[s]" and "Price Sheet[s]" that make the same representations regarding program length and loan coverage. (FAC ¶¶ 150, 152–155, 406–407, 431, 505, 524, 786.) They also allege viewing Coast's website at around the time of their enrollment—which prominently advertised the 12-month program length. (*Id.* ¶ 124.) Plaintiffs who had conversations with individual Coast representatives are also alleged to have viewed these same materials around the time of enrollment. (*Id.* ¶¶ 451, 582–583, 606, 658–660, 662, 713, 735, 763–764, 867–869.)

Moreover, contrary to Coast's arguments (Coast MTD 21:10–25), the fact that Coast had included qualifying language in some representations (*e.g.*, "approximately" 12 months) does not meaningfully alter their misleading nature. *Cf. Loomis v. Slendertone Distrib., Inc.*, 420 F. Supp. 3d 1046, 1084 (S.D. Cal. 2019) ("Defendant's disclaiming language does not automatically remove potentially deceptive statements outside the protection of [state consumer protection laws].").

Thus, the Court finds Texas Plaintiffs have each sufficiently alleged reliance upon Coast's statements regarding loan coverage and program length prior to enrolling in the AACA program.

**ii. Five-to-Six Days per Week of Training**

The Court finds Texas Plaintiffs have sufficiently alleged reliance upon Coast's statements regarding training day frequency as a basis for enrolling in the AACA program.

Plaintiffs Johnson, Kumar, McGowan, and Sanderson allege that, prior to enrollment, specific Coast representatives told them orally and/or by email that they would be flying five or six days per week during the AACA program. (FAC ¶¶ 582, 658–660, 731, 868–870.) The remaining Texas Plaintiffs—Anderson, Chodkowski, Clark, Germain, Grannell, Jones, Lusby, Mianda, and Ortega—do not allege conversing with any Coast representative on this subject. These Plaintiffs allege, however, that Coast's website stated that "[t]he training [in the AACA] is full-time, 5 to 6 days per week," and that each of thes Plaintiffs reviewed Coast's website at around the time of enrollment. (*Id.* ¶¶ 168, 406, 431, 450, 505, 524, 605, 712, 762, 786.)

Given that Texas Plaintiffs have all either spoken directly with Coast representatives or viewed Coast's website statements regarding training day frequency (five to six days per week), the Court finds Texas Plaintiffs have sufficiently alleged reliance upon Coast's statements regarding training day frequency.

**iii. Mentor Program**

Plaintiffs Germain and Johnson plead that, prior to enrollment, Faucher represented to them that they would receive a mentor from American Airlines. (FAC ¶¶ 506, 583.) All Texas Plaintiffs allege that, prior to enrollment, they reviewed Coast's website, which advertised from at least May 2021 that each program enrollee would receive an "American Airline's Pilot Mentor." (*Id.* ¶¶ 189, 406, 431, 450, 505, 524, 580, 605, 657, 712, 734, 762, 786, 866.) Thus, the Court finds all Texas Plaintiffs have sufficiently alleged reliance upon Coast's statements regarding mentorship prior to enrolling in the AACA program.

**3. Knowledge**

Generally, a TDTPA claim does not require the consumer to prove the defendant acted knowingly or intentionally. *See Miller v. Keyser*, 90 S.W.3d 712, 716 (Tex. 2002) (holding an employee personally liable under the TDTPA for his own misrepresentations without proof he acted knowingly). The TDTPA requires that the consumer show the misrepresentation was false and the false misrepresentation was the producing cause of the

consumer's damages. *Id.* A consumer is not required to prove intent to make a misrepresentation to recover under the TDTPA. *Id.*

In its Motion, Coast argues Texas Plaintiffs fail to allege Coast knew, when it made them, that its alleged representations regarding flight training frequency, mentorship, and AACA program resources (*e.g.*, aircraft fleet) were false, or that its alleged omissions were misleading. (Coast MTD 22:15–24:7.) Since the issue of Coast's knowledge is not relevant to Texas Plaintiffs' TDTPA claim, the Court does not disturb its conclusions above regarding Texas Plaintiffs' reliance on Coast's statements regarding training day frequency and mentorship.

* * *

For the reasons above, the Court **GRANTS** Coast's Motion and **DISMISSES WITHOUT PREJUDICE** the following claims against Coast:

1. Plaintiffs Fogel, Hernandez, Khan, Little, Page, Pearson, and Thelus's TDTPA claims (Count 8)

However, the Court **DENIES** Coast's Motion and declines to dismiss the following claims against Coast:

1. Texas Plaintiffs' TDTPA claims (Count 8), to the extent they are based on Coast's statements regarding loan coverage, program length, and mentorship;
2. Texas Plaintiffs' TDTPA claims (Count 8), to the extent they are based on Coast's statements regarding training day frequency; and
3. Texas Plaintiffs' TDTPA claims (Count 8), to the extent they are based on Coast's statements regarding AACA program resources and Coast's alleged omissions.

### D. Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* (Count 10)

The ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1).

### 1. "Creditor" Definition in the ECOA, 15 U.S.C. § 1691a(e)

Section 1691a(e) of the ECOA includes the following in its definition of "creditor": "[A]ny person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e).

Whether a defendant falls within the definition of "creditor" under the ECOA also depends on the claim the plaintiff is attempting to bring against the defendant. For instance, in determining whether a defendant is subject to ECOA notification requirements, courts are more likely to find a defendant to be a "creditor" where the defendant "set[s] the terms of the loan or participate[s] in credit decisions." *Reyna v. Apple Inc.*, No. 26-CV-03137-RS, 2026 WL 2032304, at *3 (N.D. Cal. July 14, 2026) (holding Apple Inc. is not a "creditor" subject to ECOA notification requirements because the plaintiff "does not allege that Apple set the terms of the loan or participated in credit decisions"); *Salvagne v. Fairfield Ford, Inc.*, 794 F. Supp. 2d 826, 836 (S.D. Ohio 2010) (finding the plaintiff's failure to allege "Ford itself set the terms of the loan" militates against finding Ford is a "creditor"). On the other hand, "for purposes of [ECOA] prohibitions against discrimination," a person can be a creditor even "where the only role a person plays is accepting and referring applications for credit, or selecting creditors to whom applications will be made." *Henry v. Westchester Foreign Autos, Inc.*, 522 F. Supp. 2d 610, 615 (S.D.N.Y. 2007) (quoting 68 Fed. Reg. 13,144, 13,155 (Mar. 18, 2003)).

Here, Plaintiffs allege Coast "arranged for the lenders cadets could choose from, set the schedule and terms for the distribution of loan funds, held the funds in its own accounts, distributed loan funds to cadets, and paid itself from the prepaid accounts for cadets' training costs" (FAC ¶¶ 78, 1044) and "certified the loan with the lender before each Plaintiff was permitted to use the loan" (*id.* ¶ 1042). Coast allegedly handled loan disbursement requests through a "Student Portal" and direct-deposited disbursements for "student paid items" (*e.g.*, housing, food, equipment, supplies, and exam costs). (*Id.* ¶¶ 76, 1043.)

Given that Plaintiffs allege Coast played a role in referring applicants to specific lenders and in disbursing loan funds, the Court finds Plaintiffs have sufficiently alleged Coast engaged in acts that qualify it as a "creditor" for purposes of Plaintiffs' ECOA claim.

**2. Coast's Alleged Discrimination**

The ECOA extends only to "credit transaction[s]." 15 U.S.C. § 1691(a)(1). Thus, the Court first evaluates whether Coast's allegedly discriminatory conduct relates to a "credit transaction." Under the ECOA's implementing regulation, "[c]redit transaction means *every* aspect of an applicant's dealings with a creditor regarding an *application for credit* or an existing extension of credit . . . including, but not limited to, information requirements; investigation procedures; standards of creditworthiness; terms of credit; furnishing of credit information; revocation, alteration, or termination of credit; and collection procedures." 12 C.F.R. § 1002.2(m) (emphasis added).

Moreover, though historically the Ninth Circuit held that evidence of disparate impact on racial minorities related to credit transactions is sufficient for alleging discrimination under the ECOA, the Consumer Financial Protection Bureau recently finalized changes on April 22, 2026, to add a new sentence to 12 C.F.R. pt. 1002 (the federal regulation implementing the ECOA), explicitly stating that the "effects test" (*i.e.*, disparate impact) no longer applies to determining discrimination under the ECOA. *See* 91 Fed. Reg. 21,620 (Apr. 22, 2026). *Compare* 12 C.F.R. § 1002.6(a) ("The Act does not provide that the 'effects test' applies for determining whether there is discrimination in violation of the Act"), *with Miller v. Am. Express Co.*, 688 F.2d 1235, 1240 (9th Cir. 1982) (finding, in reversing summary judgment for defendant on ECOA claim, that legislative history of ECOA "allows but does not limit proof of credit discrimination to the two traditional Title VII tests for employment discrimination," *i.e.*, disparate treatment and disparate impact). Instead, discriminatory practices must be "applied with the intention of advantaging or disadvantaging individuals based on protected characteristics." 12 C.F.R. § 1002.6(a)(2). Evidence of intentional discrimination tends to include direct targeting of non-white people, or offering more favorable loan packages to white people compared to

non-white people. *See Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 2d 862, 876 (N.D. Cal. 2010).

Plaintiffs allege Defendants, including Coast, engage in discriminatory practices prohibited by the ECOA, including "targeting non-white people with . . . misleading advertisements and false claims" and "maintain[ing] racially discriminatory policies and engag[ing] in acts of racial discrimination as a matter of regular procedure." (FAC ¶ 1048.) Coast argues Plaintiffs fail to plausibly allege Coast engaged in any discriminatory conduct, given that the FAC purportedly attributes the AACA program's marketing to AA Defendants. (Coast MTD 25:24–26:22.)

As a threshold matter, the Court finds none of Coast's alleged communications or actions with Plaintiffs regarding AACA program loans references race—including the signed funding disclosure (FAC ¶ 72), loan certification (*id.* ¶ 73), email-and-verbal coordination on "amount, timing, and logistics of loan distribution" (*id.* ¶¶ 74, 1044), handling Student Portal disbursement requests (*id.* ¶¶ 76, 1043), creditor email referrals (*id.* ¶¶ 67, 69), and onboarding emails regarding coverage of loans (*id.* ¶¶ 150–151). While Plaintiffs allege that "Defendants" targeted non-white applicants and that the resulting credit transactions "were predatory and were intentionally discriminatory" (*id.* ¶¶ 1048–1049; *see id.* ¶¶ 239, 262–263, 267), those allegations are pleaded collectively and do not attribute to Coast any allocation of AACA program loans "with the intention of advantaging or disadvantaging individuals based on protected characteristics." 12 C.F.R. § 1002.6(a)(2). For instance, Plaintiffs do not explicitly allege Coast treated white AACA enrollees differently from non-white AACA enrollees when engaging in any of the loan-related actions listed above. *See Davenport*, 725 F. Supp. 2d at 876 (finding the plaintiff failed to allege "direct targeting or evidence of loans made to others [not belonging to the protected class] on more favorable terms," and thus failed to plead intentional discrimination under the ECOA).

Even if Coast's overall marketing of the AACA program could constitute a "credit transaction" under the ECOA, Plaintiffs also do not allege that Coast's communications

regarding the AACA program (*e.g.*, Coast's website or emails) explicitly mentioned race or that they were otherwise intentionally based on race (*see* FAC ¶¶ 64–65, 72–76, 149–155, 166–172, 189). *See Davenport*, 725 F. Supp. 2d at 876.

For the reasons above, the Court **GRANTS** Coast's Motion and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' ECOA claims (Count 10) against Coast. (Coast MTD.)

## IV. CONCLUSION

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** Coast's Motion. (Coast MTD.) More specifically, the Court **GRANTS** Coast's Motion and **DISMISSES WITHOUT PREJUDICE** the following claims against Coast:

1. Plaintiffs Fogel, Hernandez, Khan, Little, Page, Pearson, and Thelus's TDTPA claims (Count 8), on grounds of extraterritoriality; and
2. Plaintiffs' ECOA claims (Count 10), on merits grounds.

However, the Court **DENIES** Coast's Motion and declines to dismiss the following claims against Coast:

1. Plaintiffs' fraud-based and consumer protection claims (Counts 1–7), on grounds of field preemption;
2. Plaintiffs' promissory fraud claims (Count 3), on merits grounds;
3. Plaintiffs Anderson, Chodkowski, Clark, Germain, Grannell, Johnson, Jones, Kumar, Lusby, McGowan, Mianda, Ortega, and Sanderson's TDTPA claims (Count 8), on merits grounds to the extent these Plaintiffs' Count 8 claims are based on Coast's statements regarding loan coverage, program length, training day frequency, and mentorship;
4. Plaintiffs' Unruh claims (Count 9), on grounds of field preemption.;
5. Plaintiffs' federal claims (Counts 10–12), on grounds of field preemption; and
6. Plaintiffs' contract and quasi-contract claims (Counts 13, 15), on grounds of field preemption.

For dismissed claims, Plaintiffs may file an Amended Complaint by **November 5, 2026**. Lastly, for the reasons discussed *supra* § III.A, the Court's denial of Coast's challenge to Plaintiffs' claims based on field preemption is without prejudice, subject to renewal after discovery.

**IT IS SO ORDERED.**

**DATED: October 15, 2026**

**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**